UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
─────────────────────────────────────────────

GREGORY HARVEY,

                                        Plaintiff,

              v.

                                                    9:09-cv-0517
                                                    (LEK/TWD)

J. JABOUT, et al.,

                                        Defendants.

─────────────────────────────────────────────

APPEARANCES:                            OF COUNSEL:

GREGORY HARVEY
07-A-3479
Plaintiff, *pro se*
Sing Sing Correctional Facility
354 Hunter St.
Ossining, NY 10562

LEMERY GREISLER LLC                     PETER M. DAMIN, ESQ.
*Pro Bono* Counsel for Plaintiff
50 Beaver Street
2nd Floor
Albany, NY 12207

HON. ERIC T. SCHNEIDERMAN               HELENA LYNCH, ESQ.
Attorney General of the State of New York    MELISSA A. LATINO, ESQ.
Counsel for Defendants                  Assistant Attorneys General
The Capitol
Albany, NY 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

<u>**ORDER AND REPORT-RECOMMENDATION**</u>

        On June 19, 2014, this prisoner civil rights action was dismissed in its entirety and

judgment was entered in favor of Defendant corrections officers J. Jabout ("Jabout") and K.

Reyell ("Reyell") for *pro se* Plaintiff Gregory Harvey's failure to exhaust administrative

remedies as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a).

(Dkt. Nos. 97 and 98.)  Plaintiff appealed to the United States Court of Appeals for the Second

Circuit on July 7, 2014.  (Dkt. No. 99.)  On appeal, Plaintiff argued, *inter alia*, that a "grievance

representative" told him that he could not file a grievance at Downstate Correctional Facility

("Downstate") regarding the June 21, 2007, assault because the incident occurred at Clinton

Correctional Facility ("Clinton").  (*See* Dkt. No. 102 at 3.[1])  By Summary Order dated June 12,

2015, the United States Court of Appeals for the Second Circuit vacated the judgment and

remanded the matter to the District Court.  (*See generally* Dkt. No. 102.)  Thereafter, on June 15,

2015, this matter was reopened by Senior District Court Judge Lawrence E. Kahn, and referred

to the undersigned for further proceedings.  (Dkt. No. 103.)

　　　For the reasons set forth below, the Court recommends dismissing the action for failure to

exhaust administrative remedies.

## I.    PROCEDURAL HISTORY

　　　Plaintiff is an inmate in the custody of the New York State Department of Corrections

and Community Supervision ("DOCCS"), and is currently housed at Sing Sing Correctional

Facility ("Sing Sing").  (*See* Text Entry 6/15/2015; Dkt. Not. 112 at 10-12;

http://nysdoccslookup.doccs.ny.gov (information obtained for DIN# 07-A-3479) (last visited

June 16, 2017).)

　　　On May 4, 2009, Plaintiff commenced this action pursuant to 42 U.S.C. § 1983 alleging

violations of his constitutional rights while incarcerated at Clinton.  (Dkt. No. 1.)  Plaintiff filed

an amended complaint, the operative pleading, on December 22, 2011.  (Dkt. No. 50.)

---

[1]  Page references to documents identified by docket number are to the page number assigned by
the Court's CM/ECF electronic docketing system.

Specifically, Plaintiff alleges Jabout and Reyell subjected him to excessive force on June 21, 2007, while he was housed at Clinton.  *Id*. at 3.  Five days after the incident, Plaintiff was transferred from Clinton to Downstate.  (Dkt. No. 60-3 at 28, 29.)  Approximately one month later, on July 18, 2007, Plaintiff was transferred from Downstate to Sing Sing.  *Id*. at 29.

On June 28, 2012, Defendants moved for summary judgment pursuant to Federal Rules of Civil Procedure 56 for failure to exhaust administrative remedies and on the merits.  (Dkt. No. 60.)  On January 30, 2012, the Court recommended that Defendants' motion be granted in part and denied in part.  (Dkt. No. 67.)  Specifically, the Court found that Plaintiff raised a triable issue of fact as to whether Defendants were estopped from asserting an exhaustion defense.  *Id*. at 5-11.  It was therefore recommended that Defendants' motion for summary judgment on exhaustion grounds be denied.  *Id*. at 11.  Turning to the merits, it was recommended that all claims be dismissed except Plaintiff's Eighth Amendment excessive force claim against Jabout and Reyell stemming from the June 21, 2007, incident.  *Id*. at 20.  On February 25, 2013, the District Court adopted the Report-Recommendation in its entirety.  (Dkt. No. 69.)

Thereafter, Defendants' request for an evidentiary hearing regarding Plaintiff's failure to exhaust his available administrative remedies was granted.  (Dkt. Nos. 71 and 73.)  Plaintiff was assigned *pro bono* counsel.  (Dkt. No. 74.[2])  An evidentiary hearing was held on July 12, 2013, and continued on August 23, 2013, on the limited issue of whether Plaintiff's failure to exhaust may be excused, either because Defendants were estopped from claiming the failure to exhaust

---

[2]  Attorney Peter M. Damin, Esq., of Lemery Greisler, LLC, was appointed as *pro bono* counsel for Plaintiff on April 23, 2013.  (Dkt. No. 74.)  The Court expresses its gratitude to Attorney Damin for his zealous, learned, and industrious representation on behalf of Plaintiff in this action.

defense or, alternatively, because special circumstances justified Plaintiff's failure to exhaust. (*See* Text Minute Entries 7/12/2013 and 8/23/2013.)

Based on the evidence presented at the hearing, the Court found that Plaintiff was not prevented by the actions of prison officials from filing grievances or from pursuing his administrative remedies and that no special circumstances justified Plaintiff's failure to exhaust. Accordingly, on March 18, 2014, it was recommended that the action be dismissed with prejudice because Plaintiff failed to exhaust his administrative remedies as required by the PLRA. (Dkt. No. 95.) On June 19, 2014, the District Court accepted and adopted that recommendation in its entirety and dismissed Plaintiff's amended complaint with prejudice and without addressing the merits. (Dkt. No. 97.) Judgment was entered June 19, 2014. (Dkt. No. 98.)

Plaintiff then filed a notice of appeal offering several reasons for his failure to timely file the grievance. (Dkt. No. 99.) On appeal, the Second Circuit found that Plaintiff could have filed a grievance regarding the alleged June 21, 2007, incident, which occurred at Clinton, upon his arrival at Downstate five days after the attack. (Dkt. No. 102 at 3.) The Court of Appeals noted, however, that Plaintiff also alleged that he was informed by a Downstate "grievance representative" that he could not file a grievance about conduct that occurred at another facility. *See id.*

By Summary Order dated June 12, 2015, the Second Circuit vacated the June 19, 2014, judgment and specifically remanded to the District Court "to determine, in the first instance: (1) whether the unnamed grievance representative was a staff member at Downstate and, if not, (2) whether an inmate member of an inmate grievance resolution committee is a prison official

4

whose alleged affirmative act may bar defendants from relying on an exhaustion defense." *Id*.
(citations omitted).

On reopening and referral by Judge Kahn (Dkt. No. 103), the undersigned held a
telephone conference January 8, 2016. (*See* Dkt. No. 112.) During that telephone conference,
Plaintiff advised that the unnamed grievance representative was an inmate. *Id*. at 6. However,
because Plaintiff could not proffer any additional information regarding the identity of the
inmate grievance representative, the Court granted Defendants' request for limited discovery
regarding the identity of the inmate grievance representative. *Id*. at 7-10.

At the direction of the Court, by letter dated March 3, 2016, Defendants filed a status
report advising that Plaintiff sufficiently answered Defendants' Interrogatories regarding the
identity of the inmate grievance representative. (Dkt. No. 106.) Therefore, the Court determined
that an evidentiary hearing regarding the identity of the inmate grievance representative was not
necessary. A second telephone conference was held March 21, 2016, during which the Court
directed the parties to submit letter briefs addressing the second question remanded by the Court
of Appeals. (Text Minute Entry 3/21/2016.)

## II.    ANALYSIS

### A.    Whether the Unnamed Grievance Representative was a Staff Member

Pursuant to the Second Circuit mandate, the Court must first determine "whether the
unnamed grievance representative was a staff member at Downstate[.]" (Dkt. No. 102 at 3.)

Here, the record unequivocally demonstrates that the unnamed grievance representative
was an inmate. Indeed, during the January 8, 2016, telephone conference, Plaintiff stated:

> Plaintiff: But it was an inmate representative that made the
> statement that we – I cannot file a grievance from their facility to
> another facility. It was an inmate grievance representative.

The Court:  It was?

Plaintiff:  It was.

The Court:  Okay.

(Dkt. No. 112 at 6.)  Further, because Plaintiff advised during the January 8, 2016, telephone conference that he had "no information at all" regarding the identity of the inmate grievance representative, Defendants' request for limited discovery regarding the identity of the inmate grievance representative was granted.  *Id*. at 6-7.

By letter dated March 3, 2016, Defendants advised the Court that Plaintiff had sufficiently answered the interrogatories regarding the identity of the inmate grievance representative.  (Dkt. No. 106.)  Specifically, Plaintiff indicated that the inmate "introduced himself as a grievance representative" during their one conversation that took place in Plaintiff's "housing block recreation room" where "other inmates were around" sometime between June 26, 2007, and June 30, 2007.  *Id*. at 4-5.  Plaintiff described the inmate as a white male, approximately 5'9" to 6' tall and "not fat" and "not skinny."  *Id*. at 5.  However, Plaintiff did not provide any information regarding the inmate's name, DIN, conviction, work detail, or housing assignments.  *See id*. at 4-7.  In light of the above, the Court determined that an evidentiary hearing regarding the identity of the inmate grievance representative was not necessary.

Based on the record, the Court answers the first question in the negative, and finds that the grievance representative was not a staff member at Downstate.

### B.    Whether an Inmate Grievance Representative is a Prison Official

The Court must next consider "whether an inmate member of an inmate grievance resolution committee is a prison official whose alleged affirmative act may bar defendants from

6

relying on an exhaustion defense." (Dkt. No. 102 at 3.) At indicated above, the parties submitted letter briefs addressing this question of law. (Dkt. Nos. 107 and 110.)

Generally, Defendants argue that inmate representatives are not in a position of authority and that prison officials can only be DOCCS employees, and, therefore, inmate grievance representatives are not prison officials whose alleged affirmative act may bar defendants from relying on an exhaustion defense. (Dkt. No. 107.) In response, Plaintiff, through *pro bono* counsel, argues that while inmate representatives are not employees of DOCCS, they have special powers, responsibilities, and privileges possessed by almost no other inmates, and therefore, they are prison officials whose alleged affirmative act may bar defendants from relying on the exhaustion defense. (Dkt. No. 110.)

### 1.    Inmate Grievance Representative's Role in Grievance Process

An inmate representative receives certain limited privileges associated with his position on the inmate grievance resolution committee ("IGRC"). For example, before an inmate representative of the IGRC can be removed from the committee or transferred to another facility, the inmate is entitled to a limited due process hearing. N.Y. Comp. Codes R. & Regs. tit. 7, § 701.4(c)(1). This can take the form of a Tier III disciplinary hearing or an IGRC impeachment hearing. *Id*.

Inmate representatives also aid in investigating grievances. The regulations provide that whenever feasible, an inmate representative should accompany a staff representative to conduct interviews. *Id*. § 701.6(e)(1). If an inmate cannot accompany a staff member to an interview, he shall submit questions to the staff member for which he would like answers and the staff member shall make every effort to obtain those answers. *Id*. § 701.6(e)(2). To assist the inmate

representative in fulfilling these duties, facilities are required to set up a pass system to allow

representatives to move within the facility. *Id*. § 701.6(d)(1).

      Moreover, the regulations and the inmate grievance program ("IGP") Training Manual

list the duties of the IGRC representatives which make it clear that both inmate and staff IGRC

representatives are responsible for the job duties enumerated in the IGP Training Manual. *Id*. §

701.4(e); *see also* Dkt. No. 107-1 at 35. These include, per the IGP Training Manual, among

others: "become familiar with and knowledgeable of the policies, procedures and operations of

the IGP so as to properly advise inmates utilizing the program[;] . . . inform inmates of non-

grievable issues and provide direction on the use of the appropriate appeal mechanisms;"

conduct investigations, attend IGRC hearings; and perform any other IGP related duties. (Dkt.

No. 107-1 at 35.) As per the IGP Training Manual, it is not an inmate representative but an

IGRC clerk that is the "first and principle contact for an inmate wishing to file a grievance." *Id*.

at 36. At a hearing, the role of an inmate representative is to identify the issue(s), obtain the

facts, and hear the petitions from all sides. *Id.* at 39.

      However, there are also numerous restrictions placed on inmate representatives. To be

eligible to serve as a representative, an inmate must have completed high school, obtained a

GED, or have an eighth grade education and be enrolled in one module of school working

towards a GED. N.Y. Comp. Codes R. & Regs. tit. 7, § 701.4(b)(1)(i-ii). It is also the

responsibility of the IGP Supervisor and IGP Director to facilitate elections of inmate

representatives and representatives are elected by their "peers." *Id.* § 701.4(b)(2)(i). Notably,

inmate representatives are limited to six-month terms. *Id*. § 701.4(b)(4). These six-month terms

replace a representative's regular full time job assignment and he returns to his previous job

assignment when the term ends. *Id*.

Although inmate representatives have some investigatory powers as discussed above, those powers can be significantly restricted. For example, an inmate representative shall not take part in resolving a grievance if a grievant (a fellow inmate) objects to the participation of the inmate representative. *Id*. § 701.6(c). If a grievant objects to both inmate representatives and both alternates, then the two staff member representatives will conduct the hearing on their own. *Id*. Thus, most significantly, all of the inmate representatives on a committee can be excluded from resolving grievances if the inmate filing the grievance objects to both representatives and both alternates, and the staff members alone would then decide the grievance. *Id*. This demonstrates that the IGRC does not need inmate members to function. It also shows that inmate representatives do not hold authority over ordinary inmates because it is the ordinary inmate filing a grievance who can choose whether or not he wants inmate representative participation in resolving his matter. Therefore, if all inmates filing grievances objected to all the inmate representatives, then the committee would function with only staff member representatives and that would be completely acceptable under the present regulations.

Inmate representatives' movement connected to investigating grievances can also be restricted for security reasons and the superintendent can restrict or remove individual inmate representative's pass privileges. *Id*. § 701.6(d)(1-3). Thus, the limited investigatory and movement privileges afforded to grievance representatives can be curtailed or revoked under numerous circumstances for various reasons.

Both the regulations and the IGP Training Manual state that the IGRC is not meant to be an adversarial process. *Id*. § 701.1(b); Dkt. No. 107-1 at 34, 39. Instead, the IGRC provides "correctional personnel and inmates the opportunity to jointly participate in the resolution of inmate complaints." (Dkt. No. 107-1 at 34.) The regulations and IGP Training Manual bolster

9

the proposition that inmate representatives are not prison officials but instead a type of peer facilitator of grievances.

Although Plaintiff contends that "given the position and responsibility afforded to inmate grievance representatives," the Court should find them to be prison officials whose acts bar Defendants from relying on the exhaustion defense (Dkt. No. 110 at 3), the regulations refer to inmate representatives and inmates filing grievances as "peers" several times. N.Y. Comp. Codes R. & Regs. tit. 7, §§ 701.1(c), 701.4(b)(2)(i). Inmate representatives can do very little without the assistance or oversight of a staff member. As noted above, inmates are not even able to hold elections for inmate representative without oversight from prison staff; the inmate makeup of the committee changes at regular six month intervals; and serving on the committee is referred to as a "job assignment." *Id*. §§ 701.4(b)(4), 701.4(b)(2)(i).

Even the limited due process protections afforded to inmate representatives demonstrate that they are not the equivalent of staff members or officials. Before being removed from the committee or transferred, an inmate is entitled to a limited due process hearing that can take the form of a Tier III disciplinary hearing or an impeachment hearing. *Id*. § 701.4(c)(1). This procedure is different from the removal of staff representatives, who can only be excluded temporarily from the committee where a grievance is filed against that staff representative of the committee. *Id.* § 701.6(c).

Thus, the regulations governing the DOCCS inmate grievance program and the IGP requirements and procedures explained in the IGP Training Manual weigh in favor of finding that the inmate grievance representative is not a prison official.

2.     Courts Distinguish Prison Officials from Inmate Grievance
       Representatives

Neither the PLRA nor the regulations governing DOCCS inmate grievance program

define "prison official."  Therefore, Defendants urge the Court to consider the ordinary meaning

of the word "official," defined as "a person who has position of authority in a company,

organization or government, or a person who holds an office," or "person invested with the

authority of an office."  (Dkt. No. 107 at 4 (citing Merriam-Webster and Black's Law

Dictionary, respectively).)  Defendants thus deduce that the term "prison official" "means and

includes a person in an official position of authority in a correctional facility."  *Id*.

Defendants contend that the rulings in *Ziemba v. Wezner*, 366 F.3d 161 (2d Cir. 2004)

and *Hemphill v. New York*, 380 F.3d 680 (2d Cir. 2004), *abrogated on other grounds by Ross v.*

*Blake*, __ U.S. ___, 136 S. Ct. 1850 (2016) support this interpretation.  *Id*. at 4.  In *Ziemba*, the

Second Circuit, "[a]s a matter of first impression in this circuit," held "that the affirmative

defense of exhaustion is subject to estoppel."  366 F.3d at 163.  Accordingly, on remand the

"district court [was] directed to consider [plaintiff's] claim that estoppel bars *the State's* assertion

of the exhaustion defense."  *Id*. at 163-64 (emphasis added).  In *Hemphill*, the Second Circuit

found that a court should examine "whether the *defendants' own actions* inhibiting the inmate's

exhaustion of remedies may estop one or more defendants from raising the" exhaustion defense.

380 F.3d at 686 (emphasis added).

Generally, a defendant cannot be estopped from asserting a failure to exhaust affirmative

defense based upon the action or inaction of other individuals.  *Murray v. Palmer*, No. 9:03-CV-

1010 (GTS/GHL), 2010 WL 1235591, at *5 & n.26 (N.D.N.Y. Mar 31, 2010)[3] (collecting

cases); *McCloud v. Tureglio*, No. 07-CV-0650 (NAM/GHL), 2008 WL 1772305, at *12

(N.D.N.Y. Apr. 15, 2008) ("None of those documents allege facts plausibly suggesting that [the

defendant's] own actions inhibited [the plaintiff's] exhaustion of remedies during the time in

question.").  However, some district courts have interpreted *Ziemba* as not requiring that a

defendant be personally responsible for a prisoner's failure to exhaust, "*as long as someone

employed by DOCS is*."  *See Brown v. Koenigsmann*, No. 01 Civ. 10013(LMM), 2005 WL

1925649, at *2 (S.D.N.Y. Aug. 10, 2005) (emphasis added); *Messa v. LeClaire*, No. 03-CV-1385

(TJM/DRH), 2007 WL 2292975, at *4 (N.D.N.Y. Feb 26, 2007) (citing *Brown v. Koenigsmann*

with approval and finding it "reasonable to conclude" that the warden and an individual that was

wearing a blue uniform in the infirmary that allegedly threatened the plaintiff "were employed by

DOCS"), *adopted by* 2007 WL 2288106 (N.D.N.Y. Aug. 6, 2007).

Defendants further argue that common sense also supports the interpretation that an

inmate grievance representative is not a prison official because "an inmate is not a person in a

position of authority over another inmate, but rather a peer."  (Dkt. No. 107 at 4.)  Indeed, one of

the stated purposes of the IGP is to enable inmates "to seek resolution of a complaint through a

facility committee of *elected peers and appointed staff members*."  N.Y. Comp. Codes R. &

Regs. tit. 7, § 701.1(c) (emphasis added).  To that end as noted above, "[a] facility's IGRC must

be a five-member body consisting of two voting inmates, two voting staff members, and a non-

voting chairperson."  *Id*. § 701.4(a).

---

[3]  The Court will provide Plaintiff with copies of unpublished decisions in accordance with the
Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76, 76 (2d Cir. 2009) (per curium).

Many courts in the Second Circuit distinguish between inmate representatives and prison officials in their discussion of the IGRC, which also supports the assertion that inmate representatives are not prison officials. For example, in *Hemphill v. New York*, the Second Circuit explained that the IGRC "is composed of fellow inmates *and* prison officials." *Hemphill*, 380 F.3d at 682 (emphasis supplied); *see also Larry v. Byno*, No. 9:01-cv-1574 (TJM), 2006 WL 1313344, at *3 (N.D.N.Y. May 11, 2006) ("The IGRC . . . is composed of fellow inmates and prison officials[.]"); *Boddie v. Bradley*, No. 9:99-CV-1016 (TJM), 2006 WL 162996, at *2 (N.D.N.Y. Jan. 20, 2006) (same); *Singh v. Goord*, 520 F. Supp. 2d 487, 495 (S.D.N.Y. 2007) (same); *McCullough v. Burroughs*, No. 04-CV-3216 (FB), 2005 WL 3164248, at *3 (E.D.N.Y. Nov. 29, 2005) (same); *Pendergrass v. Sanney*, No. 01 CV 243A, 2004 WL 1946458, at *1 (W.D.N.Y. Aug. 18, 2004) (same).

Additionally, in other discussions of inmate representatives, courts use language distinguishing inmate representatives from prison officials. For example, in *Kotler v. Donelli*, the plaintiff was an "elected inmate representative on the grievance committee at the Bare Hill Correctional Facility [and] [p]rison officials considered [the inmate's] behavior on the committee to be overly adversarial." 528 F. App'x 10, 12 (2d Cir. 2013). There, the inmate-plaintiff alleged that "prison officials had planted the weapon to retaliate against him for his conduct on the grievance committee." *Id*. The issue before the Court of Appeals was "whether the disciplinary determination that the weapon belonged to [inmate-plaintiff] collaterally estop[ped] him from proving that prison officials actually planted the weapon." *Id*. On appeal, the Court held there was "a genuine dispute as to whether prison officials planted the weapon found in [inmate-plaintiff's] cell. *Id*. at 14.

13

In *Gill v. Riddick*, the court found that the inmate-plaintiff "has a protected First Amendment right to 'engage in his duties as an IGRC representative without fear of reprisal or retaliation.'" No. 9:03-CV-1456 (NAM/RFT), 2005 WL 755745, at *9 (N.D.N.Y. Mar. 21, 2005) (quoting *Alnutt v. Cleary*, 913 F. Supp. 160, 169 (W.D.N.Y. 1996.)) However, this right derives not from any official status the inmate may hold, but "is derived from the inmates' protected rights to petition for redress." *Id.* (citations omitted).

Similarly, courts distinguish between inmates serving on Inmate Liaison Committees ("ILC") and prison officials.[4] For example, in *Shaheen v. Filion*, the inmate-plaintiff "alleged that defendants placed him in keeplock and removed him from his position as chairman of the ILC [at Coxsackie Correctional Facility] in retaliation for writing newspaper articles and filing complaints about prison officials." No. 9:04-CV-625 (FJS/DRH), 2006 WL 2792739, at *2 (N.D.N.Y. Sept. 5, 2006). There, the court found that the inmate-plaintiff's "writing of articles critical of prison officials and his complaints to prison officials in his capacity as the chairman of the ILC were clearly assertions of his constitutional rights protected by the First Amendment." *Id.* at 3. The Court also noted "it [wa]s reasonably possible that other inmates would fail to exercise their constitutional right to criticize prison officials for fear they would be subjected to false misbehavior reports and sentenced to keeplock." *Id.* Ultimately, however, the court granted summary judgment to Coxsackie's superintendent, deputy superintendent, lieutenant, and correctional officers, because the inmate-plaintiff failed to show a causal connection between "his criticism of prison officials and the alleged filing of a false misbehavior report

---

[4] The ILC is "a group of inmates elected to communicate grievances to officials." *Dolan v. Connolly*, 794 F.3d 290, 294-95 (2d Cir. 2015) (internal quotation marks and citation omitted).

14

because he only offer[ed] conclusory evidence to support his claim that defendants were aware of his criticism of the prison." *Id.*

In *Adames v. N.Y. Dep't of Corrs.*, the plaintiff served as a member of the ILC during his pre-trial detention at the George R. Vierno Center on Riker's Island. No. 07 Civ. 4021 (GBD), 2008 WL 2743835, at *1 (S.D.N.Y. July 14, 2008). There, the plaintiff contended that "in his capacity as an inmate representative, [he] frequently met with the facility's warden and other lesser officials, and during such meetings made several complaints on behalf of himself and the inmate population regarding the conditions there." *Id.*

In light of the above, courts in the Second Circuit routinely distinguish between inmate representatives and prison officials. Plaintiff acknowledged this distinction as well. When questioned whether anyone witnessed the conversations between himself and the grievance representative, Plaintiff answered that "other inmates were around." (*See* Dkt. No. 107-1 at 5.) Notably, Plaintiff's single conversation with the inmate grievance representative occurred in the recreation yard, as opposed to the IGP Clerk's office. *Id.* Plaintiff admitted that he only spoke to the inmate representative once and was not otherwise familiar with the inmate or his involvement in the grievance program. *Id.* Plaintiff admitted that he never informed any other inmate grievance representative of what that inmate told him regarding filing a grievance at Downstate. *Id.* at 6. Plaintiff acknowledged that he did not "review any rule, regulation, or policy relating to the [IGP] to confirm what [that] inmate grievance representative was claiming." *Id.*[5]

---

[5] While housed at Downstate, Plaintiff also had many other people with whom he could have spoken to clarify the grievance representative's statements and from whom he could have sought guidance in filing his grievance. During his testimony at the August 23, 2013, hearing, Lieutenant Charles Olmstead listed several people, other than inmates, to whom Plaintiff could

Furthermore, notwithstanding any informal advice Plaintiff may have received from the inmate grievance representative, Plaintiff was not prevented from filing a grievance. In fact, Plaintiff testified that he filed a grievance from Downstate to Clinton despite the information he allegedly received from the inmate grievance representative. (Dkt. No. 89 at 17.) Although untimely, Plaintiff continued to attempt to exhaust his administrative remedies following his transfer to Sing Sing. *Id*. at 17-18. Thus, Plaintiff did not take the word of the inmate representative as final authority.

Based on all of the above, the Court finds that the weight of the authority supports Defendants' position that the person alleged to have impeded exhaustion must be a person of authority --- either a named defendant or DOCCS employee --- and an inmate member of an IGRC is not a prison official whose alleged affirmative act may bar defendants from relying on an exhaustion defense.

C.    **Special Circumstances**

Finally, to the extent that Plaintiff relies on *Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) and argues in the alternative that "even if the false information provided to the Plaintiff by the inmate grievance [representative] d[oes] not estop the Defendants from raising the defense of exhaustion . . . the acts of the inmate grievance representative demonstrate a special circumstance that justifies [Plaintiff's] failure to comply with the exhaustion requirement[,]" (Dkt. No. 110 at 3), "that avenue has been foreclosed." *Riles v. Buchanan*, 656 F. App'x 577, 581 (2d Cir. 2016).

---

have spoken if he had questions about the grievance procedure at Downstate. (Dkt. No. 88 at 18.) These included housing unit officers, the housing unit supervisor, the chow supervisor, Plaintiff's guidance counselor, and Lieutenant Olmstead himself. *Id.* at 18, 19.

While this matter was pending, and not long after Plaintiff filed his letter brief, the Supreme Court rejected the "special circumstances" exception and held that "[c]ourts may not engraft an unwritten 'special circumstance' onto the PLRA's exhaustion requirement." *Ross*, 136 S. Ct. 1850, 1862 ("mandatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion"); *see also Williams v. Priatno*, 829 F.3d 118, 123 (2d Cir. 2016) (*Hemphill* and *Giano* have been abrogated by *Ross* to the extent those decisions established the "special circumstances" exception from the exhaustion of administrative remedies requirement in the PLRA). As the Second Circuit explained in *Williams*, "*Ross* largely supplants our *Hemphill* inquiry by framing the exception issue entirely within the context of whether administrative remedies were actually available to the aggrieved inmate." *Williams*, 829 F.3d at 123.

The *Ross* Court found the ordinary meaning of the word "available" to be "'capable of use for the accomplishment of a purpose,' and that which 'is accessible or may be obtained.'" *Ross*, 136 S. Ct. at 1858 (quoting *Booth v. Churner*, 532 U.S. 731, 737-38 (2001)). "Accordingly, an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Id.* at 1859 (citation omitted).

In this case, the Court previously determined that the IGP was available to Plaintiff and he failed to exhaust his administrative remedies. (Dkt. Nos. 67 and 69.) The Court also found that Plaintiff was not prevented by the actions of prison officials, including Jabout and Reyell, from filing grievances or from pursuing his administrative remedies, including appealing to the superintendent of the relevant prison and the Central Office Review Committee ("CORC"). (Dkt. Nos. 95 and 97.)

17

If the District Court accepts this Report-Recommendation, and determines that that (1) the unnamed grievance representative was not a staff member at Downstate; and (2) an inmate member of an IGRC is not a prison official whose alleged affirmative act may bar defendants from relying on an exhaustion defense, it is further recommended that the action be dismissed with prejudice based on Plaintiff's failure to exhaust administrative remedies as required by the PLRA.

**WHEREFORE**, it is hereby

**RECOMMENDED** that the District Court answer the two questions remanded by the United States Court of Appeals for the Second Circuit (Dkt. No. 102) in the negative, and find that (1) the unnamed grievance representative was not a staff member at Downstate; and (2) an inmate member of an IGRC is not a prison official whose alleged affirmative act may bar defendants from relying on an exhaustion defense; and it is further

**RECOMMENDED** that the action be dismissed with prejudice based on Plaintiff's failure to exhaust administrative remedies as required by the PLRA; and it is hereby

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[6] Such objections shall be filed with the Clerk of the

---

[6] If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL**

**PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

*Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C.

§ 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).


    Dated: June 16, 2017
           Syracuse, New York

                                        Therese Wiley Dancks
                                        United States Magistrate Judge

KeyCite Yellow Flag - Negative Treatment
Distinguished by Arnett v. Shojaie, C.D.Cal., November 8, 2011

2010 WL 1235591
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

James MURRAY, Plaintiff,
v.
R. PALMER; S. Griffin; M. Terry;
F. Englese; Sergeant Edwards; K.
Bump; and K.H. Smith, Defendants.

No. 9:03-CV-1010 (GTS/GHL).
|
March 31, 2010.

**Attorneys and Law Firms**

James Murray, Malone, NY, pro se.

Bosman Law Office, AJ Bosman, Esq., of Counsel, Rome, NY, for Plaintiff.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Timothy Mulvey, Esq., James Seaman, Esq., Assistant Attorneys General, of Counsel, Albany, NY, for Defendants.

*DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

**\*1** The trial in this prisoner civil rights action, filed *pro se* by James Murray ("Plaintiff") pursuant to 42 U.S.C. § 1983, began with an evidentiary hearing before the undersigned on March 1, 2010, regarding the affirmative defense of seven employees of the New York State Department of Correctional Services-R. Palmer, S. Griffin, M. Terry, F. Englese, Sergeant Edwards, K. Bump, and K.H. Smith ("Defendants")-that Plaintiff failed to exhaust his available administrative remedies, as required by the Prison Litigation Reform Act, before filing this action on August 14, 2003. At the hearing, documentary evidence was admitted, and testimony

was taken of Plaintiff as well as Defendants' witnesses (Darin Williams, Sally Reams, and Jeffery Hale), whom Plaintiff was able to cross-examine through *pro bono* trial counsel. At the conclusion of the hearing, the undersigned indicated that a written decision would follow. This is that written decision. For the reasons stated below, Plaintiff's Second Amended Complaint is dismissed because of his failure to exhaust his available administrative remedies.

**I. RELEVANT LEGAL STANDARD**

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U .S.C. § 1997e. The PLRA was enacted "to reduce the quantity and improve the quality of prisoner suits" by "afford[ing] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter v. Nussle,* 534 U.S. 516, 524-25, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). In this regard, exhaustion serves two major purposes. First, it protects "administrative agency authority" by giving the agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of the agency's procedures." *Woodford v. Ngo,* 548 U.S. 81, 89, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). Second, exhaustion promotes efficiency because (a) "[c]laims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court," and (b) "even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial review." *Woodford,* 548 U .S. at 89. "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532.

In accordance with the PLRA, the New York State Department of Correctional Services ("DOCS") has made available a well-established inmate grievance program. 7 N.Y.C.R.R. § 701.7. Generally, the DOCS Inmate Grievance Program ("IGP") involves the following three-step procedure for the filing of grievances. 7 N.Y.C.R.R.

§§ 701.5, 701.6(g), 701.7.[1] *First,* an inmate must file a complaint with the facility's IGP clerk within a certain number of days of the alleged occurrence.[2] If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's inmate grievance resolution committee ("IGRC") has a certain number of days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within a certain number of days of receipt of the grievance, and issues a written decision within a certain number of days of the conclusion of the hearing. *Second,* a grievant may appeal the IGRC decision to the facility's superintendent within a certain number of days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within a certain number of days of receipt of the grievant's appeal. *Third,* a grievant may appeal to the central office review committee ("CORC") within a certain number of days of receipt of the superintendent's written decision. CORC is to render a written decision within a certain number of days of receipt of the appeal.

[1]   See also *White v. The State of New York,* 00-CV-3434, 2002 U . S. Dist. LEXIS 18791, at *6 (S.D.N.Y. Oct 3, 2002).

[2]   The Court uses the term "a certain number of days" rather than a particular time period because (1) since the three-step process was instituted, the time periods imposed by the process have changed, and (2) the time periods governing any particular grievance depend on the regulations and directives pending during the time in question.

**\*2** Moreover, there is an expedited process for the review of complaints of inmate harassment or other misconduct by corrections officers or prison employees. 7 N.Y.C.R.R. § 701.8. In the event the inmate seeks expedited review, he or she may report the misconduct to the employee's supervisor. The inmate then files a grievance under the normal procedures outlined above, but all grievances alleging employee misconduct are given a grievance number, and sent immediately to the superintendent for review. Under the regulations, the superintendent or his designee shall determine immediately whether the allegations, if true, would state a "bona fide" case of harassment, and if so, shall initiate an investigation of the complaint, either "in-house," by the Inspector General's Office, or by the New York State Police Bureau of Criminal Investigations. An appeal of the adverse decision of the superintendent may be taken to the CORC as in the regular grievance procedure. A similar "special" procedure is provided for claims of discrimination against an inmate. 7 N.Y.C.R.R. § 701.9.

It is important to note that these procedural requirements contain several safeguards. For example, if an inmate could not file such a complaint within the required time period after the alleged occurrence, he or she could apply to the facility's IGP Supervisor for an exception to the time limit based on mitigating circumstances. If that application was denied, the inmate could file a complaint complaining that the application was wrongfully denied.[3] Moreover, any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can-and must-be appealed to the next level, including CORC, to complete the grievance process.[4] There appears to be a conflict in case law regarding whether the IGRC's nonresponse must be appealed to the superintendent where the plaintiff's grievance was never assigned a grievance number.[5] After carefully reviewing this case law, the Court finds that the weight of authority appears to answer this question in the affirmative.[6] The Court notes that, if the plaintiff adequately describes, in his appeal to the superintendent, the substance of his grievance (or if the plaintiff attaches, to his appeal, a copy of his grievance), it would appear that there is something for the superintendent to review.

[3]   *Groves v. Knight,* 05-CV-0183, Decision and Order at 3 (N.D.N.Y. filed Aug. 4, 2009) (Suddaby, J.).

[4]   7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *see, e.g .,* DOCS Directive 4040 dated 8/22/03, ¶ VI.G. ("Absent [a time limit extension granted by the grievant], matters not decided within the time limits may be appealed to the next step.); *Pacheco v. Drown,* 06-CV-0020, 2010 WL 144400, at *19 & n. 21 (N.D.N.Y. Jan.11, 2010) (Suddaby, J.) ("It is important to note that any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process."), *accord, Torres v. Caron,* 08-CV-0416, 2009 WL 5216956, at *5 & n. 28 (N.D.N.Y. Dec.30, 2009) (Mordue, C.J.), *Benitez*

*v. Hamm,* 04-CV-1159, 2009 WL 3486379, at *13 & n. 34 (N.D.N.Y. Oct.21, 2009) (Mordue, C.J.), *Ross v. Wood,* 05-CV-1112, 2009 WL 3199539, at *11 & n. 34 (N.D.N.Y. Sept.30, 2009) (Scullin, J.), *Sheils v. Brannen,* 05-CV-0135, 2008 WL 4371776, at *6 & n. 24 (N.D.N.Y. Sept.18, 2008) (Kahn, J.), *Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *15 & n. 46 (N.D.N.Y. June 20, 2008) (Hurd, J.), *McCloud v. Tureglio,* 07-CV-0650, 2008 WL 17772305, at *10 & n. 25 (N.D.N.Y. Apr. 15, 2008) (Mordue, C.J.), *Shaheen v. McIntyre,* 05-CV-0173, 2007 WL 3274835, at *14 & n. 114 (N.D.N.Y. Nov.5, 2007) (McAvoy, J.); *Nimmons v. Silver,* 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17, 2006) (Hurd, J.); *Gill v. Frawley,* 02-CV-1380, 2006 WL 1742738, at *11 & n. 66 (N.D.N.Y. June 22, 2006) (McAvoy, J.) ("[A]n inmate's mere attempt to file a grievance (which is subsequently lost or destroyed by a prison official) is not, in and of itself, a reasonable effort to exhaust his administrative remedies since the inmate may still appeal the loss or destruction of that grievance."); *Walters v. Carpenter,* 02-CV-0664, 2004 WL 1403301, at *3 (S.D.N.Y. June 22, 2004) ("[M]atters not decided within the prescribed time limits must be appealed to the next level of review."); *Croswell v. McCoy,* 01-CV-0547, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him.").

5    *Compare Johnson v. Tedford,* 04-CV-0632, 616 F.Supp.2d 321, 326 (N.D.N.Y.2007) (Sharpe, J.) ("[W]hen a prisoner asserts a grievance to which there is no response, *and it is not recorded or assigned a grievance number,* administrative remedies may be completely exhausted, as there is nothing on record for the next administrative level to review.") [emphasis in original, and citations omitted] *with Waters v. Schneider,* 01-CV-5217, 2002 WL 727025, at *2 (S.D.N.Y. Apr.23, 2002) (finding that, in order to exhaust his available administrative remedies,

plaintiff had to file an appeal with the superintendent from the IGRC's non-response to his grievance, of which no record existed).

6    *See, e.g., Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *16, 18 (N.D.N.Y. June 20, 2008) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) (finding that, in order to exhaust his available administrative remedies with regard to his grievance of August 30, 2000, plaintiff had to file an appeal with the superintendent from the IGRC's non-response to that grievance, which included a failure to acknowledge the receipt of the grievance and assign it a number); *Midalgo v. Bass,* 03-CV-1128, 2006 WL 2795332, at *7 (N.D.N.Y. Sept.26, 2006) (Mordue, C.J., adopting Report-Recommendation of Treece, M.J.) (observing that plaintiff was "requir[ed]" to seek an appeal to the superintendent, even though he never received a response to his grievance of April 26, 2003, which was never assigned a grievance number); *Collins v. Cunningham,* 06-CV-0420, 2009 WL 2163214, at *3, 6 (W.D.N.Y. July 20, 2009) (rejecting plaintiff's argument that his administrative remedies were not available to him where his grievance of March 20, 2004, was not assigned a grievance number); *Veloz v. New York,* 339 F.Supp.2d 505, 515-16 (S.D.N.Y.2004) (rejecting inmate's argument that the prison's grievance procedure had been rendered unavailable to him by the practice of prison officials' losing or destroying his grievances, because, *inter alia,* "there was no evidence whatsoever that any of [plaintiff's] grievances were filed with a grievance clerk," and he should have "appeal[ed] these claims to the next level once it became clear to him that a response to his initial filing was not forthcoming"); *cf. Hernandez v. Coffey,* 582 F.3d 303, 305, 309, n. 3 (2d Cir.2009) ("Our ruling in no way suggests that we agree with Hernandez's arguments regarding exhaustion or justification for failure to exhaust [which included an argument that the Inmate Grievance Program was not available to him because, when he filed a grievance at the first stage of the Program, he received no response and his grievance was not assigned a grievance number].").

It is also important to note that DOCS has a *separate and distinct* administrative appeal process for inmate misbehavior hearings:

A. For Tier III superintendent hearings, the appeal is to the Commissioner's designee, Donald Selsky, D.O.C.S. Director of Special Housing/Inmate Disciplinary Program, pursuant to 8 N.Y.C.R.R. § 254.8;

B. For Tier II disciplinary hearings, the appeal is to the facility superintendent pursuant to 7 N.Y.C.R.R. § 253.8; and

C. For Tier I violation hearings, the appeal is to the facility superintendent or a designee pursuant to 7 N.Y.C.R.R. § 252.6.

**\*3** "An individual decision or disposition of any current or subsequent program or procedure having a written appeal mechanism which extends review to outside the facility shall be considered nongrievable." 7 N.Y.C.R.R. § 701.3(e)(1). Similarly, "an individual decision or disposition resulting from a disciplinary proceeding ... is not grievable." 7 N.Y.C.R.R. § 701.3(e) (2). However, "[t]he policies, rules, and procedures of any program or procedure, including those above, are grievable." 7 N.Y.C.R.R. § 701.3(e)(3); *see also* N.Y. Dep't Corr. Serv. Directive No. 4040 at III.E.

Generally, if a prisoner has failed to follow each of the required three steps of the above-described grievance procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006) (citing *Porter,* 534 U.S. at 524). However, the Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004), *accord, Ruggiero,* 467 F.3d at 175. First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* [citations omitted]. Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* [citations and internal quotations omitted].

With regard to this third inquiry, the Court notes that, *under certain circumstances,* an inmate may exhaust his administrative remedies by raising his claim during a related *disciplinary proceeding. Giano v. Goord,* 380 F.3d 670, 678-79 (2d Cir.2004); *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004). [7] However, in essence, the circumstances in question include instances in which (1) the inmate reasonably believed that his "only available remedy" was to raise his claim as part of a tier disciplinary hearing, [8] *and* (2) the inmate articulated and pursued his claim in the disciplinary proceeding in a manner that afforded prison officials the time and opportunity to thoroughly investigate that claim. [9] Some district courts have found the first requirement not present where (a) there was nothing objectively confusing about the DOCS regulations governing the grievability of his claim, [10] (b) the inmate was specifically informed that the claim in question was grievable, [11] (c) the inmate separately pursued the proper grievance process by filing a grievance with the IGRC, [12] (d) by initially alleging that he did appeal his claim to CORC (albeit without proof), the inmate has indicated that, during the time in question, he understood the correct procedure for exhaustion, [13] and/or (e) before and after the incident in question, the inmate pursued similar claims through filing a grievance with the IGRC. [14] Other district courts have found the second requirement not present where (a) the inmate's mention of his claim during the disciplinary hearing was so insubstantial that prison officials did not subsequently investigate that claim, [15] and/or (b) the inmate did not appeal his disciplinary hearing conviction. [16]

[7]   The Court recognizes that the Supreme Court's decision in *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), may have changed the law regarding possible exceptions to the exhaustion requirement (and thus the possibility that exhaustion might occur through the disciplinary process). Specifically, in *Woodford,* the Supreme Court held that the PLRA required "proper" exhaustion as a prerequisite to filing a section 1983 action in federal court. *Woodford,* 548 U.S. at 93. "Proper" exhaustion means that the inmate must complete the administrative review process *in accordance with the applicable procedural rules,* as a prerequisite to bringing suit in federal court. *Id.* at 88-103 (emphasis added). It is unclear whether *Woodford* has overruled

Murray v. Palmer, Not Reported in F.Supp.2d (2010)
Case 9:09-cv-00517-LEK-TWD   Document 113   Filed 06/16/17   Page 24 of 101

2010 WL 1235591

any decisions that recognize "exceptions" to the exhaustion requirement. Out of special solicitude to Plaintiff, the Court will assume that *Woodford* has not overruled the Second Circuit's *Giano-Testman* line of cases.

8    *Giano,* 380 F.3d at 678 ("[W]hile Giano was required to exhaust available administrative remedies before filing suit, his failure to do so was justified by his reasonable belief that DOCS regulations foreclosed such recourse."); *Testman,* 380 F.3d at 696-98 (remanding case so that district court could consider, *inter alia,* whether prisoner was justified in believing that his complaints in the disciplinary appeal procedurally exhausted his administrative remedies because the prison's remedial system was confusing).

9    *Testman,* 380 F.3d at 696-98 (remanding case so that district court could consider, *inter alia,* whether prisoner's submissions in the disciplinary appeals process exhausted his remedies "in a substantive sense" by "afford[ing] corrections officials time and opportunity to address complaints internally"); *Chavis v. Goord,* 00-CV-1418, 2007 WL 2903950, at *9 (N.D.N.Y. Oct.1, 2007) (Kahn, J.) ("[T]o be considered proper, exhaustion must occur in both a substantive sense, meaning that prison officials are somehow placed on notice of an inmate's complaint, and procedurally, in that it must be presented within the framework of some established procedure that would permit both investigation and, if appropriate, remediation.") [citation omitted]. The Court joins the above-described two requirements in the conjunctive because the Second Circuit has recognized that mere notice to prison officials through informal channels, without more, does not suffice to satisfy the PLRA procedural exhaustion requirement. *See Macias v. Zenk,* No. 04-6131, 495 F.3d 37, at *43-44 (2d Cir.2007) (recognizing that *Woodford v. Ngo,* 548 U.S. 81 [2006], overruled *Braham v. Casey,* 425 F.3d 177 [2d Cir.2005], to the extent that *Braham* held that "informal complaints" would suffice to exhaust a claim).

10   *See, e.g., Reynoso v. Swezey,* 423 F.Supp.2d 73, 75 (W.D.N.Y.2006), *aff'd,* 238 F. App'x 660 (2d Cir.2007) (unpublished order), *cert. denied,* 552 U.S. 1207, 128 S.Ct. 1278, 170 L.Ed.2d 109 (2008); *Holland v. James,* 05-CV-5346, 2009 WL 691946, at *3 (S.D.N.Y. March 6, 2009); *Winston v. Woodward,* 05-CV-3385, 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008); *cf. Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *5 & n. 23 (N.D.N.Y. July 11, 2007)

(McAvoy, J.) (reciting this point of law in context of failure to appeal grievance determination to CORC).

11   *See, e.g., Johnson v. Barney,* 04-CV-10204, 2007 WL 2597666, at *2 (S.D.N.Y. Aug.30, 2007); *Reynoso,* 423 F.Supp.2d at 75-76.

12   *See, e.g., Reynoso,* 423 F.Supp.2d at 75 ("There is no evidence that plaintiff was confused or misled about the proper method for raising his claims. In fact, the record shows exactly the opposite: plaintiff did file a grievance about the incident. He simply failed to appeal the denial of that grievance to CORC."); *Tapp v. Kitchen,* 02-CV-6658, 2004 WL 2403827, at *9 (W.D.N.Y. Oct.26, 2004) ("In the instant case, however, plaintiff does not and cannot claim to have believed that his only available remedy was to raise his complaint as part of his disciplinary hearing, since he also filed a grievance with the Inspector General, and also claims to have filed both an inmate grievance and a separate complaint with the facility superintendent."); *cf. Muniz,* 2007 WL 2027912, at *5 & n. 23 ("Plaintiff's Complaint alleges facts indicating that he believed it necessary to file a grievance with the Gouverneur C.F. IGRC and to appeal the denial of that grievance to the Gouverneur C.F. Superintendent. Why would he not also believe it necessary to take the next step in the exhaustion process and appeal the Superintendent's decision to CORC?").

13   *See, e.g., Petrusch v. Oliloushi,* 03-CV-6369, 2005 WL 2420352, at *5 (W.D.N.Y. Sept.30, 2005) ("[A]s to his grievance, which is the subject of this lawsuit, plaintiff does not appear to be contending that he believed the Superintendent's denial constituted exhaustion, since by initially claiming that he did appeal to CORC, albeit without proof, he has demonstrated his knowledge of the correct procedure for exhaustion.").

14   *See, e.g., Benjamin v. Comm'r N.Y. State DOCS,* 02-CV-1703, 2007 WL 2319126, at *14 (S.D.N.Y. Aug.10, 2007) ("Benjamin cannot claim that he believed that appealing his disciplinary proceeding was the only available remedy at his disposal in light of the numerous grievances he has filed during his incarceration at Green Haven [both before and after the incident in question]."), *vacated in part on other grounds,* No. 07-3845, 293 F. App'x 69 (2d Cir.2008).

15   *See, e.g., Chavis,* 2007 WL 2903950, at *9 ("The focus of a disciplinary hearing is upon the conduct of the inmate, and not that of prison officials.... While the mention of a constitutional claim during plaintiff's disciplinary hearing could potentially have satisfied

Case 9:09-cv-00517-LEK-TWD    Document 113    Filed 06/16/17    Page 25 of 101
Murray v. Palmer, Not Reported in F.Supp.2d (2010)

2010 WL 1235591

his substantive exhaustion requirement by virtue of his having notified prison officials of the nature of his claims, he did not fulfill his procedural exhaustion requirement [under the circumstances due to his] ... mere utterance of his claims during the course of a disciplinary hearing .... [T]here is nothing in the record to suggest that when the issues of interference with plaintiff's religious free exercise rights or alleged retaliation for having voiced his concerns were in any way investigated by prison officials.") [citations omitted].

16    See, e.g., Colon v. Furlani, 07-CV-6022, 2008 WL 5000511, at *2 (W.D.N.Y. Nov.19, 2008) ("Colon was found guilty of harassment based on a letter that he wrote to defendant Bordinaro, concerning some of the events giving rise to his failure-to-protect claim, but it does not appear that he appealed that disposition.... While under some circumstances an inmate may be able to satisfy the exhaustion requirement by appealing from a disciplinary hearing decision ..., plaintiff did not do so here, and this claim is therefore barred under the PLRA.") [citations omitted]; Cassano v. Powers, 02-CV-6639, 2005 WL 1926013, at *5 (W.D.N.Y. Aug.10, 2005) ("[E]ven assuming plaintiff believed that his proper recourse was to raise [his] complaint at his disciplinary hearing, rather than using the Inmate Grievance Program, he did not exhaust that process. That is, plaintiff has not provided any evidence that he appealed his Tier III hearing conviction. Since plaintiff did not pursue even the disciplinary appeal process, he can not have made submissions in the disciplinary process that were sufficient, in a substantive sense, to exhaust his remedies under § 1997e(a).") [internal quotation marks and citation omitted].

*4 Finally, two points bear mentioning regarding exhaustion. First, given that non-exhaustion is an affirmative defense, the defendant bears the burden of showing that a prisoner has failed to exhaust his available administrative remedies. See, e.g., Sease v. Phillips, 06-CV-3663, 2008 WL 2901966, *4 (S.D.N.Y. July 25, 2008). However, once a defendant has adduced reliable evidence that administrative remedies were available to Plaintiff and that Plaintiff nevertheless failed to exhaust those administrative remedies, Plaintiff must then "counter" Defendants' assertion by showing exhaustion, unavailability, estoppel, or "special circumstances." [17]

17    See Hemphill, 380 F.3d at 686 (describing the three-part inquiry appropriate in cases where a prisoner

plaintiff plausibly seeks to "counter" defendants' contention that the prisoner failed to exhaust his available administrative remedies under the PLRA); Verley v. Wright, 02-CV-1182, 2007 WL 2822199, at *8 (S.D.N.Y. Sept.27, 2007) ("[P]laintiff has failed to demonstrate that the administrative remedies were not, in fact, 'actually available to him.' "); Winston v. Woodward, 05-CV-3385, 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008) (finding that the plaintiff "failed to meet his burden under Hemphill of demonstrating 'special circumstances' "); see also Ramirez v. Martinez, 04-CV-1034, 2009 WL 2496647, at *4 (M.D.Pa. Aug.14, 2009) ("In order to effectively oppose defendants' exhaustion argument, the plaintiff has to make a showing in regard to each of his claims."); Washington v. Proffit, 04-CV-0671, 2005 WL 1176587, at *1 (W.D.Va. May 17, 2005) ("[I]t is plaintiff's duty, at an evidentiary hearing, "to establish by a preponderance of the evidence that he had exhausted his administrative remedies or that any defendant had hindered or prevented him from doing so within the period fixed by the Jail's procedures for filing a grievance.").

Second, the Court recognizes that there is case law from within the Second Circuit supporting the view that the exhaustion issue is one of fact, which should be determined by a jury, rather than the Court. [18] However, there is also case law from within the Second Circuit supporting the view that the exhaustion issue is one of law, which should be determined by the Court, rather than by a jury. [19] After carefully reviewing the case law, the Court finds that the latter case law-which includes cases from the Second Circuit and this District-outweighs the former case law. [20] (The Court notes that the latter case law includes cases from the Second Circuit and this District.) [21] More importantly, the Court finds that the latter cases are better reasoned than are the former cases. In particular, the Court relies on the reasons articulated by the Second Circuit in 1999: "Where administrative remedies are created by statute or regulation affecting the governance of prisons, ... the answer depends on the meaning of the relevant statute or regulation." Snider v. Melindez, 199 F.3d 108, 113-14 (2d Cir.1999). The Court relies also on the several reasons articulated by Judge Richard A. Posner in a recent Seventh Circuit decision: most notably, the fact that the exhaustion-of-administrative-remedies inquiry does not address the merits of, or deadlines governing, the plaintiff's claim but an issue of "judicial traffic control" (i.e., what forum a dispute is to be resolved in), which is never an issue for a jury but always an issue

for a judge. *See Pavey v. Conley,* 544 F.3d 739, 740-42 (7th Cir.2008) (en banc), *cert. denied,* --- U.S. ----, 129 S.Ct. 1620, 173 L.Ed.2d 995 (2009). The Court notes that the First, Third, Fourth, Fifth, Sixth, Eighth, Ninth, Tenth and Eleventh Circuits appear to agree with the ultimate conclusion of the Second and Seventh Circuits that the exhaustion issue is properly decided by a judge, not a jury.[22]

18    *See, e.g., Lunney v. Brureton,* 04-CV-2438, 2007 WL 1544629, at *10 n. 4 (S.D.N.Y. May 29, 2007) ("There is certainly case law that supports the view that exhaustion should be determined by the Court rather than by a jury. As the Supreme Court has recently affirmed, however, exhaustion is an 'affirmative defense,' much like a statute of limitations defense. Where there are disputed factual questions regarding an affirmative defense such as a statute of limitations defense, the Second Circuit has stated that 'issues of fact as to the application of that defense must be submitted to a jury.' Thus, it is not clear that factual disputes regarding the exhaustion defense should ultimately be decided by the Court."); *Finch v. Servello,* 06-CV-1448, 2008 WL 4527758, at *8 n. 5 (N.D.N.Y. Sept.29, 2008) (McAvoy, J.) (citing *Lunney* and noting that "it is not clear that factual disputes regarding the exhaustion defense should ultimately be decided by the Court").

19    *See, e.g., Harrison v. Goord,* 07-CV-1806, 2009 WL 1605770, at *7 n. 7 (S.D.N.Y. June 9, 2009) (recognizing that "[t]here is authority ... for the position that where questions of fact exist as to whether a plaintiff has exhausted administrative remedies, such fact questions are for the Court, rather than a jury, to decide ...."); *Amador v. Superintend. of Dept. of Corr. Servs.,* 03-CV-0650, 2007 WL 4326747, at *5 n. 7 (S.D.N.Y. Dec.4, 2007) ("It is unclear whether factual disputes regarding the exhaustion defense should ultimately be decided by the court or by a jury.... [T]here is ... case law ... supporting the view that exhaustion should be determined by the court and not a jury."), *appeal pending,* No. 08-2079-pr (2d Cir. argued July 15, 2009).

20    *See, e.g., Mastroianni v. Reilly,* 602 F.Supp.2d 425, 438 (E.D.N.Y.2009) (noting that the magistrate judge held an evidentiary hearing "on the issue of exhaustion"); *Sease v. Phillips,* 06-CV-3663, 2008 WL 2901966, *3 n. 2 (S.D.N.Y. July 25, 2008) (finding that "the better approach is for the judge, and not the jury, to decide any contested issues of fact relating

to the defense of failure to exhaust administrative remedies."); *Amador,* 2007 WL 4326747, at *5 n. 7 ("[T]here is ... case law, which in my view is more persuasive and on point, supporting the view that exhaustion should be determined by the court and not a jury. I find it proper that this issue be decided by the court."); *Enigwe v. Zenk,* 03-CV-0854, 2006 WL 2654985, at *4 (E.D.N.Y. Sept.15, 2006) (finding that, at the summary judgment "stage of the proceedings, a genuine question of fact exists with respect to whether [plaintiff] should be excused from exhausting his administrative remedies with regard to claims relating to his confinement at MDC Brooklyn," and therefore "direct[ing] that a hearing be held" before a judge, to resolve this issue); *Dukes v. S.H.U. C.O. John Doe # 1,* 03-CV-4639, 2006 WL 1628487, at *6 (S.D.N.Y. June 12, 2006) (ordering an "evidentiary hearing [before a judge] on the issue of whether prison officials failed to assign grievance numbers to [plaintiff]'s grievances and, if so, whether that rendered further administrative remedies unavailable, estopped the Defendants from asserting non-exhaustion, or justified [plaintiff]'s failure to appeal to the CORC"); *Mingues v. Nelson,* 96-CV-5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb.20, 2004) ("The Court could have *sua sponte* dismiss[ed] this action as the record is unmistakeably clear that an appropriate administrative procedure was available to him, that he was required to exhaust his administrative remedies, and that he failed to do so as required by the PLRA.... In this case, plaintiff has been afforded notice and given an opportunity to respond to the exhaustion issue and his failure remains clear."); *Roland v. Murphy,* 289 F.Supp.2d 321, 323 (E.D.N.Y.2003) "[W]hether the plaintiff has exhausted his administrative remedies is a question for the Court to decide as a matter of law." [internal quotation marks and citation omitted]; *Evans v. Jonathan,* 253 F.Supp.2d 505, 509 (W.D.N.Y.2003) ( "[W]hether the plaintiff has exhausted his administrative remedies is a question for the Court to decide as a matter of law.").

21    *See, e.g., Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999) ("Whether an administrative remedy was available to a prisoner in a particular prison or prison system, and whether such remedy was applicable to the grievance underlying the prisoner's suit, are not questions of fact. They either are, or inevitably contain, questions of law. Where administrative remedies are created by statute or regulation affecting the governance of prisons, the existence of the administrative remedy is purely a question of law.

The answer depends on the meaning of the relevant statute or regulation."), *accord, Mojias v. Johnson,* 351 F.3d 606, 608-11 (2d Cir.2003) (citing relevant language from *Snider v. Melindez,* and later stating that a district court could *sua sponte* dismiss a prisoner's civil rights complaint for failure to exhaust his available administrative remedies if it gave him notice and an opportunity to be heard); *DeBlasio v. Moriarty,* 05-CV-1143, Minute Entry (N.D.N.Y. filed Dec. 9, 2008) (McCurn, J.) (indicating that judge held pre-trial evidentiary hearing on whether plaintiff had exhausted administrative remedies before filing action); *Pierre v. County of Broome,* 05-CV-0332, 2007 WL 625978, at *1 n. 1 (N.D.N.Y. Feb.23, 2007) (McAvoy, J.) (noting that "[t]he court held an evidentiary hearing on October 25, 2006 concerning the issue of whether Plaintiff had exhausted administrative remedies"); *Hill v. Chanalor,* 419 F.Supp.2d 255, 257-59 (N.D.N.Y. March 8, 2006) (Kahn, J.) (*sua sponte* dismissing a prisoner's civil rights complaint, pretrial, for failure to exhaust his available administrative remedies after it gave him notice and an opportunity to be heard); *Raines v. Pickman,* 103 F.Supp.2d 552, 555 (N.D.N.Y.2000) (Mordue, J.) ("[I]n order for the Court to dismiss for failing to exhaust administrative remedies, the Court must be shown that such a remedy exists for an inmate beating in the grievance context. This is an issue of law for the Court to determine.").

22    *See Casanova v. Dubois,* 289 F.3d 142, 147 (1st Cir.2002); *Hill v. Smith,* 186 F. App'x 271, 273-74 (3d Cir.2006); *Mitchell v. Horn,* 318 F.3d 523, 529 (3d Cir.2003); *Anderson v. XYZ Corr. Health Servs., Inc.,* 407 F.3d 674, 682-83 (4th Cir.2005); *Dillon v. Rogers,* No. 08-30419, 2010 WL 378306, at *7 (5th Cir. Feb.4, 2010); *Taylor v. U.S.,* 161 F. App'x 483, 486 (6th Cir.2005); *Larkins v. Wilkinson,* 172 F.3d 48, at *1 (6th Cir.1998); *Husley v. Belken,* 57 F. App'x 281, 281 (8th Cir.2003); *Ponder v. Wackenhut Corr. Corp.,* 23 F. App'x 631, 631-32 (8th Cir.2002); *Wyatt v. Terhune,* 315 F.3d 1108, 1119-20 (9th Cir.2003), *cert. denied,* 540 U.S. 810 (2003); *Freeman v. Watkins,* 479 F.3d 1257, 1260 (10th Cir.2007); *Alloway v. Ward,* 188 F. App'x 663, 666 (6th Cir.2006); *Bryant v. Rich,* 530 F.3d 1368, 1373-76 (11th Cir.), *cert. denied, ---U.S. ----,* 129 S.Ct. 733, 172 L.Ed.2d 734 (2008).

## II. ANALYSIS

As an initial matter, Plaintiff argues that he exhausted his administrative remedies regarding the claims at issue in this action, by filing a grievance regarding those claims,

and then appealing the non-response to that grievance all the way to CORC. Because the Court rejects this argument based on the evidence adduced at the hearing, the Court proceeds to an analysis of the three-step exhaustion inquiry established by the Second Circuit.

### A. Availability of Administrative Remedies

*5 New York prison inmates are subject to an Inmate Grievance Program established by DOCS and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* 96-CV-5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb.20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003), and *Snider v. Melindez,* 199 F.3d 108, 112-13 [2d Cir.1999] ). There are different circumstances under which the grievance procedure is deemed not to have been available to an inmate plaintiff. *Hemphill,* 380 F.3d at 687-88. For example, courts have found unavailability "where plaintiff is unaware of the grievance procedures or did not understand it or where defendants' behavior prevents plaintiff from seeking administrative remedies." *Hargrove v. Riley,* 04-CV-4587, 2007 WL 389003, at *8 (E.D.N.Y. Jan.31, 2007) (internal citations omitted). When testing the availability of administrative remedies in the face of claims that undue influence from prison workers has caused a plaintiff inmate to forego the formal grievance process, courts employ an objective test, examining whether "a similarly situated individual of ordinary firmness [would] have deemed them available." *Hemphill,* 380 F.3d at 688 (quotations and citations omitted); *see Hargrove,* 2007 WL 389003, at *8.

Here, after carefully considering the evidence submitted at the hearing in this action on March 1, 2010, the Court finds that administrative remedies were "available" to Plaintiff during the time in question. The Court makes this finding for the following four reasons.

First, in his sworn Complaint (which has the force and effect of an affidavit), Plaintiff stated, "Yes," in response to the question, "Is there a prisoner grievance procedure at this facility ." (Dkt. No. 1, ¶ 4.a.) [23] Second, both Darin Williams (the corrections officer in charge of the special housing unit during the relevant time period) and Sally Reams (the Inmate grievance program supervisor during the relevant time period) testified credibly, at the exhaustion hearing, that there was a working grievance program at Great Meadow Correctional Facility during

the time in question. (Hearing Tr. at 10, 12, 14-21, 40-54.) Third, Plaintiff testified, at the exhaustion hearing that, during this approximate time period (the August to November of 2000), he filed at least three other grievances Great Meadow Correctional Facility, to which he received responses from the inmate grievance clerk, the Superintendent, and CORC. (*Id.* at 154, 157-58, 169-70; *see also* Hearing Exs. D-4, D-5, P-8, P-13, P-14.) [24] Fourth, the Court finds the relevant portions of Plaintiff's hearing testimony regarding the grievance at issue in this action to be incredible due to various omissions and inconsistencies in that testimony, and his demeanor during the hearing. (*Id.* at 127-34.) [25]

[23]    The Court notes that, in his Complaint, Plaintiff also swore that his "grievance was denied." (Dkt. No. 1, ¶ 4.b.ii.) However, during the exhaustion hearing, Plaintiff testified that he never received a response to his grievance from any member of DOCS.

[24]    In addition, the documentary evidence adduced at the hearing establishes that, in actuality, Plaintiff filed ten other grievances during this time period (and several appeals from the denials of those grievances). The first of these grievances (Grievance Number GM-30651-00), filed on August 25, 2000, regarded Plaintiff's request for medications. (Hearing Exs. D-4, D-5.) The second of these grievances (Grievance Number GM-30691-00), filed on September 1, 2000, regarded Plaintiff's request for copies. (Hearing Ex. D-4.) The third of these grievances (Grievance Number GM-30729-00), filed on September 11, 2000, regarded the use of full restraints against Plaintiff. (*Id.; see also* Hearing Ex. P-14.) The fourth of these grievances, filed on October 19, 2000 (Grievance Number GM-30901-00), regarded Plaintiff's request for the repair of his cell sink. (Hearing Exs. D-4, D-5.) The fifth of these grievances (Grievance Number GM-30901-00), also filed on October 19, 2000, regarded Plaintiff's request for the clean up of his cell. (Hearing Ex. D-4.) The sixth of these grievances (Grievance Number GM-31040-00), filed on November 17, 2000, regarded the review of records. (*Id.*) The seventh of these grievances (Grievance Number GM-31041-00), also filed on November 17, 2000, regarded Plaintiff's request for medical attention. (*Id.;* see also Hearing Ex. P-13) The eighth of these grievances (Grievance Number GM-31048-00), filed on November 20, 2000, regarded the rotation of books. (Hearing Ex. D-14) The ninth of these grievances (Grievance Number

GM-31040-00), filed on November 27, 2000, regarded the review of records (and was consolidated with his earlier grievance on the same subject). (*Id.*) The tenth of these grievances (Grievance Number GM-31070-00), filed on November 27, 2000, regarded Plaintiff's eyeglasses. (*Id.*)

[25]    For example, Plaintiff was unable to identify the corrections officers to whom he handed his grievance and appeals for mailing. (*Id.* at 127-34.) Moreover, Plaintiff did not convincingly explain why the grievance and appeals at issue in this action did not make it through the mailing process, while his numerous other grievances and appeals did make it through the mailing process. (*Id.* at 154-171.) In addition, Plaintiff acknowledged that it was his belief, during this time period, that an inmate was not required to exhaust his administrative remedies in matters involving the use of excessive force; yet, according to Plaintiff, he decided to exhaust his administrative remedies on his excessive force claim anyway. (*Id.* at 148-49.)

**B. Estoppel**

After carefully considering the evidence submitted at the hearing in this action on March 1, 2010, the Court finds that Defendants did not forfeit the affirmative defense of non-exhaustion by failing to raise or preserve it, or by taking actions that inhibited Plaintiff's exhaustion of remedies. For example, Defendants' Answer timely asserted this affirmative defense. (Dkt. No. 35, ¶ 17.) Moreover, Plaintiff failed to offer any credible evidence at the hearing that *Defendant* s in any way interfered with Plaintiff's ability to file grievances during the time in question. (Hearing Tr. at 127-34, 157-58, 169-70.) Generally, a defendant in an action may not be estopped from asserting the affirmative defense of failure to exhaust administrative remedies based on the actions (or inactions) of other individuals. [26]

[26]    *See Ruggiero v. County of Orange,* 467 F.3d 170, 178 (2d Cir.2006) (holding that defendants were not estopped from asserting the affirmative defense of non-exhaustion where the conduct plaintiff alleged kept him from filing a grievance-that he was not given the manual on how to grieve-was not attributable to the defendants and plaintiff "point[ed] to no affirmative act by prison officials that would have prevented him from pursuing administrative remedies"); *Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *19 (N.D.N.Y. June 20, 2008)

(Hurd, J., adopting Report-Recommendation of Lowe, M.J.) ("I have found no evidence sufficient to create a genuine issue of triable fact on the issue of whether Defendants, *through their own actions,* have inhibited Plaintiff exhaustion of remedies so as to estop one or more Defendants from raising Plaintiff's failure to exhaust as a defense.") [emphasis in original]; *Shaheen v. McIntyre,* 05-CV-0173, 2007 WL 3274835, at *16 (N.D.N.Y. Nov.5, 2007) (McAvoy, J. adopting Report-Recommendation of Lowe, M.J.) (finding defendants not estopped from raising Plaintiff's non-exhaustion as a defense based on plaintiff's allegation "that [he] was inhibited (through non-responsiveness) by [ ] unnamed officials at Coxsackie C.F.'s Inmate Grievance Program (or perhaps the Grievance Review Committee), and Coxsackie C.F. Deputy Superintendent of Security Graham" because plaintiff's complaint and "opposition papers ... fail to contain any evidence placing blame on Defendants for the (alleged) failure to address his grievances and complaint letters"); *Smith v. Woods,* 03-CV-0480, 2006 WL 1133247, at *16 (N.D.N.Y. Apr.24, 2006) (Hurd, J. adopting Report-Recommendation of Lowe, M.J.) (finding that defendants are not estopped from relying on the defense of non-exhaustion because "no evidence (or even an argument) exists that any Defendant ... inhibit[ed] Plaintiff's exhaustion of remedies; Plaintiff merely argues that a non-party to this action (the IGRC Supervisor) advised him that his allegedly defective bunk bed was not a grievable matter."); *cf. Warren v. Purcell,* 03-CV-8736, 2004 WL 1970642, at *6 (S.D.N.Y. Sept.3, 2004) (finding that conflicting statements [offered by a non-party]-that the prisoner needed to refile [his grievance] and that the prisoner should await the results of DOCS's investigation-estopped the defendants from relying on the defense on non-exhaustion, or "[a]lternatively, ... provided ... a 'special circumstance' under which the plaintiff's failure to pursue the appellate procedures specified in the IGP was amply justified."); *Brown v. Koenigsmann,* 01-CV-10013, 2005 WL 1925649, at *1-2 (S.D.N.Y. Aug.10, 2005) ("Plaintiff does not assert that Dr. Koeingsmann personally was responsible for [the failure of anyone from the Inmate Grievance Program to address plaintiff's appeal]. [However,] *Ziemba [v. Wezner,* 366 F.3d 161 (2d Cir.2004) ] does not require a showing that Dr. Koenigsmann is personally responsible for plaintiff's failure to complete exhaustion [in order for Dr. Koeningsmann to be estopped from asserting the affirmative defense of failure to exhaust administrative remedies], as long as someone

employed by DOCS is. If that reading of Ziemba is incorrect, however, ... then the circumstances here must be regarded as special, and as justifying the incompleteness of exhaustion, since a decision by CORC is hardly something plaintiff could have accomplished on his own.").

### C. Special Circumstances

**\*6** There are a variety of special circumstances that may excuse a prisoner's failure to exhaust his available administrative remedies, including (but not limited to) the following:

(1) The facility's "failure to provide grievance deposit boxes, denial of forms and writing materials, and a refusal to accept or forward plaintiff's appeals-which effectively rendered the grievance appeal process unavailable to him." *Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (noting that "[s]uch facts support a finding that defendants are estopped from relying on the exhaustion defense, as well as "special circumstances" excusing plaintiff's failure to exhaust");

(2) Other individuals' "threats [to the plaintiff] of physical retaliation and reasonable misinterpretation of the statutory requirements of the appeals process." *Clarke v. Thornton,* 515 F.Supp.2d 435, 439 (S.D.N.Y.2007) (noting also that "[a] correctional facility's failure to make forms or administrative opinions "available" to the prisoner does not relieve the inmate from this burden."); and

(3) When plaintiff tries "to exhaust prison grievance procedures[, and] although each of his efforts, alone, may not have fully complied, together his efforts sufficiently informed prison officials of his grievance and led to a thorough investigation of the grievance." *Hairston v. LaMarche,* 05-CV-6642, 2006 WL 2309592, at *8 (S.D.N.Y. Aug.10, 2006).

After carefully considering the issue, the Court finds that there exists, in this action, no "special circumstances" justifying Plaintiff's failure to comply with the administrative procedural requirements. Construed with the utmost of special leniency, Plaintiff's hearing testimony, and his counsel's cross-examination of Defendants' witnesses, raise the specter of two excuses for not having exhausted his available administrative remedies before he (allegedly) mailed his Complaint in this action on August 14, 2003:(1) that exhaustion was

2010 WL 1235591

not possible because of the administrative procedures that DOCS has implemented regarding inmate grievances; and/or (2) that an unspecified number of unidentified corrections officers (who are not Defendants in this action) somehow interfered with the delivery of his grievance and appeals. For example, Plaintiff testified at the exhaustion hearing that he handed his grievance and appeals to various corrections officers making rounds where he was being housed, and that, if his grievance and/or appeals were never received, it must have been because his letters were not properly delivered. (Hearing Tr. at 126-36.)

With regard to these excuses, the Court finds that, while these excuses could constitute special circumstances justifying an inmate's failure to exhaust his available administrative remedies in certain situations,[27] these excuses are not available to Plaintiff in the current action because, as stated in Part II.A. of this Decision and Order, the credible testimony before the Court indicates that Plaintiff did not hand his grievance and appeals to various corrections officers with regard to the claims in question. *See, supra,* Part II.A. of this Decision and Order.[28]

[27]    *See, e.g., Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (noting that "refusal to accept or forward plaintiff's appeals ... effectively render[s] the grievance appeal process unavailable to him").

[28]    The Court notes that, even if Plaintiff did (as he testified) hand to a corrections officer for mailing a

letter to the Superintendent on September 13, 2000, appealing from the IGRC's failure to decide his grievance of August 22, 2000, within nine working days (i.e., by September 5, 2000), it appears that such an appeal would have been filed two days too late under DOCS Directive 4040, which requires that appeal to be filed within four working days of the IGRC's failure to decide his grievance (i.e., by September 11, 2000). (*See* Hearing Tr. 127-34; Hearing Ex. P-1, at 5-7 [attaching ¶¶ V.A, V.B. of DOCS Directive 4040, dated 6/8/98].)

**\*7**    For all these reasons, the Court finds that Plaintiff's proffered excuse does not constitute a special circumstance justifying his failure to exhaust his available administrative remedies before filing this action.

**ACCORDINGLY,** it is

**ORDERED** that Plaintiff's Second Amended Complaint (Dkt. No. 10) is *DISMISSED* **in its entirety without prejudice** for failure to exhaust his available administrative remedies before filing this action, pursuant to the PLRA; and it is further

**ORDERED** that the Clerk of the Court shall enter judgment for Defendants and close the file in this action.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1235591

End of Document

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 1772305
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Christopher McCLOUD, Plaintiff,

v.

C. TUREGLIO, Correctional Officer,
Greene Correctional Facility, Defendant.

No. 9:07-CV-0650.
|
April 15, 2008.

**Attorneys and Law Firms**

Christopher McCloud, Wallkill, NY, Pro Se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Charles J. Quackenbush, Esq. Assistant
Attorney General, of Counsel, New York, NY, for
Defendant.

*ORDER*

NORMAN A. MORDUE, Chief Judge.

 **\*1** The above matter comes to me following a Report-
Recommendation by Magistrate Judge George H. Lowe,
duly filed on the 17th day of March 2008. Following ten
days from the service thereof, the Clerk has sent me the
file, including any and all objections filed by the parties
herein.

After careful review of all of the papers herein, including
the Magistrate Judge's Report-Recommendation, and no
objections submitted thereto, it is

ORDERED, that:

1. The Report-Recommendation is hereby adopted in its
entirety.

2. The Defendant's motion to dismiss for failure to state a
claim (Dkt. No. 11) [1] is granted.

---

[1]     The Magistrate Judge's Report-Recommendation
        inadvertently refers to Defendant's motion to dismiss

as Dkt. No. 42 on page 35. The correct Dkt.
No. is 11 as referred to throughout the Report-
Recommendation.

3. The Court certifies that any appeal of this order would
not be taken in good faith. *See* 28 U.S.C. § 1915(a)(3).

4. The Clerk of the Court shall serve a copy of this Order
upon all parties and the Magistrate Judge assigned to this
case.

IT IS SO ORDERED.

*REPORT-RECOMMENDATION*

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, filed pursuant to
42 U.S.C. § 1983, has been referred to me for Report and
Recommendation by the Honorable Norman A. Mordue,
Chief United States District Judge, pursuant to 28 U.S.C.
§ 636(b) and Local Rule 72.3(c) of the Local Rules of
Practice for this Court. In his Complaint, Christopher
McCloud ("Plaintiff") alleges that, on May 31, 2007, at
Green Correctional Facility ("Green C.F."), Correctional
Officer C. Turriglio ("Defendant") physically assaulted
and threatened Plaintiff in violation of his constitutional
rights. (Dkt. No. 1, ¶ 6 [Plf.'s Compl.].) Currently before
the Court is Defendant's motion to dismiss Plaintiff's
Complaint for failure to state a claim upon which
relief might be granted, pursuant to Fed.R.Civ.P. 12(b)
(6). (Dkt. No. 11.) For the reasons set forth below, I
recommend that the Court grant Defendants' motion to
dismiss.

**I. BACKGROUND**

**A. Summary of Plaintiff's Complaint**
On June 20, 2007, Plaintiff filed his Complaint in this
action. (Dkt. No. 1 [Plf.'s Compl.].) The factual allegations
giving rise to Plaintiff's (unspecified) constitutional claim
against Defendant Turriglio are as follows:

> On May 31, [20]07 I came to my
> program late[.] [My program] ... is
> Mess [H]all [during the] P.M. and
> late eve[ning shift]. [F]or coming in
> late I was placed in the pot room[.]
> [M]y regular job title is 2 ser[v]er on

the C-side line[.][W]hile I was in the
pot room I was making noise and
Officer Tureglio [sic] came into the
pot room and started banging pots
and curs[ ]ing at me [,] telling me to
shut up[.] [A]fter that he told me to
stop eye balling him or he'll pull my
eyes from my skull[.][A]t 2:30 P.M.
[it] is count time and all inmates
must report to the din[ ]ing are[a] for
count[.] [A]fter count he called me to
his office and took me to the back of
the Mess [H]all out of plain view and
placed me o[n] the wall and started
to slap me [o]n the back of the head[.]
[A]fter his as[sa]ult he placed his
pocket knife to his face and told me
he'll cut hi[m]self and say I did it [in
order to] let the other inmates know
he's not play[ing around].

**\*2** (Dkt. No. 1, ¶ 6 [Plf.'s Compl.].) As a result of this
alleged misconduct, Plaintiff is requesting three forms
of relief: (1) a court order "secur[ing] [Plaintiff's] safety
and mak[ing] sure there will be [ ]no [ ] retaliation from
coworkers or staff"; (2) a court order directing that a
search be performed of Defendant's "file to see if [a]ny
complaints or grievances [have] been filed against him in
the past concerning brutality"; and (3) "$1,000,000 for
mental anguish and distress." (*Id.* at ¶¶ 7, 9.)

It is important to note that, in his form Complaint,
Plaintiff provided some information regarding his efforts
to exhaust his available administrative remedies before
filing this action. Specifically, in response to a question
reading "Is there a prisoner grievance procedure at this
facility?" Plaintiff checked the box reading "Yes." (*Id.*
at ¶ 4[a].) In response to a question reading "If your
answer to 4(a) is YES, did you present the facts relating
to your complaint in this grievance program?" Plaintiff
checked the box reading "No." (*Id.* at ¶ 4[b].) In response
to a question reading "If your answer to 4(b) is NO:
Why did you choose to not present the facts relating
to your complaint in the prison's grievance program?"
Plaintiff stated, "Because I fear retaliation from officers
and the officer [I]'m fil[ ]ing against brag[s] about the
grievance system not working and he claims his uncle is a
superintendent." (*Id.*) Finally, in elaboration on this last
assertion, Plaintiff stated later on in the Complaint that

"[t]he officer [I]'m fil[ ]ing [this action] againsts uncle [sic]
is a Superintendent here at Green Corr." (*Id.* at ¶ 4[c].)

### B. Plaintiff's Abandoned Efforts to File an Amended Complaint and a Supplemental Complaint

On June 22, 2007, Plaintiff filed a letter to the Clerk of
the Court. (Dkt. No. 6.) The stated purpose of the letter
was to serve "as evidence in [Plaintiff's] case." (*Id.*) The
letter requested that his Complaint be amended to reflect
that the correct spelling of Defendant's name was "C.
Turriglio," not "Tureglio." (*Id.*) (The Court subsequently
directed that the docket be so amended.) In addition, the
letter requested that a claim be "add [ed] to [Plaintiff's]
complaint...." (*Id.*) The factual allegation giving rise to
this claim was as follows:

> On June 18, 2007 Officer Turriglio
> made intimidating comments [to]
> me [and] taunt[ed] me[,] saying
> [']McCloud knows I doesn't [sic]
> play[.] Let them know [.'] [By
> 'them' he was] talking about new
> Mess [H]all workers. I assumed he
> was back from vacation time or
> answering a grievance because he
> [was] brag[g]in' about laying on the
> beach when some inmates here at the
> facility filed a grievance against him.

(*Id.*)

On July 5, 2007, I directed the Clerk to strike Plaintiff's
submission from the docket for two reasons: (1) to the
extent that Plaintiff was requesting court permission for
leave to amend his Complaint, such permission was
unnecessary under Fed.R.Civ.P. 15(a) since Defendant
had not yet filed a responsive pleading; and (2) to the
extent that Plaintiff was requesting that his (one-page,
single-spaced) letter serve as his amended pleading, such
an amendment was prohibited by Local Rule 7.1(a), which
required that amended pleadings be complete pleadings
that superseded the original pleadings in all respects. (Dkt.
No. 7.)

**\*3** However, Plaintiff did not subsequently file an
Amended Complaint. Rather, on August 8, 2007, Plaintiff
filed another letter with the Court. (Dkt. No. 12.) The
stated purpose of the letter was to again request "the
court[']s permission to amend [Plaintiff's] complaint."

2008 WL 1772305

(*Id.*) Although Plaintiff used the word "amend," it was clear that what he was intending was a "supplemental" complaint. *See* Fed.R.Civ.P. 15(d). This is because the factual allegations he asserted in the letter arose from incidents occurring *after* the filing of his Complaint on June 20, 2007. (Dkt. No. 12.) In pertinent part, Plaintiff alleged as follows:

> On July 14, [20]07 the very next day [after speaking to a prison psychologist and Iman about the anxiety I was suffering due to my experience with Officer Turriglio] I was approached by [O]fficer Turriglio once I arrived ... [at my] program. Officer Turriglio told me [']I want to talk to you.['] After program assi[ ]g[n]ments ... [were] completed [O]fficer Turriglio pulled me to the side away from other inmate[ ]mess hall workers on the B side in the din[ ]ing area; [O]fficer Turriglio['s] exact words ... [were] 'I spok[e] to the Imam [about] what[']s going on[.] [Y]ou can talk to me man to man. I must admit I was nervous when [O]fficer Turriglio approached me. I started studdering [sic] when I spoke and made up a lie.... After that [O]fficer Turriglio walked away.

(*Id.* at 1.) In addition, Plaintiff attempted to assert a claim against various (unidentified) nonparties. In pertinent part, Plaintiff alleged as follows:

> On July 24, [20]07 I was called to the sergeant[']s office[ ] and forced to write a statement [about what had taken place between Plaintiff and Officer Turriglio] that is false.... When I arrived at the sergeant[']s office[,] three sergeants or lieutenants ... [were] there[.] [O]ne left and the other two stayed[.] [O]ne of them asked what happen[ed] between me and Turriglio. [The] [I]nspector [G]eneral's [O]ffice [had] informed them of what [had] happen[ed]. One of the sergeant[']s or lieutenants told me what to write. I tried to write what really took place between me and [O]fficer Turriglio. I was told '[T]hat [']s not good enough.['] I informed the sergeant or lieutenants that I[had] filed a federal complaint against [O]fficer Turriglio. I was still told what to write[.][W]hen I refused that[']s when

threats ... [were] made and I was called a nigger. I was told [I']m not leaving the sergeant[']s office intell [sic] I give them what th[e]y want [sic].... I repeat [that] my statement was false and forced and I took no oath[;] it was given out of fear for my safety.... I can [']t identify [the two sergeants or lieutenants] by name because th[e]y were not wearing badges or name tags.... I [would] like to add [as defendants in my action] Green Cor. Fac. [,] D.O.C. as a while[,] [and the] New Yo[r]k State employees here at Greene [Correctional Facility] ....

**\*4** (*Id.* at 2.)

On August 13, 2007, I directed the Clerk to strike Plaintiff's submission from the docket for two reasons: (1) to the extent that Plaintiff was requesting court permission for leave to supplement his Complaint, such permission was unnecessary under Fed.R.Civ.P. 15(a) since Defendant had not yet filed a responsive pleading; and (2) to the extent that Plaintiff was requesting that his (two-page, single-spaced) letter serve as his supplemental pleading, such a supplemental pleading was not in conformity with Fed.R.Civ.P. 10(b), Local Rule 10. 1, and Local Rule 7.1(a)(4) in that the document was not double spaced, the text was not broken down into paragraphs, and the paragraphs were not numbered consecutively to the paragraphs contained in the original pleading. (Dkt. No. 14.)

However, Plaintiff did not subsequently file a Supplemental Complaint. Rather, on August 29, 2007, Plaintiff filed another letter with the Court. (Dkt. No. 15.) In the letter, Plaintiff requested "the court[']s permission to make a formal complaint, 'not to amend my complaint.' " (*Id.* at 1.) The claim that Plaintiff wished to assert arose from events occurring on August 21, 2007, at Greene C.F., involving the delayed arrival of a piece of his legal mail. (*Id.* at 1-2.) More specifically, Plaintiff alleged that (1) at approximately 3:30 p.m. in Plaintiff's housing unit, Correctional Officer Forbes handed Plaintiff a piece of legal mail (a time-sensitive court order issued by the U.S. District Court for the Southern District of New York on May 31, 2007) unaccompanied by the addressed envelope in which it had arrived at the prison, and (2) that same

2008 WL 1772305

day, while signing for legal mail (from the New York State Court of Claims) in front of Officer Turriglio at the law library, Plaintiff was led to "fear [that] Officer Turriglio has tampered with my mail ... [because he was] the officer who had access to all inmate['s] legal mail." (*Id.*) As a form of relief, Plaintiff requested that the Court "issue a[n] order to have the Defendant Officer Turriglio removed from the law library intell [sic] this matter is resolved." (*Id.* at 2.)

On September 6, 2007, I directed the Clerk to strike Plaintiff's submission from the docket for the exact two reasons given in my Order of August 13, 2007 (i.e., that Plaintiff need not request permission to file a Supplemental Complaint since he had the right to do so without permission under the circumstances, and that his two-page, single-spaced letter could not serve as his supplemental pleading since the document was not double spaced, the text was not broken down into paragraphs, and the paragraphs were not numbered consecutively to the paragraphs contained in the original pleading), as well as for the additional reason that Plaintiff had failed to indicate that he had served his submission on opposing counsel, as required by Local Rule 5.1(a). (Dkt. No. 16.)

However, again, Plaintiff did not subsequently file a Supplemental Complaint.

### C. Defendant's Motion to Dismiss and Plaintiff's Response

**\*5** On August 2, 2007, Defendant filed a motion to dismiss Plaintiff's Complaint for failure to state a claim upon which relief might be granted, pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt. No. 11.) Defendant's motion is premised on two independent grounds: (1) that Plaintiff's action is barred by the Prison Litigation Reform Act ("PLRA") due to his failure to exhaust his available administrative remedies before filing this action; and (2) that Plaintiff's action is barred by the PLRA since that statute requires that any inmate claiming damages related to mental and emotional distress, as is Plaintiff, must make a prior showing of physical injury, which Plaintiff has not made. (Dkt. No. 11, Part 2, at 4-6 [Def.'s Memo. of Law].)

In response to Defendant's first argument (i.e., regarding Plaintiff's failure to exhaust his available administrative remedies), Plaintiff argues that (1) Defendant's own actions inhibited Plaintiff's exhaustion of administrative remedies so as to estop Defendant from asserting

Plaintiff's failure to exhaust as a defense, and/or (2) under the circumstances, special circumstances existed justifying his failure to exhaust his administrative remedies. (Dkt. No. 18, Plf.'s Memo. of Law, "Point I.") In response to Defendant's second argument (i.e., regarding Plaintiff's failure to make a prior showing of physical injury), Plaintiff essentially argues that the "continuous injuries" inflicted on Plaintiff by Defendant constitute the showing of physical injury required by the PLRA. (Dkt. No. 18, Plf.'s Memo. of Law, "Point II.")

## II. RECENTLY CLARIFIED LEGAL STANDARD FOR MOTIONS TO DISMISS

Under Fed.R.Civ.P. 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Rule 8(a)(2); [1] or (2) a challenge to the legal cognizability of the claim. [2]

---

[1]  *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") [citations omitted]; *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

[2]  *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514 (2002) ( "These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187

(2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") [citation omitted]; *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12 [b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ("Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") [citation omitted]; *Util. Metal Research & Generac Power Sys.,* 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101-02 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01-CV-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b] [6] motion-one aimed at the sufficiency of the pleadings under Rule 8 [a], and the other aimed at the legal sufficiency of the claims).

Rule 8(a)(2) requires that a pleading include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Such a statement must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."[3] The purpose of this rule is to "facilitate a proper decision on the merits."[4] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims."[5]

[3] *Dura Pharm., Inc. v. Broudo,* 125 S.Ct. 1627, 1634 (2005) (holding that the complaint failed to meet this test) (quoting *Conley v. Gibson,* 355 U.S. 41, 47 [1957] ); *see also Swierkiewicz,* 534 U.S. at 512 (quoting *Conley,* 355 U.S. at 47); *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168 (1993) (quoting *Conley,* 355 U.S. at 47).

[4] *See Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48).

[5] *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Tech., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

The Supreme Court has long characterized this pleading requirement under Rule 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement.[6] However, it is well established that even this liberal notice pleading standard "has its limits."[7] As a result, several Supreme Court and Second Circuit decisions exist, holding that a pleading has failed to meet this liberal notice pleading standard.[8]

[6] *See, e.g., Swierkiewicz,* 534 U.S. at 513-514 (characterizing Fed.R.Civ.P. 8[a][2]'s pleading standard as "simplified").

[7] *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed.2003).

[8] *See, e.g., Bell Atl. Corp. v. Twombly,* 127 S.Ct. 1955, 1964-74 (2007) (pleading did not meet Rule 8[a] [2]'s liberal requirement), *accord, Dura Pharm.,* 125 S.Ct. at 1634-35, *Christopher v. Harbury,* 536 U.S. 403, 416-22 (2002), *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234-35 (2d Cir.2004), *Gmurzynska v. Hutton,* 355 F.3d 206, 208-09 (2d Cir.2004). Several unpublished decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after *Swierkiewicz. See, e.g., Salvador v. Adirondack Park Agency of the State of N.Y.,* No. 01-7539, 2002 WL 741835, at *5 (2d Cir. Apr. 26, 2002) (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule 8[a][2] ). Although these decisions are not themselves precedential authority, *see* Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after *Swierkiewicz,* of certain cases from within the Second Circuit interpreting Rule 8(a)(2). *See Khan v. Ashcroft,* 352 F.3d 521, 525 (2d Cir.2003) (relying on summary affirmances because "they clearly acknowledge the

continued precedential effect" of *Domond v. INS,* 244 F.3d 81 [2d Cir.2001], after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr,* 533 U.S. 289 [2001] ).

**\*6** Most notably, in the recent decision of *Bell Atl. Corp. v. Twombly,* the Supreme Court, in reversing an appellate decision holding that a complaint had stated a claim upon which relief could be granted, "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 127 S.Ct. 1955, 1968-69 (2007). [9] Rather than turning on the conceivability of an actionable claim, the Court clarified, the Rule 8 standard turns on the "plausibility" of an actionable claim. *Id.* at 1965-74. More specifically, the Court held that, for a plaintiff's complaint to state a claim, his "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]" assuming, of course, that all the allegations in the complaint are true. *Id.* at 1965 [citations omitted]. What this means, on a practical level, is that there must be "plausible grounds to infer [actionable conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." *Id.; see also Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) ("[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly* ] is ... requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible.*" ) [emphasis in original].

[9] The Court in *Twombly* further explained: "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint.... *Conley,* then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Twombly,* 127 S.Ct. at 1969.

Having said that, it should be emphasized that, "[i]n reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." [10] Moreover, it should be noted

that "[t]his standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*" [11] In other words, while all pleadings are to be construed liberally, *pro se* civil rights pleadings are generally to be construed with an *extra* degree of liberality. Indeed, generally "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." [12] In addition, when addressing a *pro se* complaint, generally a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." [13]

[10] *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted]; *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

[11] *Hernandez,* 18 F.3d at 136 [citation omitted]; *see also Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) [citations omitted]; *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) [citation omitted].

[12] *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) (internal quotation and citation omitted).

[13] *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

However, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." [14] Moreover, an opportunity to amend should be denied where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." [15]

[14] *Stinson v. Sheriff's Dep't of Sullivan County,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980); *accord, Standley v. Dennison,* 05-CV-1033, 2007 WL 2406909, at \*6, n. 27 (N.D.N.Y. Aug. 21, 2007) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Muniz,* 2007 WL 2027912, at \*2 (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *DiProjetto v. Morris Protective Serv.,* 489 F.Supp.2d 305, 307 (W.D.N.Y.2007); *Cosby v. City of White Plains,* 04-CV-5829, 2007 WL

853203, at *3 (S.D.N.Y. Feb. 9, 2007); *Lopez v. Wright,* 05-CV-1568, 2007 WL 388919, at *3, n. 11 (N.D.N.Y. Jan. 31, 2007) (Mordue, C.J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5 (N.D.N.Y. Jan. 23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan. 10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins,* 2007 WL 37404, at *4 (Kahn, J., adopting report-recommendation of Lowe, M.J.).

15    *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) [citation omitted]; *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted].

**\*7** Finally, it should be remembered that Fed.R.Civ.P. 12(b)(6) motions to dismiss are limited to the facts alleged in the complaint and must be converted into a Fed.R.Civ.P. 56 motion for summary judgment if the court considers materials outside the pleadings.[16] However, of course, the court may, without converting the motion to dismiss into a motion for summary judgment, consider any documents provided by the plaintiff in opposition to defendants' motion to dismiss, *to the extent those documents are consistent with the allegations in the complaint.*[17]

16    *See* Fed.R.Civ.P. 12(b) ("If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material pertinent to such a motion by Rule 56.").

17    "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* 96 Civ. 7544, 1997 WL 714879, *1, n. 2 (S.D.N.Y. Nov. 17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way,

"in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) (citations omitted), *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004).

### III. ANALYSIS

As stated above in Part I.C. of this Report-Recommendation, Defendant's motion is premised on two independent grounds: (1) that Plaintiff's action is barred by the Prison Litigation Reform Act ("PLRA") due to his failure to exhaust his available administrative remedies before filing this action; and (2) that Plaintiff's action is barred by the PLRA since that statute requires that any inmate claiming damages related to mental and emotional distress, as is Plaintiff, must make a prior showing of physical injury, which Plaintiff has not made. (Dkt. No. 11, Part 2, at 4-6 [Def.'s Memo. of Law].) Because I conclude that Defendant's lack-of-physical-injury argument for dismissal is somewhat stronger than is his failure-to-exhaust argument, I address the lack-of-physical-injury argument first.

#### A. Requirement of Physical Injury

The Prison Litigation Reform Act of 1995 ("PLRA") provides, in pertinent part, as follows: "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C.1997e(e).

Here, Plaintiff alleges that, on May 31, 2007, Defendant (1) "bang[ed] pots" in the prison's "pot room," (2) "curs[ed]" at Plaintiff, (3) told Plaintiff "to shut up," (4) told Plaintiff to stop "eye balling him" or he would "pull [Plaintiff's] eyes from [his] skull, (5) "placed [Plaintiff] o[n] the wall and started to slap me [o]n the back of the head," and (6) "placed his pocket knife to his [own] face and told [Plaintiff] he'll cut hi[m]self and say I did it [in order to] let the other inmates know he's not play[ing around]." (Dkt. No. 1, ¶ 6 [Plf.'s Compl.].) As a result of this misconduct, Plaintiff alleges that he suffered "mental anguish and distress." (*Id.* at ¶¶ 7, 9.)

These factual allegations do not plausibly suggest that Plaintiff suffered any *physical injury* as a result of Defendant's alleged misconduct. Generally, some slaps on the back of the head do not constitute a cognizable *physical injury* under the PLRA. *See Jackson v. Johnson,* 04-CV-0110, 2005 U.S. Dist. LEXIS 21720, at *18-19, 32 (M.D. Ga. June 17, 2005) (no physical injury under PLRA occurred where corrections officer, *inter alia,* "slapp[ed] [prisoner] in the face immediately [after shouting derogatory remark to him]"). This is especially true where, as here, there is no allegation that the slaps resulted in any observable or diagnosable medical condition requiring treatment by a medical care professional. *See Jarriett v. Wilson,* 162 Fed. App'x 394, 400-01 (6th Cir.2005) (mild swelling of left toe with some pain but no need for medical treatment was not cognizable physical injury under PLRA); *Dixon v. Toole,* 225 Fed. App'x 797, 799 (11th Cir.2007) ("mere bruising from the application of restraints [resulting in welts]" was not cognizable physical injury under PLRA); *Silgar v. Hightower,* 112 F.3d 191, 193-94 (5th Cir.1997) (prisoner's "sore, bruised ear lasting for three days" was not cognizable physical injury under PLRA); *cf. Liner v. Goord,* 196 F.3d 132, 135 (2d Cir.1998) (citing *Silgar v. Hightower* for the point of law that the physical injury under the PLRA must be more than "de minimis"), *accord, Voorhees v. Goord,* 05-CV-1407, 2006 WL 1888638, at *10, n. 2 (S.D.N.Y. Feb. 24, 2006) (same), *Leon v. Johnson,* 96 F.Supp.2d 244, 248 (W.D.N.Y.2000) (same). [18]

[18]   *See also Harris v. Garner,* 190 F.3d 1279, 1287 (11th Cir.1999) (prisoner's claim that corrections officers forced him to "dry shave" during prison "shakedown," causing him to experience bleeding, irritation, and pain, alleged only *de minimis* injury and not the kind of physical injury cognizable under the PLRA) [citation omitted], *opinion reinstated in part on rehearing,* 216 F.3d 970 (11th Cir .2000); *Russell v. Johnson,* 07-CV-0008, 2008 WL 480020, at *2 (M.D.Ga. Feb. 19, 2008) (detainee's claim that, during a traffic stop, his foot was caught in police officer's automotive transmission, which resulted only in pain, was not cognizable physical injury under PLRA).

   **\*8** I note that *repeated punches* by correctional officials (while, of course, deplorable if unprovoked) have been specifically held by district courts in this Circuit to not constitute *physical injury* under the PLRA, where they

resulted in only superficial and temporary irritations or abrasions. *See Espinal v. Goord,* 00-CV-2242, 2001 WL 476070, at *3-4, 12-13 (S.D.N.Y. May 7, 2001) ("red face" suffered by inmate after correctional officer "struck [him] a couple times," "punch[ing][him] in the head and face," did not constitute physical injury cognizable under PLRA); *Warren v. Westchester County Jail,* 106 F.Supp.2d 559, 563, 569 (S.D.N.Y.2000) (minor scratches suffered by jail inmate as a result of two to three punches by guard, including two scratches to inmate's face, and very small cut inside mouth, did not constitute physical injury cognizable under PLRA); *cf. Abreu v. Nicholls,* 04-CV-7778, 2007 WL 2111086, at *5 (S.D.N.Y. July 24, 2007) [collecting cases in which minor blows to inmates' faces and heads were not actionable under the Eighth Amendment]. [19]

[19]   *See also Borroto v. McDonald,* 04-CV-0165, 2006 WL 2789152, at *1 (N.D.Fla. Sept. 26, 2006) (prisoner's claim that he was "repeatedly punched" by correctional officers, alone, did not allege the kind of *physical injury* that is cognizable under PLRA); *cf. Barker v. Lehrer,* 02-CV-0085, 2004 WL 292142, at *4-5 (N.D.Tex. Jan. 30, 2004) (fact that prisoner was "hit ... with a closed fist on the left side of his forehead," resulting in "a lump on his forehead after the assault," did not constitute *physical injury* under PLRA).

Furthermore, even if (out of special solicitude to Plaintiff) I were to consider the factual allegations contained in Plaintiff's three aborted efforts at filing an amended or supplemental pleading, and the factual allegations contained in Plaintiff's papers in opposition to Defendant's motion, I would reach the same conclusion. None of those documents assert any allegations plausibly suggesting that Plaintiff suffered any physical injury as a result of Defendant's alleged misconduct on May 31, 2007. (*See* Dkt. No. 6 [Plf.'s Letter filed 6/22/07]; Dkt. No. 12 [Plf.'s Letter filed 8/8/07]; Dkt. No. 15 [Plf.'s Letter filed 8/29/07]; Dkt. No. 18 [Plf .'s Opposition Papers].)

Plaintiff alleges, in his letter to the Court of June 22, 2007, that, on June 18, 2007, Officer Turriglio made "intimidating comments" to Plaintiff, and "taunt[ed]" him, by saying to other Mess Hall workers, "McCloud knows I doesn't [sic] play." (Dkt. No. 6.) He alleges, in his letter to the Court of August 8, 2007, that, on July 14, 2007, during a conversation with Defendant, Plaintiff became "nervous" and "started studdering [sic] when [he]

2008 WL 1772305

spoke" to Defendant. (Dkt. No. 12, at 1.) He alleges, in his letter to the Court of August 29, 2007, that, on August 21, 2007, he "fear[ed] [that] Officer Turriglio ha[d] tampered with [his] mail ... [because Officer Turriglio was] the officer who had access to all inmate[']s legal mail." (Dkt. No. 15, at 1-2.) None of these three documents contains any allegation that Plaintiff suffered any physical injury at all. Furthermore, none of the three documents sufficiently connects any of the emotional distress described therein to the incident on May 31, 2007; rather, the documents all allege facts plausibly suggesting that the cause of the emotional distress described in the documents was contact between Plaintiff and Defendant occurring more than two weeks after May 31, 2007.

**\*9** The closest Plaintiff comes to alleging facts plausibly suggesting that he suffered a "physical injury" as a result of the incident on May 31, 2007, is when he alleges, in his letter to the Court of August 8, 2007, that, on July 14, 2007, a prison psychologist diagnosed Plaintiff with "anxiety." (Dkt. No. 12, at 1.) However, this allegation of "anxiety" is insufficient for two reasons. First, Plaintiff does not allege that the diagnosis of "anxiety" on July 14, 2007, was caused by the incident on May 31, 2007-as opposed to being caused by the incident on June 18, 2007 (which is not at issue in this action), or some sort of pre-existing emotional disorder. Second, and much more importantly, numerous courts have held-correctly, I believe-that physical manifestations of emotional injuries (e.g., anxiety, depression, stress, nausea, hyperventilation, headaches, insomnia, dizziness, appetite loss, weight loss, etc.) are not "physical injuries" for purposes of the PLRA. [20] This is especially true where, as here, the plaintiff does not allege an extensive list of physical manifestations but only one, i.e., "anxiety."

[20] *See, e.g., Davis v. District of Columbia,* 158 F.3d 1342, 1349 (D.C.Cir.1998) (weight loss, appetite loss, and insomnia caused by emotional distress not "physical injury" for purposes of PLRA); *Cooksey v. Hennessey,* 07-CV-3829, 2007 WL 2790365, at \*1 (N.D.Cal. Sept. 20, 2007) ("Physical symptoms that are not sufficiently distinct from a plaintiff's allegations of emotional distress do not qualify as a prior showing of physical injury [for purposes of the PLRA].") [internal quotation marks]; *Johnson v. Georgia,* 06-CV-0049, 2007 WL 2684985, at \*3 (M.D.Ga. Sept. 7, 2007) (stress and "a mental disorder" not "physical injury" for purposes of PLRA); *Brown v. Porter,* 01-CV-20957, 2006 WL

2092032, at \*2 (N.D.Cal. July 26, 2006) (migraines, dry mouth, and loss of appetite caused by mental health problems not "physical injury" for purposes of PLRA); *Watkins v. Trinity Serv. Group, Inc.,* 05-CV-1142, 2006 WL 3408176, at \*4 (M.D.Fla. Nov. 27, 2007) (diarrhea, vomiting, cramps, nausea, and headaches from eating spoiled food on one day not "physical injury" for purposes of PLRA); *Hill v. Williams,* 03-CV-0192, 2005 WL 5993338, at \*4 (N.D.Fla. Oct. 14, 2005) (thirty-minute episode of hyperventilation, accompanied by shortness of breath, swollen tongue, pounding heart, and headache, not "physical injury" for purposes of PLRA); *Mitchell v. Newryder,* 245 F.Supp.2d 200, 203, 205 (D.Me.2003) ("permanent traumatization" not "physical injury" for purposes of PLRA); *Todd v. Graves,* 217 F.Supp.2d 958, 960 (S.D.Iowa 2002) (stress, hypertension, insomnia, dizziness, and loss of appetite not "physical injury" for purposes of PLRA); *Ashann-Ra v. Virginia,* 112 F.Supp.2d 559, 566 (W.D.Va.2000) (psychosomatic conditions, including sexual dysfunction, caused by emotional distress not "physical injury" for purposes of PLRA); *McGrath v. Johnson,* 67 F.Supp.2d 499, 508 (E.D.Pa.1999) (inflamation of pre-existing skin condition caused by emotional trauma not "physical injury" for purposes of PLRA); *Cain v. Virgina,* 982 F.Supp. 1132, 1135 & n. 3 (E.D.Va.1997) (depression and painful headaches caused by emotional distress not "physical injury" for purposes of PLRA); *Pinkston-Bey v. DeTella,* 96-CV-4823, 1997 WL 158343, at \*3 (N.D.Ill. March 31, 1997) (severe headaches caused by emotional distress not "physical injury" for purposes of PLRA).

Finally, for reasons similar to those articulated above, I find that the affidavit submitted by Plaintiff in opposition to Defendant's motion alleges no facts plausibly suggesting that he suffered a *physical injury* as a result of the incident on May 31, 2007 (or even any physical injury as a result of subsequent incidents). (Dkt. No. 18, Plf.'s Affid., ¶¶ 4, 5[A]-[H].)

For all of these reasons, I recommend that the Court dismiss Plaintiff's Complaint for failing to allege facts plausibly suggesting that he experienced any *physical injury* as a result of Defendant's alleged misconduct.

**B. Exhaustion of Available Administrative Remedies**

In addition, the PLRA requires, in pertinent part, that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983

Case 9:09-cv-00517-LEK-TWD Document 113 Filed 06/16/17 Page 40 of 101
McCloud v. Turegrio, Not Reported in F.Supp.2d (2008)
2008 WL 1772305

... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." [21] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." [22] The Department of Correctional Services ("DOCS") has available a well-established three-step inmate grievance program. [23]

[21]    42 U.S.C. § 1997e.

[22]    *Porter v. Nussle,* 534 U.S. 516, 532 (2002).

[23]    7 N.Y.C.R.R. § 701.7.

Generally, the DOCS Inmate Grievance Program ("IGP") involves the following procedure. [24] *First,* an inmate must file a complaint with the facility's IGP clerk within fourteen (14) calendar days of the alleged occurrence. A representative of the facility's inmate grievance resolution committee ("IGRC") has seven working days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within seven (7) working days of receipt of the grievance, and issues a written decision within two (2) working days of the conclusion of the hearing. *Second,* a grievant may appeal the IGRC decision to the facility's superintendent within four (4) working days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within ten (10) working days of receipt of the grievant's appeal. *Third,* a grievant may appeal to the central office review committee ("CORC") within four (4) working days of receipt of the superintendent's written decision. CORC is to render a written decision within twenty (20) working days of receipt of the appeal.

[24]    7 N.Y.C.R.R. § 701.7; *see also White v. The State of New York,* 00-CV-3434, 2002 U.S. Dist. LEXIS 18791, at *6 (S.D.N.Y. Oct 3, 2002).

**\*10** It is important to emphasize that any failure by the IGRC or the superintendent to adequately respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process. [25] It is also important to emphasize that DOCS provides for an expedited procedure for the review of grievances alleging employee harassment. [26] While this procedure provides for review of the grievance directly by the facility superintendent, it still requires the

filing of a grievance by the inmate. [27] Furthermore, the superintendent's decision must be appealed to CORC in order for the inmate to complete the grievance process. [28]

[25]    7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *see, e.g .,* *Croswell v. McCoy,* 01-CV-0547, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him."); *Nimmons v. Silver,* 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17, 2006) (Hurd, J.).

[26]    7 N.Y.C.R.R. § 701.2.

[27]    *Id.*

[28]    *Id.*

Generally, if a prisoner has failed to follow each of these steps prior to commencing litigation, he has failed to exhaust his administrative remedies. [29] However, the Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. [30] *First,* "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." [31] *Second,* if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." [32] *Third,* if the remedies were

available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." [33]

[29]  *Rodriguez v. Hahn,* 209 F.Supp.2d 344, 347-48 (S.D.N.Y.2002); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002).

[30]  *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004).

[31]  *Hemphill,* 380 F.3d at 686 (citation omitted).

[32]  *Id.* [citations omitted].

[33]  *Id.* [citations and internal quotations omitted].

Before I proceed to an analysis of the above-referenced three-part inquiry established by the Second Circuit, I should briefly discuss the appropriateness (or inappropriateness) of a failure-to-exhaust argument during a motion to dismiss for failure to state a claim upon which relief might be granted, pursuant to Fed.R.Civ.P. 12(b)(6).

For some years now, it has been the majority rule (followed by the Second Circuit) that a prisoner's fulfillment of his duty to exhaust his available administrative remedies under the Prison Litigation Reform Act ("PLRA") is not a fact that the prisoner had to plead in order to state a claim under 42 U.S.C. § 1983 but a fact that may be challenged by a defendant through an affirmative defense (such as on a motion for summary judgment pursuant to Fed.R.Civ.P. 56, or a motion to dismiss for lack of subject-matter jurisdiction pursuant to Fed.R.Civ.P. 12[b][1] ) established by the PLRA. *See, e.g., Jenkins v. Haubert,* 179 F.3d 19, 28-29 (2d Cir.1999) ("Because, under the PLRA, a prisoner must exhaust administrative remedies before filing a § 1983 suit ..., a defendant in a prisoner § 1983 suit may also assert as an affirmative defense the plaintiff's failure to comply with the PLRA's requirements."); *Snider v. Melindez,* 199 F.3d 108, 114 (2d Cir.1999) ("A court may not dismiss for failure to exhaust administrative remedies unless the court determines that such remedies are available. Snider's answers [on a form complaint] cannot establish that.").

**\*11** Recently, the Supreme Court upheld this interpretation of the exhaustion requirement, prohibiting circuits (such as the Sixth, Tenth and Eleventh Circuits) from using exhaustion as a heightened pleading requirement in prisoner civil rights case. *See Jones v. Block,* 127 S.Ct. 910, 914-915, 918-923 (2007). A prisoner has no independent *duty* to plead facts plausibly suggesting that he exhausted his available administrative remedies, in order to state an actionable claim under 42 U.S.C. § 1983. *Block,* 127 S.Ct. at 919-21. "[T]his is not to say that failure to exhaust cannot be a basis for dismissal for failure to state a claim." *Id.* at 921. If a prisoner *chooses* to plead facts regarding exhaustion, and those facts plausibly suggest that he failed to exhaust his available administrative remedies, then his Complaint may be dismissed for failure to state a claim. *Id.* at 920-21. Simply stated, if a prisoner says nothing or little about exhaustion in his *pro se* civil rights complaint, he is likely protected from a Fed.R.Civ.P. 12(b)(6) motion to dismiss premised on failure to exhaust. However, if he says too much about exhaustion in that complaint so that his non-exhaustion is readily apparent, he may "plead himself out of court," as the saying goes. This is what has happened here, according to Defendants.

### 1. Availability of Administrative Remedies

With regard to the first inquiry (i.e., whether the administrative remedies not pursued by Plaintiff were in fact available to Plaintiff), I answer this question in the affirmative, based on even the most liberal of constructions of Plaintiff's Complaint. More specifically, I find that Plaintiff has not alleged any facts plausibly suggesting that administrative remedies were not available to prisoners at Greene C.F. during the time in question (i .e., between the occurrence of the event in question, on May 31, 2007, and the expiration of the deadline by which to file a grievance 14 days later, on or about June 14, 2007). Indeed, Plaintiff quite expressly alleges that there was a prisoner grievance procedure at Greene C.F. (Dkt. No. 1, ¶ 4[a] [Plf.'s Compl.].)

Furthermore, even if (out of special solicitude to Plaintiff) I were to consider the factual allegations contained in Plaintiff's three aborted efforts at filing an amended or supplemental pleading, and the factual allegations contained in Plaintiff's papers in opposition to Defendant's motion, I would reach the same conclusion. None of those documents assert any allegations plausibly suggesting that administrative remedies were not available

to prisoners (and Plaintiff in particular) at Greene C.F. during the time in question. (*See* Dkt. No. 6 [Plf.'s Letter filed 6/22/07]; Dkt. No. 12 [Plf .'s Letter filed 8/8/07]; Dkt. No. 15 [Plf.'s Letter filed 8/29/07]; Dkt. No. 18 [Plf.'s Opposition Papers].)

**2. Estoppel**

With regard to the second inquiry (i.e., whether Defendant's own actions inhibited Plaintiff's exhaustion of remedies so as to estop Defendant from raising Plaintiff's failure to exhaust as a defense), I answer this question in the negative, based on even the most liberal of constructions of Plaintiff's Complaint. In his Complaint, Plaintiff alleges no facts plausibly suggesting that Defendant took any actions whatsoever that inhibited Plaintiff from exhausting his available administrative remedies at Greene C.F. during the time in question (i.e., between the occurrence of the event in question, on May 31, 2007, and the expiration of the deadline by which to file a grievance 14 days later, on or about June 14, 2007). Rather, Plaintiff alleges that he chose to not present the facts relating to his Complaint in the prison's grievance program "[b]ecause I fear retaliation from officers and the officer [I]'m fil [ ]ing against brag[s] about the grievance system not working and he claims his uncle is a superintendent [at Greene C.F.]." (*Id.*) Plaintiff's feeling of fear of "retaliation from [unidentified] officers" is completely unexplained and wholly conclusory. Furthermore, Defendant's action of "brag[ing] about the grievance system not working" and claiming that his uncle was a superintendent at Greene C.F. in no way constitutes an *action* by Defendant that inhibited Plaintiff from filing a grievance at Greene C.F. about the events giving rise to his claims in this action. At best, these statements by Defendant constituted an indication that Plaintiff might be *unsuccessful* in the grievance process before any appeal reached to the final level of review, by DOCS' Central Office Review Committee ("CORC"). Notifying an inmate of the *prospect* of *initial* failure (due to alleged antipathy for inmates or even sympathy for correctional officers, held by various other officials, participating in the grievance process) is hardly the sort of adverse *action* that is required to estop a correctional officer from asserting the legal defense of non-exhaustion.

**\*12** Nor do the other factual allegations of Plaintiff's Complaint plausibly suggest that Defendant took any actions that inhibited Plaintiff from exhausting his

available administrative remedies at Greene C.F. so as to estop Defendant from raising Plaintiff's failure to exhaust as a defense. Plaintiff alleges, on May 31, 2007, Defendant (1) told Plaintiff to "stop eye balling him" or he would "pull [Plaintiff's] eyes from [his] skull," (2) "slap[ped] [Plaintiff] on the side of his head," and (3) placed a pocket knife to *his own face* and threatened to cut *his own face* and blame it on Plaintiff in order to let the other inmates know he was not "play[ing]" around. (Dkt. No. 1, ¶ 6 [Plf.'s Compl.].) The problem with these allegations (at least from Plaintiff's perspective) is that they have absolutely nothing to do with the filing of any grievance, or even the making of any verbal complaint, by Plaintiff. Simply stated, while the alleged conduct is (of course) deplorable, it did not (as alleged) have either the design or effect of preventing Plaintiff from exhausting his administrative remedies.

Morever, even if (out of special solicitude to Plaintiff) I were to consider the factual allegations contained in Plaintiff's three aborted efforts at filing an amended or supplemental pleading, and the factual allegations contained in Plaintiff's papers in opposition to Defendant's motion, I would reach the same conclusion. None of those documents allege facts plausibly suggesting that Defendant's own actions inhibited Plaintiff's exhaustion of remedies during the time in question. (*See* Dkt. No. 6 [Plf.'s Letter filed 6/22/07]; Dkt. No. 12 [Plf.'s Letter filed 8/8/07]; Dkt. No. 15 [Plf.'s Letter filed 8/29/07]; Dkt. No. 18 [Plf.'s Opposition Papers].)

In particular, Plaintiff's letter to the Court of June 22, 2007, alleges that, on June 18, 2007, Defendant "intimidat[ed]" and "taunt[ed]" Plaintiff by saying to other inmates, "McCloud knows I [don't] play" around. (Dkt. No. 6.) This allegation fails for the same reason as the allegation about Defendant's earlier comments to Plaintiff fails: it had absolutely nothing to do with the filing of any grievance, or the making of any complaint, by Plaintiff. Moreover, Defendant's utterance of these words occurred on June 22, 2007, more than a *week* after Plaintiff had decided not to exhaust his available administrative remedies. (The deadline by which Plaintiff had to file a grievance regarding the incident on May 31, 2007, expired on or about June 14, 2007.) [34] Thus, it could not have possibly inhibited Plaintiff from exhausting his available administrative remedies.

Case 9:09-cv-00517-LEK-TWD   Document 113   Filed 06/16/17   Page 43 of 101
McCloud v. Tureglio, Not Reported in F.Supp.2d (2008)
2008 WL 1772305

34      As described above, an inmate must file a complaint
        with the facility's IGP clerk within 14 calendar days
        of the alleged occurrence.

Plaintiff's letter to the Court of August 8, 2007, alleges
that, on July 14, 2007, Defendant said to Plaintiff, "I
spok[e] to the Imam [about] what['s] going on[.] [Y]ou
can talk to me man to man." (Dkt. No. 12.) An attempt
to informally resolve a dispute (which is encouraged
in DOCS' grievance process) is not an act inhibiting
an inmate from exhausting his available administrative
remedies. Plaintiff's letter of August 8, 2007, further
alleges that on July 24, 2007, persons *other than Defendant*
coerced Plaintiff into making a false statement about what
had taken place between Plaintiff and Defendant. (*Id.*)
Plaintiff alleges no action by *Defendant* on July 24, 2007.
Nor does Plaintiff explain how the false statement on *July*
14, 2007-whatever that false statement may have been-
in any way caused his decision by *June* 14, 2007, not to
exhaust his available administrative remedies.

 *13  Plaintiff's letter to the Court of August 29, 2007,
alleges that Plaintiff obtained reason to "fear" that
Defendant was responsible for the delayed arrival of
a piece of his legal mail on August 21, 2007. (Dkt.
No. 15.) However, the sole reason for this fear was the
(alleged) fact that Defendant "had access to all inmate['s]
legal mail." (Dkt. No. 15.) Moreover, this fear occurred
on August 21, 2007, which was more than *two months*
after Plaintiff had decided to not exhaust his available
administrative remedies by June 14, 2007.

In an affidavit submitted in opposition to Defendant's
motion, Plaintiff swears that, before the incident on
May 31, 2007, a fellow inmate, Saheithe Pigford, filed
both a federal court action and a grievance against
Officer Turriglio and was "beaten on several occasions,
threaten[ed] and had his personal area searched during
late evening or at predawn hours." (Dkt. No. 18, Plf.'s
Affid., ¶ 4.) Plaintiff also swears that, on May 31,
2007, "Plaintiff was aware of what had happened to ...
[Inmate] Shakeith Pigford as a result of filing his grievance
[against Officer Turriglio]" since the "Pigford ... incident[]
occurred prior to that of the plaintiffs' [sic]." (*Id.* at ¶ 5[A].)

For the sake of argument, I will assume that Plaintiff is
swearing that Mr. Pigford was beaten *by Officer Turriglio*
(since actions *by third-persons* can hardly estop Officer
Turriglio from asserting Plaintiff's failure to exhaust
as a legal defense). The problem with Plaintiff's sworn

assertion is that it is so patently false as to be implausible
(if not sanctionable). I take judicial notice of the fact
that Inmate Pigford did not file the action to which
Plaintiff is referring (which is the only federal court action
that has been filed by Shakeith Pigford, according to
the Federal Judiciary's PACER service) until nearly *a
month after* the incident giving rise to the current action,
on May 31, 2007. *See Pigford v. Turriglio,* 07-CV-0687,
Complaint (N.D.N.Y. filed June 29, 2007, and dated
June 25, 2007). Furthermore, I take judicial notice of
the fact that the event giving rise to Inmate Pigford's
action against Officer Turriglio did not occur until *three
days after* the event giving rise to the current action,
on May 31, 2007. *See Pigford v. Turriglio,* 07-CV-0687,
Complaint, ¶ 6 (N.D.N.Y.). No mention is made in Inmate
Pigford's Complaint as to when he filed his grievance
and was assaulted. *Id.* at ¶¶ 4(b), 6. However, given
the clear factual inaccuracies of Plaintiff's other sworn
statements regarding Inmate Pigford's experience, I find
that Plaintiff's allegation that Inmate Pigford's experience
dissuaded Plaintiff from filing a grievance in this action
(from May 31, 2007, to June 14, 2007) to be wholly
*implausible.*

Furthermore, because I find that the absence of this
factual allegation (regarding Inmate Pigford's having been
assaulted for filing a grievance against Officer Turriglio)
from Plaintiff's Complaint (which is otherwise quite
specific as to why Plaintiff "fear[ed] retaliation" if he
filed a grievance) to be conspicuous, I find that this late-
blossoming factual allegation to be *inconsistent* with the
factual allegations of Plaintiff's Complaint. Therefore, I
find that this portion of Plaintiff's Opposition Affidavit
may not serve to effectively amend Plaintiff's Complaint.
(*See, supra,* note 17 of this Report-Recommendation
[citing cases].)

 *14  In his affidavit, Plaintiff also swears that, before the
incident on May 31, 2007, a fellow inmate, Mohammed
Montalvo, filed a grievance against Officer Turriglio for
"brandish[ing] a knife" and was "threaten[ed] thereafter
with bodily harm until he agreed to sign-off [sic] on the
grievance...." (Dkt. No. 18, Plf.'s Affid., ¶ 4.) For the
sake of brevity, I will set aside the fact that Plaintiff
does not assert precisely *when* Inmate Montalvo was so
threatened. I will also set aside incredulity with which I
view this late-blossoming, self-serving sworn statement,
given Plaintiff's other misrepresentations to the Court-
discussed above, and below. (*See, infra,* Part III.C. of

this Report-Recommendation.) The more important fact is that Plaintiff does not allege that it was *Officer Turriglio* who threatened Inmate Montalvo with bodily harm. Again, actions *by third-persons* cannot estop Officer Turriglio from asserting Plaintiff's failure to exhaust as a legal defense. Moreover, because of the conspicuous absence of this factual allegation (regarding Inmate Montalvo's having been threatened for filing a grievance against Officer Turriglio) from Plaintiff's Complaint (which is otherwise quite specific as to why Plaintiff "fear[ed] retaliation" if he filed a grievance), I find that this factual allegation to be *inconsistent* with the factual allegations of Plaintiff's Complaint. Therefore, I find that this portion of Plaintiff's Opposition Affidavit may not serve to effectively amend Plaintiff's Complaint. (*See, supra,* note 17 of this Report-Recommendation [citing cases].)

Finally, in his affidavit, Plaintiff swears that he experienced several other adverse actions following the incident in question on May 31, 2007. As an initial matter, the vast majority of this asserted misconduct was committed by correctional officers at Greene C.F. other than Defendant. More importantly, all of this misconduct occurred between July 24, 2007, and October 9, 2007-*well after* the expiration of the June 14, 2007, deadline by which he had to file a grievance regarding the incident giving rise to this action. (*See* Dkt. No. 18, Plf.'s Affid., ¶¶ 5[D]-[H].) Thus, it is impossible for this misconduct to have been the reason that Plaintiff chose not to file a grievance against Defendant between May 31, 2007, and June 14, 2007.

### 3. "Special Circumstances" Justifying Failure to Exhaust

With regard to the third inquiry (i.e., whether Plaintiff has plausibly alleged *special circumstances* justifying his failure to comply with the administrative procedural requirements), I answer this question in the negative, also based on even the most liberal of constructions of Plaintiff's Complaint. Plaintiff has not alleged that, during the time in question, he was laboring under any sort of physical infirmity, or reasonable misunderstanding of the law, which impeded his attempts to complain. Indeed, he has not even alleged, in his Complaint, that he *attempted* to complain, for example, by sending a letter of complaint directly to CORC, the DOCS' Commissioner, or a Deputy Commissioner (which prisoners occasionally do in analogous circumstances).

**\*15** Morever, even if (out of special solicitude to Plaintiff) I were to consider the factual allegations contained in Plaintiff's three aborted efforts at filing an amended or supplemental pleading, and the factual allegations contained in Plaintiff's papers in opposition to Defendant's motion, I would reach the same conclusion. None of those documents allege facts plausibly suggesting the existence of any special circumstances justifying Plaintiff's failure to pursue (and exhaust) his administrative remedies during the time in question (i.e., between the occurrence of the event in question, on May 31, 2007, and the expiration of the deadline by which to file a grievance 14 days later, on or about June 14, 2007). (*See* Dkt. No. 6 [Plf.'s Letter filed 6/22/07]; Dkt. No. 12 [Plf.'s Letter filed 8/8/07]; Dkt. No. 15 [Plf.'s Letter filed 8/29/07]; Dkt. No. 18 [Plf.'s Opposition Papers].) I note that Plaintiff swears that, between June 3, 2007, and June 5, 2007, he wrote letters of complaint to both the New York State Inspector General's Office, and the Superintendent of Greene C.F., regarding the incident on May 31, 2007. (*See* Dkt. No. 18, Plf.'s Affid., ¶¶ 5[B]-[C].) However, Plaintiff does not explain why the "letter of complaint" that he sent to the superintendent was not in the form of a grievance filed with the Greene C.F. IGRC, as required by 7 N.Y.C.R.R. § 701.2. Nor does Plaintiff explain why he failed to write to CORC, following whatever action the superintendent did or did not take with respect to the "letter of complaint." Nor does Plaintiff allege that, during the time in question, he was laboring under any sort of physical infirmity, or reasonable misunderstanding of the law, which impeded his attempts to file a formal grievance with the Greene C.F. IGRC, or at least write a letter of complaint to CORC.

For all of these reasons, I recommend that, in the alternative, the Court dismiss Plaintiff's Complaint for alleging facts plausibly suggesting that he failed to exhaust his available administrative remedies following the incident on May 31, 2007.

### C. Second Alternative Ground for Dismissal: Misrepresentations to Court

As stated above in this Report-Recommendation, Plaintiff has, in a sworn statement, falsely stated to the Court that, when the incident in question occurred on May 31, 2007, Plaintiff was aware that a fellow inmate (Shakeith Pigford) had been retaliated against for having filed a grievance against Officer Turriglio-

a temporal impossibility since the event giving rise to Inmate Pigford's grievance had not even yet occurred as of May 31, 2007. (*See, supra,* Part III.B.2. of this Report-Recommendation.) This is not the only misrepresentation that Plaintiff has made to the Court.

As of the date he filed this action on June 16, 2007, Plaintiff had acquired two "strikes" for purposes of 28 U.S.C. § 1915's so-called "three strikes rule." *See McCloud v. D.O. C.,* 06-CV-14278 (S.D.N.Y.) (prisoner civil rights case filed by an inmate bearing New York City Department of Correction Identification Number 141-06-05253, with a date of birth of 9/1/74; dismissed *sua sponte* for failure to state a claim pursuant to 28 U.S.C. § 1915 on 12/8/06); *McCloud v. D.O.C.,* 06-CV-14279 (S.D.N.Y.) (prisoner civil rights case by an inmate bearing New York City Department of Correction Identification Number 141-06-05253, with a date of birth of 9/1/74; dismissed *sua sponte* for failure to state a claim pursuant to 28 U.S.C. § 1915 on 12/8/06).

**\*16** Plaintiff failed to disclose these two cases in Paragraph 5 of his sworn Complaint, where he checked the box labeled "Yes" next to the question "Have you ever filed any other lawsuits in any state or federal court relating to your imprisonment?" but then listed only one such lawsuit (i.e., *McCloud v. Buckhalter,* 07-CV-4576 [S.D.N.Y.] ) in response to the form complaint's directive: "If your answer to 5(a) is YES you must describe any and all lawsuits, currently pending or closed, in the space provided on the next page." (Dkt. No. 1, ¶ 5 [Plf.'s Compl.].)

While a plaintiff is under no duty to provide this information in order to state an actionable civil rights claim, here, Plaintiff *chose* to answer a question on a form complaint calling for such information, and *swore* to the truthfulness of his answer. There is simply no excuse for making such a sworn misrepresentation to the Court. District Judges from this Court have indicated a willingness to sanction *pro se* litigants for making such misrepresentations. *See, e.g., Standley v. Dennison,* 05-CV-1033, 2007 WL 2406909, at *13-14 (N.D.N.Y. Aug. 21, 2007) (Sharpe, J., adopting, on *de novo* review, Report-Recommendation by Lowe, M.J., premised on alternative ground that the plaintiff should be sanctioned for making a material misrepresentation to the Court in his complaint); *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *6 & n. 32 (N.D.N.Y. July

11, 2007) (McAvoy, J., adopting, on plain-error review, Report-Recommendation by Lowe, M.J., premised on alternative ground that the plaintiff should be sanctioned for making a material misrepresentation to the Court in his complaint) [collecting cases]. I have considered less drastic sanctions and have found them to be inadequate to curb this particular intentional and egregious litigation abuse.

For these reasons, I recommend that, in the alternative, the Court dismiss Plaintiff's Complaint *sua sponte,* under Fed.R.Civ.P. 11, as a sanction for making multiple sworn misrepresentations to the Court.

### D. Third Alternative Ground for Dismissal: Unavailability of Relief Requested

As stated above in Part I.A. of this Report-Recommendation, as a result of the misconduct alleged in this action, Plaintiff is requesting three forms of relief: (1) a court order "secur[ing] [Plaintiff's] safety and mak[ing] sure there will be [ ]no[ ] retaliation from coworkers or staff"; (2) a court order directing that a search be performed of Defendant's "file to see if [a]ny complaints or grievances [have] been filed against him in the past concerning brutality"; and (3) "$1,000,000 for mental anguish and distress." (Dkt. No. 1, ¶¶ 7, 9 [Plf.'s Compl.].)

I find that the first two forms of relief are able to be, and should be, denied on the alternative ground that Plaintiff has alleged no facts plausibly suggesting his entitlement to either form of relief. The first form of relief, which is essentially an injunction or temporary restraining order, must be supported by documents showing cause for the granting of the requested relief-which Plaintiff's Complaint does not do. *See* Fed.R.Civ.P. 65; N.D.N.Y. L.R. 65.1, 65.2, 7.1(f), 7.1(b)(2), 7.1(e). The second form of relief is merely a vehicle by which Plaintiff may embark on a fishing expedition to obtain facts that would enable him to assert an actionable legal claim against Defendant. Rule 8 of the Federal Rules of Civil Procedure-which requires that a plaintiff must assert enough facts in his complaint (and thus be in possession of such basic facts *before* he files the complaint) to give a defendant *fair notice* of the claim against him-does not permit such a "bootstrap" pleading.[35] Nor does Plaintiff even provide cause in support of what is essentially a request for discovery.

Case 9:09-cv-00517-LEK-TWD    Document 113    Filed 06/16/17    Page 46 of 101
McCloud v. Tureglio, Not Reported in F.Supp.2d (2008)
2008 WL 1772305

35      *See Balliett v. Heydt,* 95-CV-5184, 1997 U.S. Dist. LEXIS 14913, at *3-9, 29 (E.D.Pa. Sept. 25, 1997) (referring to a similar attempt to state a claim-based on information generated in 1997, several years after the filing of the complaint in 1995-as a "means of circular pleading and bootstrapping"); *Hill v. Austin,* 89-CV-7790, 1997 U.S. Dist. LEXIS 11737, at *10 (N.D.Ill. Sept. 6, 1990) ("Hill cannot bootstrap his [untimely and therefore non-actionable] complaints dealing with the years 1976 through 1982 through his timely filing of the complaint on the 1985 involuntary detail."); *cf. City of New York v. Permanent Mission of India to the U.N.,* 446 F.3d 365, 377 (2d Cir.2006) (referring to an analogous attempt to state a claim as a "use [of] creative pleading to 'bootstrap' claims" that were otherwise unavailable to the plaintiff); *Scott v. Johnson,* 95-CV-0403, 1995 U.S. Dist. LEXIS 22445, at *6 (W.D.Mich. July 28, 1995) ("A prison inmate cannot bootstrap his complaints with conclusory allegations of retaliation ....") [citation omitted].

**\*17** For these reasons, I recommend that, in the alternative, the Court dismiss Plaintiff's Complaint *sua sponte,* under 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b), 36 to the extent that the Complaint requests, as relief for the constitutional violation(s) alleged, (1) a court order "secur[ing] [Plaintiff's] safety and mak[ing] sure there will be [ ]no[ ] retaliation from coworkers or staff," and (2) a court order directing that a search be performed of Defendant's "file to see if [a]ny complaints or grievances [have] been filed against him in the past concerning brutality." (Dkt. No. 1, ¶¶ 7, 9 [Plf.'s Compl.].)

36      *See* 28 U.S.C. § 1915(e)(2)(B)(ii) ("[T]he court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis*] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails

to state a claim on which relief may be granted [,] ... or ... seeks monetary relief against a defendant who is immune from such relief"); 28 U.S.C. § 1915A(b) ("On review, the court shall ... dismiss the [prisoner's] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted....").

**ACCORDINGLY,** for the reasons stated above, it is

**RECOMMENDED** that Defendants' motion to dismiss for failure to state a claim (Dkt. No. 42) be ***GRANTED;*** and it is further

**RECOMMENDED** that, when dismissing Plaintiff's Complaint (Dkt. No. 1), the Court state that the dismissal constitutes a "strike" for purposes of 28 U.S.C. § 1915(g); and it is further

**RECOMMENDED** that the Court certify in writing, for purposes of 28 U.S.C. § 1915(a)(3), that any appeal taken from the Court's final judgment in this action would not be taken in good faith.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec 'y of Health and Human Servs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 1772305

2005 WL 1925649
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

James BROWN, Plaintiff,

v.

Carl J. KOENIGSMANN, M.D., s/h/a Dr.
Carl Koenigsmann, Medical Director of Green
Haven Correctional Facility, Defendants.

No. 01 Civ. 10013(LMM).
|
Aug. 10, 2005.

*MEMORANDUM AND ORDER*

MCKENNA, J.

1.

**\*1** Plaintiff James Brown, incarcerated at the Green Haven Correctional Facility ("Green Haven") of the New York State Department of Correctional Services ("DOCS") from January of 1992 until August 23, 1996, and from March 14, 2001 to the present, brings this action under 42 U.S.C. § 1983 against Carl Koenigsmann, M.D.-employed by DOCS presently as Regional Medical Director for a number of DOCS facilities in the Sullivan and Great Meadow regions, and previously, from March of 1999 to April of 2003, Facility Health Services Director for Green Haven-alleging deliberate indifference to his serious medical condition in violation of the Eighth Amendment to the Constitution of the United States. [1]

[1]    The State of New York was named as a defendant in the original complaint, but was dropped in the amended complaint.

Defendant moves, pursuant to Fed.R.Civ.P. 12(b)(6), for dismissal of the amended complaint, asserting that (i) plaintiff failed to exhaust available administrative remedies, (ii) the amended complaint fails to allege personal involvement by Dr. Koenigsmann in the conduct claimed to have violated plaintiff's rights, (iii) plaintiff cannot demonstrate that Dr. Koenigsmann treated plaintiff with deliberate medical indifference, and (iv)

Dr. Koenigsmann is entitled to qualified immunity. (Def. Mem. at 1-2.)

The Court earlier denied a motion by defendant pursuant to Rule 12(b)(6), made on the ground of failure to exhaust administrative remedies. *See Brown v. Koenigsmann,* No. 01 Civ. 10013, 2003 WL 22232884 (S.D.N.Y. Sept. 29, 2003), familiarity with which is here assumed. [2]

[2]    The cited decision summarizes the allegations of the amended complaint and plaintiff's efforts to exhaust administrative remedies, 2003 WL 22232884, at \*1, sets forth the standards governing consideration of a motion under Rule 12(b)(6) to dismiss a *pro se* complaint, *id.* at \*2, and describes the DOCS grievance program. *Id.* at \*3. All of that is incorporated herein by reference.

2.

The exhaustion requirement of 42 U.S.C. § 1997e(a) "applies to all inmate suits about prison life," *Porter v. Nussle,* 534 U.S. 516, 532 (2002), including this one. Here, plaintiff alleges that he "has made every available attempt to exhaust his administrative remedies but did not receive any response when appealing." (Am.Comp.¶ II.C.) In its 2003 decision the Court found that there was an issue of fact as to exhaustion which prevented dismissal under Rule 12(b)(6). *Brown,* 2003 WL 22232884, at \*3.

Defendant now raises two exhaustion arguments. First, he says that, whatever the case may have been in 2003, dismissal for failure to exhaust is required under *Ziemba v. Wezner,* 366 F.3d 161 (2d Cir.2004). Then he urges that, whatever the case may be concerning exhaustion of plaintiff's claim that defendant denied him surgery for his right eye, plaintiff's claim regarding unnecessary surgery (Am.Comp.¶ 17) is clearly not exhausted. [3]

[3]    Initially, defendant advanced a third exhaustion argument, based on a "total exhaustion" theory. (Def. Mem. at 15-17.) Defendant has withdrawn that argument. (Def. Reply Mem. at 2 n. 3.)

In *Ziemba,* the Second Circuit, "[a]s a matter of first impression in this circuit," held "that the affirmative defense of exhaustion is subject to estoppel." 366 F.3d at 163.

Here, defendant argues that, "because Dr. Koenigsmann had no involvement in DOCS grievance procedures or plaintiff's efforts to exhaust these procedures, there is no basis to estop Dr. Koenigsmann from raising the exhaustion defense." (Def. Mem. at 14.)

> In this case, there are no allegations in the [amended complaint] that Dr. Koenigsmann himself "prevented" [plaintiff] from exhausting his administrative remedies through threats or any other form of intimidation or misconduct. *See Ziemba* 366 F.3d at 162. Unlike the actions by defendants in *Ziemba,* there was no conduct by Dr. Koenigsmann which can be said to estop him from asserting the exhaustion defense. Accordingly, the Court should grant defendant's motion to dismiss for failure to exhaust.

**\*2** (*Id.*)

In the present case, there is evidence that plaintiff initiated a grievance seeking a "new operation" in his remaining eye, the right; that when the Inmate Grievance Committee did not address the request for the operation, plaintiff appealed to the Superintendent, and that when the Superintendent did not address the request for the operation, plaintiff filled out the form provided for appeal to the Central Office Review Committee ("CORC"), and sent it to the Grievance Clerk; and that thereafter plaintiff inquired several times of the Grievance Clerk as to the status of the appeal. (Pl. Mem. Exhibits A, A-1, B, C, D, E, F & G; *see also Brown,* 2003 WL 22232884, at \*1.) The appeal, it appears, was not acted on. There is certainly an issue of fact as to whether or not the Inmate Grievance Program is responsible for plaintiff's failure to obtain a determination at the Program's third and final level, CORC. Plaintiff does not assert that Dr. Koeingsmann personally was responsible for whatever happened to plaintiff's appeal in the Inmate Grievance Program.

Nothing in *Ziemba,* however, requires that the action or inaction which is the basis for the estoppel be that of the particular defendant in the prisoner's case. In *Ziemba,* "the district court [was] directed to consider Ziemba's claim

that estoppel bars *the State's* assertion of the exhaustion defense." 366 F.3d at 163-64 (emphasis added). In *Wright v. Hollingsworth,* 260 F.3d 357 (5th Cir.2001), the holding of which the Second Circuit adapted in *Ziemba,* 366 F.3d at 163 (quoting *Wright,* 260 F.3d at 358 n. 2), the defendant was a prison nurse. *Ziemba* does not require a showing that Dr. Koenigsmann is personally responsible for plaintiff's failure to complete exhaustion, as long as someone employed by DOCS is. If that reading of *Ziemba* is incorrect, however, *cf. Hemphill v. New York,* 380 F.3d 680, 689 (2d Cir.2004), then the circumstances here must be regarded as special, and as justifying the incompleteness of exhaustion, since a *decision* by CORC is hardly something plaintiff could have accomplished on his own. *See id.,* 380 F.3d at 689 (quoting *Giano v. Goord,* 380 F.3d 670, 676 (2d Cir.2004)).

As to defendant's second argument-that plaintiff has failed to exhaust a claim for unnecessary laser surgery-plaintiff has made it clear that his amended complaint is not intended to assert such a claim. (Pl. Mem. at 6, 44.) [4]

[4]    The Court does not convert the present motion, insofar as it concerns exhaustion, to a Rule 56 motion, *see Ziemba,* 366 F.3d at 164, because of the quite apparent issue of fact, and the consideration that plaintiff has not had discovery.

3.

Defendant next argues that plaintiff has not alleged personal involvement on his part in relation to the laser surgery claim. As already noted, however, plaintiff has made it clear that he makes no such claim. This argument is therefore moot.

4.

Defendant then argues that,

> [a]ssuming, *arguendo,* that plaintiff's eye condition meets the standard for an objectively serious medical condition, plaintiff's claims of deliberate indifference against Dr. Koenigsmann must nevertheless fail because plaintiff cannot demonstrate that the defendant had the requisite

state of mind that is necessary to satisfy the subjective component of a claim of deliberate medical indifference.

**\*3**  (Def. Mem. at 21.) Dr. Koenigsmann's state of mind is a factual question which cannot be resolved on a Rule 12 motion. Defendant's motion, insofar as it is based on this ground, must be denied.[5]

[5]     The Court will not convert defendant's motion, as based on this ground, to a Rule 56 motion, because plaintiff has had no discovery.

5.

Further, defendant seeks dismissal on the ground that he is entitled to qualified immunity. In making this argument, however, defendant appears to misconstrue plaintiff's claim. Defendant, indicating that plaintiff's right eye had been examined by an opthalmologist at Green Haven, and that opthamological evaluations of plaintiff's condition, including visual field testing and treatment at the glaucoma clinic at the Westchester Medical Center, have been performed, then urges: "In essence, plaintiff seeks to hold Dr. Koenigsmann liable for treatment he did not provide, and did not even directly supervise. Because holding Dr. Koenigsmann responsible for the care provided by outside specialists, who are also not defendants in this case, would create a new category of liability, Dr. Koenigsmann is entitled to qualified immunity." (Def. Mem. at 24-25.)[6]

[6]     *See* Koenigsmann Decl., June 10, 2004, ¶¶ 6-18, for a description of plaintiff's medical records; the Koenigsmann Supp. Decl., Apr. 7, 2005, describes subsequent medical events.

The gravamen of the amended complaint, however, is that, after the laser surgery, plaintiff was informed by an opthalmologist that there was a medical procedure available-plaintiff calls it a "Trabeailectomy Irisecyomy"-which would prevent his right eye from becoming blind and restore 20/20 vision, which DOCS would have to pay for, and that Dr. Koenigsmann delayed or denied the procedure and ignored plaintiff's request to discuss it with a specialist. (Am. Comp. ¶¶ 9-15, 18-21; *see also* Pl. Mem. at 3-5.)

Defendant does not address the question actually raised: whether, if, as claimed by plaintiff, Dr. Koenigsmann denied plaintiff an available medical procedure that would prevent blindness in plaintiff's remaining eye, he would be entitled to dismissal on the ground of qualified immunity. That being the case, defendant's motion insofar as it seeks dismissal on the ground of qualified immunity is denied.[7]

[7]     The use of Rule 12 instead of Rule 56 motions to raise the issue of qualified immunity is discussed in *McKenna v. Wright,* 386 F.3d 432, 435-36 (2d Cir.2004).

6.

Defendant, in his Reply Memorandum, adds a further prong to his motion, seeking dismissal of the amended complaint insofar as it seeks damages against Dr. Koenigsmann in his official capacity. The Court does not understand the amended complaint to seek such relief, however. Paragraphs B, C and D of the *ad damnum* portion of the amended complaint seek damages "against the defendant in his individual and personal capacities" (Am. Comp. at 5), the words "individual" and "personal" both indicating, in context, the opposite of "official." On this understanding of the amended complaint, the motion is denied.[8]

[8]     It is true that in Plaintiff's Memorandum, he says that he is suing Dr. Koenigsmann "in his official capacity." (Pl. Mem. at 39.) Were plaintiff to move to amend his complaint again to assert damage claims against Dr. Koenigsmann in his official capacity, the Court would have to deny the motion. The premise of defendants' argument-that the Eleventh Amendment precludes assertion of a damage claim against Dr. Koenigsmann in his official capacity-is correct. *Britt v. Dep't of Corr.,* No. 99 Civ. 1672, 2004 WL 547955, at \*4 (March 19, 2004).

7.

For the reasons set forth above, defendant's motion for dismissal under Rule 12(b)(6) is denied.
SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 1925649

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 2292975
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Rafael MESSA, Plaintiff,

v.

Lucien J. LeCLAIRE, Jr., Deputy Commissioner;
Lester N. Wright, Deputy Commissioner/Chief
Medical Officer, DOCS; Marc F. Stern, Regional
Medical Director, DOCS; Steven VanBuren,
Regional Health Services Administration;
Dr. Bendhein, Medical Doctor, GHCF; Albert
Paolano, Facility Health Service Director, CMCF;
Howard Silverburg; Mr. Nesmith; V. Blaestz,
Senior Correctional Counselor; John Tiorney,
Correctional Sergeant; S. Ullrich, Correctional
Sergeant; Gerald Tillotson; David Mazzella;
Charles V. Austin; W.R. Kelly; C. Mitchell; J.
Erms; M. Miller; and M. Mrzyglod, Defendants.

No. 03-CV-1385 (TJM/DRH).
|
Feb. 26, 2007.

**Attorneys and Law Firms**

Rafael Messa, Dannemora, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the
State of New York, Bridget Erin Holohan, Esq.,
Assistant Attorney General, of Counsel, Albany, NY, for
Defendants.

## REPORT-RECOMMENDATION AND ORDER [1]

[1]     This matter was referred to the undersigned for report
        and recommendation pursuant to 28 U.S.C. § 636(b)
        and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, U.S. Magistrate Judge.

**\*1** Plaintiff pro se Rafael Messa ("Messa"), an inmate
in the custody of the New York State Department
of Correctional Services ("DOCS"), brings this action
pursuant to 42 U.S.C. § 1983 alleging that defendants,
nineteen DOCS employees, violated his constitutional

rights under the Eighth and Fourteenth Amendments
when they assaulted him, wrongly found him guilty of
disciplinary charges, and provided inadequate medical
treatment. Compl. (Docket No. 1).[2] Presently pending
is defendants' motion for summary judgment pursuant
to Fed.R.Civ.P. 56. Docket No. 70. Messa opposes the
motion. Docket No. 76. For the following reasons, it is
recommended that defendants' motion be granted in part
and denied in part.

[2]     The complaint named seven additional defendants.
        Those defendants were previously dismissed. Docket
        Nos. 50, 55. The Clerk shall amend the docket of this
        case to reflect that the action has been terminated
        as to defendants Goord, Greiner, Duncan, Bundrick,
        Nunez, Rodas, and Martuscello.

## I. Background

The facts are presented in the light most favorable to
Messa as the non-moving party. See Ertman v. United
States, 165 F.3d 204, 206 (2d Cir.1999).

On March 25, 2001, while incarcerated at Green Haven
Correctional Facility ("Green Haven"), Messa was
involved in an altercation with corrections officers in
which he sustained injuries. See Holohan Aff. (Docket
No. 70), Ex. A. Shortly thereafter, Messa was treated by
Dr. Bendheim and he noted that Messa had sustained a
contusion above the right eye, dried blood on his lips,
and complained of right ankle pain. See Bendheim Decl.
(Docket No. 70) at ¶¶ 3-8. Dr. Bendheim ordered x-rays,
placed Messa's right ankle in a splint, and transferred him
to the infirmary for pain management. Id. at ¶¶ 7, 9. The
x-rays were negative and Messa was discharged from the
infirmary. Id. at ¶¶ 8, 11. On June 5, 2001, Messa filed
a grievance regarding his medical treatment, but it was
denied. See Compl. at ¶ 50; see also Holohan Aff., Ex. B.

As a result of this altercation, Messa was issued a
misbehavior report for, inter alia, assault on a staff
member. See Holohan Aff. (Docket No. 70), Ex. E at 1-10.
On April 9, 2001, Blaetz found Messa guilty of all charges
and sentenced him to 180 days in the Special Housing
Unit ("SHU"),[3] recommended loss of six months of good
time credits, and 210 days loss of commissary, recreation,
telephones, and packages. Id. at 40. On August 24, 2001,
the disposition was administratively reversed. Id. at 52-53;

*see also* Compl at ¶ 51. On or about September 6, 2001, Messa was transferred to Great Meadow Correctional Facility ("Great Meadow"). *See* Paolano Aff. (Docket No. 70) at ¶ 5; *see also* Compl. at ¶ 51. While at Great Meadow, Messa filed various grievances regarding his alleged inadequate medical treatment by defendants. *See* Compl. at ¶¶ 54, 57, 60, 67.

3    SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population ...." N.Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b) (2006). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

This action followed.

## II. Discussion

Messa asserts three causes of action in his complaint. The first alleges that defendants used excessive force and failed to intervene in violation of the Eighth Amendment's prohibition against cruel and unusual punishment. Compl. at ¶ 72. The second alleges that Blaetz found Messa guilty of disciplinary charges without any supporting evidence in violation of the Fourteenth Amendment. *Id.* at ¶ 74.[4] The third alleges that defendants were deliberately indifferent to Messa's serious medical needs in violation of the Eighth Amendment. *Id.* at ¶ 76-77. Defendants seek summary judgment on all claims.

4    Messa's second cause of action was previously dismissed as to claims that defendants filed false misbehavior reports. *See* Docket Nos. 50 at 9; 55.

## A. Standard

**\*2** A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.* 22 F.3d 1219, 1223-24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988). When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247-48.

## B. Exhaustion

Defendants contend that Messa has failed to demonstrate any reasonable excuse for failing to exhaust his administrative remedies as to his Eighth Amendment excessive force claim. *See* Defs. Mem. of Law (Docket No. 70) at 2-4. Messa contends that he failed to exhaust his administrative remedies after the March 25, 2001 incident because he was threatened by an unidentified prison official. *See* Pl. Reply Mem. of Law (Docket No. 76) at 7-9.

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), subjects suits concerning prison conditions brought under federal law to certain prerequisites. Specifically, the PLRA dictates that a prisoner confined to any jail, prison, or correctional facility must exhaust all available administrative remedies prior to bringing any

suit concerning prison life, " 'whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' " *Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir.2004) (quoting *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)); *see also Jones v. Bock,* ---U.S. ----, ---- - ----, 127 S.Ct. 910, 918-19, 166 L.Ed.2d 798 (2007) ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court.") (citation omitted); *Woodford v. Ngo,* --- U.S. ----, ---- - ----, 126 S.Ct. 2378, 2382-83, 165 L.Ed.2d 368 (2006). Administrative remedies include all appellate remedies provided within the system, not just those that meet federal standards. *Woodford,* 126 S.Ct. at 2382-83. However, the Second Circuit has recognized three exceptions to the PLRA's exhaustion requirement:

> **\*3** when (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement.

*Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006) (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004); *see also Boddie v. Bradley,* No. Civ. 99-1016(TJM), 2006 WL 162996, at \*2 (N.D.N.Y. Jan 20, 2006).

"The PLRA's exhaustion requirement is designed to 'afford [ ] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004) (quoting *Porter,* 534 U.S. at 524-25). " '[A] grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought.' " *Id.* (quoting *Strong v. David,* 297 F.3d 646, 650 (7th Cir.2002)). Inmates must provide sufficient information to "allow prison officials to take appropriate responsive measures." *Id.*

DOCS has established a grievance procedure which includes a three-stage review and appeal process. *See* N.Y. Correct. Law § 139 (McKinney 2003); N.Y. Comp.Codes

R. & Regs. tit. 7, § 701.1-.16 (2003); *Hemphill,* 380 F.3d at 682-83. When an inmate files a grievance, it is investigated and reviewed by an Inmate Grievance Resolution Committee ("IGRC"). If the grievance cannot be resolved informally, a hearing is held. The IGRC decision may be appealed to the Superintendent of the facility. Finally, an inmate may appeal the Superintendent's decision to the Central Office Review Committee ("CORC"). N.Y. Comp.Codes R. & Regs. tit.7, § 701.7(a) (2003).

During Messa's October 22, 2005 deposition, he testified that although he understood the three-step grievance process provided by DOCS (*see* Messa Dep. (Holohan Aff., Ex. C) at 22),[5] he failed to file a grievance after the incident because he "was not thinking very clearly ... because of [his] injuries." Messa Dep. at 22. However, in his reply to defendants' summary judgment motion, Messa contends that he failed to file a grievance because he feared for his life after an unidentified prison employee threatened to kill him while he was in the infirmary. *See* Pl. Reply Mem. of Law at 8-9; *see also* Messa Dep. at 63-65, 73. Defendants contend that because the threat came from an unidentified prison employee, and not one of the named defendants, they should not be estopped from asserting the affirmative defense of non-exhaustion.[6] In support, defendants interpret the Second Circuit's holding in *Hemphill* to require a plaintiff to demonstrate that conduct by named defendants rendered the administrative remedies unavailable. *See* Defs. Reply Mem. of Law at 2-3. However, the facts of *Hemphill* are distinguishable from the instant case because unlike here where Messa contends that an unidentified prison employee threatened him, the plaintiff in *Hemphill* alleged that it was only named defendants who were responsible for the threats. *See Hemphill,* 380 F.3d at 688-91. Thus, the Second Circuit never reached the issue of whether a plaintiff must demonstrate that a named defendant rendered the administrative remedies unavailable and thus estopped the defendants from presenting the affirmative defense of non-exhaustion. However, a district court in the Second Circuit has addressed this issue.

5  Messa gives conflicting testimony about his understanding of the grievance process before March 25, 2001. *Compare* Messa Dep. at 20-21, *with id.* at 22-24. However, it is clear that Messa had filed a grievance prior to March 25, 2001. *See id.* at 24; *see also* Holohan Aff. (Docket No. 70), Ex. D.

6      Defendants also argue that "a plaintiff may not
       change his or her deposition testimony in an effort
       to avoid summary judgment." Defs. Reply Mem. of
       Law (Docket No. 80) at 2-3 (citing *Bracci v. New
       York Dep't of Corr. Servs.,* No. Civ. 01-1300(TJM),
       2005 WL 2437029, at *1 n. 1 (N.D.N.Y. Sept.30,
       2005). However, a fair reading of Messa's testimony
       could be reasonably construed to demonstrate that he
       was simply confused at times during the deposition
       instead of affirmatively attempting to change his
       testimony. Thus, viewing the evidence in the light
       most favorable to Messa as the non-moving party,
       and in light of his pro se status, a triable issue of fact
       remains as to whether Messa failed to file a grievance
       because of the threat.

**\*4** In *Brown v. Koenigsmann,* the district court relied on
the Second Circuit's decision in *Ziemba* in holding that
"[n]othing ... requires that the action or inaction which
is the basis for the estoppel [of the affirmative defense
of non-exhaustion] be that of the particular defendant
in the prisoner's case." No. Civ. 01-10013(LMM), 2005
WL 1925649, at *2 (S.D.N.Y. Aug.10, 2005); *see also
Ziemba,* 366 F.3d at 163-64. Instead, the court held
that "*Ziemba* does not require a showing that [a named
defendant] is personally responsible for plaintiff's failure
to complete exhaustion, as long as someone employed by
DOCS is." *Id.* Here, Messa contends that the threats came
from a warden and an individual in the infirmary that
was wearing a blue uniform. *See* Messa Dep. at 64-65.
It is reasonable to conclude that these individuals were
employed by DOCS. Thus, their actions as alleged by
Messa estop the named defendants in this action from
asserting the affirmative defense of non-exhaustion. Thus,
viewing the evidence in the light most favorable to Messa
as the non-moving party, and taking into account his pro
se status, triable issues of fact remain regarding whether
the threats against Messa estop defendants from asserting
the affirmative defense of non-exhaustion.

Therefore, it is recommended that defendants' motion on
this ground be denied.

## C. Due Process

Messa contends that Blaetz found him guilty at the April
9, 2001 disciplinary hearing without any evidence to
support the charges. Compl. at ¶ 74.

At a prison disciplinary proceeding, an inmate is entitled
to (1) advance written notice of the charges, (2) an
opportunity to call witnesses if it conforms with prison
security, (3) a statement of evidence and reasons for the
disposition, and (4) a fair and impartial hearing officer.
*Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir.1999)
(citing *Wolff v. McDonnell,* 418 U.S. 539, 563-64, 94 S.Ct.
2963, 41 L.Ed.2d 935 (1974)). Additionally, the finding of
guilt must be supported by some evidence in the record to
comport with due process. *See Massachusetts Corr. Inst.
v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356
(1985); *see also Luna v. Pico,* 356 F.3d 481, 487-89 (2d
Cir.2004).

Here, Blaetz relied upon the misbehavior reports of
defendants Kelly, Martuscello, Mrzyglod, and Tillotson
in finding Messa guilty of the charges brought against
him in the March 25, 2001 misbehavior reports. *See*
Holohan Aff., Ex. E at 43. Each of these defendants
relied on their personal knowledge when drafting their
misbehavior reports. *See id.* at 1-10. Messa contends
that Blaetz could not simply rely on the misbehavior
reports to support his finding of guilt, arguing that the
reports "must be supported by some type of substantial
evidence." Pl. Reply Mem. of Law at 11. However, a
misbehavior report alone suffices to support a hearing
officer's finding of guilt. *See Chapple v. Keane,* 903
F.Supp. 583, 585 (S.D.N.Y.1995); *see also Simon v. Selsky,*
No. Civ. 99-5747 (LAP/JCF), 2002 WL 1205737, at *4
(S.D.N.Y. Mar.12, 2002) ("the misbehavior report by
itself is sufficient to establish [plaintiff's] guilt"). Thus,
Messa has failed to raise an issue of material fact regarding
his Fourteenth Amendment claim.

**\*5** Therefore, it is recommended that defendants' motion
on this ground be granted.[7]

7      Liberally construed, Messa's submissions assert a
       claim for failure to provide an adequate translator
       during his April 9, 2001 disciplinary hearing in
       violation of the Fourteenth Amendment's Due
       Process clause. *See* Pl. Reply Mem. of Law at 11;
       *see also Triestman,* 470 F.3d at 474-75 ("It is well
       established that the submissions of a pro se litigant
       must be construed liberally and interpreted to raise
       the strongest arguments that they suggest") (internal
       quotations and citations omitted)). "Unless Spanish
       speaking inmates understand and can communicate
       with the [parole] hearing board, they are being
       denied the due process protections guaranteed in

Case 9:09-cv-00517-LEK-TWD   Document 113   Filed 06/16/17   Page 55 of 101
Messa v. LeClaire, Not Reported in F.Supp.2d (2007)
2007 WL 2292975

Wolff." *Powell v. Ward,* 487 F.Supp. 917, 932 (S.D.N.Y.1980); *see also Clarkson v. Coughlin,* 898 F.Supp. 1019, 1040 (S.D.N.Y.1995) (holding that "sufficient [due] process must include the presence of a qualified interpreter" to assist an inmate during the disciplinary process). In his reply, Messa incorporates by reference a July 3, 2001 letter from Sylvia Santana of Prisoners' Legal Services contending that the inability of Messa's Spanish translator to translate properly denied him a fair disciplinary hearing. *See* Holohan Aff., Ex. E at 49-50. This may constitute a colorable claim under the authorities cited above, but that claim has not been clearly raised nor have defendants had a fair opportunity to address it. Therefore, it is recommended that Messa be granted thirty (30) days from the date of the district court's decision on this motion to file an amended complaint alleging the failure to provide him with an adequate translator in violation of the Fourteenth Amendment.

### D. Eight Amendment

In his third cause of action, Messa contends that defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. *See* Compl. at ¶¶ 76-77.

A prisoner advancing an Eighth Amendment claim for denial of medical care must allege and prove deliberate indifference to a serious medical need. *Wilson v. Seiter,* 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). More than negligence is required "but less than conduct undertaken for the very purpose of causing harm." *Hathaway,* 37 F.3d at 66. The test is twofold. First, the prisoner must show that there was a sufficiently serious medical need. *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan,* 511 U.S. 825, 844, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

A serious medical need is " 'one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the

necessity for a doctor's attention.' " *Camberos v. Branstad,* 73 F.3d 174, 176 (8th Cir.1995) (quoting *Johnson v. Busby,* 953 F.2d 349, 351 (8th Cir.1991)). An impairment that a reasonable doctor or patient would find important and worthy to treat, a medical condition that affects the daily activities of an individual, or the existence of chronic and substantial pain are all factors that are relevant in the consideration of whether a medical condition was serious. *Chance,* 143 F.3d at 702-03.

Deliberate indifference requires the prisoner to prove that the prison official knew of and disregarded the prisoner's serious medical needs. *Id.* at 702. Mere disagreement over proper treatment does not create a constitutional claim as long as the treatment was adequate. *Id.* at 703. Allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). Here, it is unclear whether Messa's conditions constituted a serious medical need. However, even if Messa's conditions were considered serious, his Eighth Amendment claim fails to demonstrate that defendants were deliberately indifferent.

#### 1. Dr. Bendheim

Messa contends that after the March 25, 2001 incident, Dr. Bendheim "repeatedly refused to provide proper and adequate medical treatment." Compl. at ¶ 49. Shortly after the incident, Dr. Bendheim examined Messa and noted that he had a contusion above his right eyebrow, dried blood on his lips, and refused to walk or put weight on his right ankle. *See* Bendheim Decl. (Docket No. 70) at ¶ 4 & Ex. A. Dr. Bendheim also noted that Messa had previously suffered a right ankle fracture. *See id.* at ¶ 5 & Ex. A. As a result of these findings, Dr. Bendheim had Messa's right ankle placed in a splint, admitted him to the infirmary, ordered x-rays, and collected a urine sample. *See id.* at ¶¶ 6-7, 9 & Ex. A. Messa's x-rays and urinalysis were negative, but he was still prescribed pain medication. *See id.* at ¶¶ 8-10 & Ex. A. Messa was discharged from the infirmary on April 2, 2001 in stable condition. *See id.* at ¶ 11 & Ex. A. Although Messa continued to complain of lower back pain during his time at Green Haven, all physical examinations were unremarkable for any significant injury. *See id.* at ¶¶ 12-14 & Exs. A-B. Nevertheless, Messa was prescribed pain medication and physical therapy for his back. *See id.* at ¶ 14 & Exs. A-B.

Thus, it is clear that Messa received more than adequate care for his injuries while at Green Haven and has failed to raise an issue of material fact as to Dr. Bendheim's alleged deliberate indifference.

**\*6** Therefore, it is recommended that defendants' motion on this ground be granted as to Dr. Bendheim.

### 2. Great Meadow

Messa contends that after arriving at Great Meadow, he was denied "adequate and proper medical treatment" by defendants Paolano, Silverburg, and Nesmith. Compl. at ¶ 76. Messa also contends that defendants have failed to properly treat his "mild degeneration disc disease" that he allegedly suffered due to the incident. *See* Pl. Reply Mem. of Law at 13.

Regarding Messa's general complaint of inadequate medical care while at Great Meadow, he has failed to demonstrate that defendants were deliberately indifferent. After his transfer to Great Meadow, Messa was examined by the medical staff and only complained of back pain. *See* Paolano Aff. at ¶¶ 7-8. Over the next two years, Messa complained intermittently of back pain, but x-rays and other diagnostic tests ordered by the medical staff failed to demonstrate any significant problems. *See id.* at ¶ 33 & Ex. A at 19-25, 27; *see also* Paolano Aff., Ex. E. Moreover, Messa was provided with pain medication for his alleged lower back pain. *See* Paolano Aff. at ¶¶ 12, 29-30; *see also* Pl. Reply Mem. of Law at 13 ("the only treatment that plaintiff has received is medication to try and stimulate the pain, but is not the medication requested by the outside specialist").[8]

[8]   To the extent that Messa contends he should have been provided the pain medication recommended by the outside specialist, this claim must fail because mere disagreement over proper treatment does not create a constitutional claim as long as the treatment was adequate. *See Chance,* 143 F.3d at 702. Here, Messa has failed to demonstrate that the pain medication provided by defendants was inadequate.

On October 31, 2002, after complaining of right ankle pain, Messa was examined by an orthopedic specialist who recommended that he begin physical therapy and that he be given a lace-up ankle brace and an MRI. *See* Paolano Aff., Exs. C-D. The results of the MRI were

unremarkable. *See id.* at Ex. D. On January 14, 2003, Messa also complained of testicular pain and on April 8, 2003, Dr. Silverburg ordered a urology examination. *See id.,* Ex. A at 30 & F. The urologist recommended an ultrasound, which was negative. *See id.,* Ex. G. Thus, Messa has failed to raise a material issue of fact regarding defendants' treatment of his alleged lower back and right ankle pain.

As to Messa's contention that an August 11, 2005 MRI demonstrated that he suffered from a mild degenerative disc condition, this condition arose more than eighteen months after he was transferred out of the custody of Great Meadow. *See* Pl. Reply Mem. of Law at 13.[9] Moreover, Messa has failed to produce the medical records from this purported August 11, 2005 MRI to support his contention. Further, a June 7, 2004 MRI failed to demonstrate any disc herniation. *See* Paolano Aff., Ex. I. Thus, in light of defendants' documentary evidence to the contrary, Messa's conclusory allegations that defendants denied him proper medical treatment fail to raise a genuine issue of material fact as to the deliberate indifference of defendants Paolano, Silverburg, or Nesmith. *See Cifarelli v. Village of Babylon,* 93 F.3d 47, 51 (2d Cir.1996) ("mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment").

[9]   Messa was transferred to Clinton Correctional Facility in December 2003. *See* Paolano Aff. at ¶ 34.

**\*7** Therefore, it is recommended that defendants' motion be granted as to Messa's third cause of action as to defendants Paolano, Silverburg, and Nesmith.[10]

[10]   Defendants Paolano, Nesmith, and Silverburg also contend that Messa cannot demonstrate that they were personally involved in the alleged deliberate indifference. *See* Defs. Mem. of Law at 15-16. However, it is recommended herein that Messa's deliberate indifference claim be dismissed on other grounds. Thus, there is no need to address the argument.

### E. Qualified Immunity

Messa also alleges in his third cause of action that defendants LeClaire, Wright, VanBuren, Stern, and Paolano failed to investigate Messa's complaints and

failed to insure that he received adequate medical care. Compl. at ¶ 77. These defendants contend that they are entitled to qualified immunity on this claim. Defs. Mem. of Law at 17-18. Qualified immunity generally protects governmental officials from civil liability insofar as their conduct does not violate clearly established constitutional law of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229 (N.D.N.Y.2002), *aff'd,* 80 Fed.Appx. 146 (2d Cir. Nov.10, 2003). A court must first determine that if plaintiff's allegations are accepted as true, there would be a constitutional violation. Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230.

Here, as discussed *supra,* accepting all of Messa's allegations as true, he has not shown that any defendant violated his constitutional rights. Therefore, because Messa's medical treatment was constitutionally adequate, there was no basis for investigation of his complaints and Messa has failed to raise a question of fact whether defendants LeClaire, Wright, VanBuren, Stern, or Paolano violated his Eighth Amendment rights. Accordingly, defendants' motion for summary judgment on this ground should be granted as to these defendants.

### III. Conclusion

For the reasons stated above, it is hereby

**RECOMMENDED** that:

1. Defendants' motion for summary judgment (Docket No. 70) be **GRANTED** as to Messa's second and third causes of action and this action be **TERMINATED** as to defendants Bendheim, Paolano, Silverburg, Nesmith, LeClaire, Wright, VanBuren, and Stern; [11]

[11]     *See also* note 2 *supra.*

2. **DENIED** as to Messa's first cause of action for excessive force; and

3. Messa be granted **THIRTY (30) DAYS** from the date of the district court's decision on this motion to file an amended complaint to allege the failure to provide him with an adequate translator in violation of the Fourteenth Amendment.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 2292975

2007 WL 2288106
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Rafael MESSA, Plaintiff,

v.

Lucien J. LeCLAIRE, Jr., Deputy Commissioner,
DOCS; Lester N. Wright, Deputy Commissioner/
Chief Medical Officer, DOCS; Marc F. Stern,
Regional Medical Director, DOCS; Steven Van
Buren, Regional Health Services Administration;
Dr. Bendhein, Medical Doctor, GHCF; Albert
Paolano, Facility Health Service Director, GMCF;
Howard Silverburg, Medical Doctor, GMCF;
Mr. Nesmith, Physician's Assistant, GMCF;
V. Blaestz, Senior Correctional Counselor,
GHCF; John Tiorney, Correctional Sergeant,
GHCF; S. Ullrich, Correctional Sergeant, GHCF;
Gerald Tillotson; David Mazzella; Charles
V. Austin; W.R. Kelly; C. Mitchell; J. Erns;
M. Miller; and M. Mrzyglod, Defendants.

No. 9:03-CV-1385.
|
Aug. 6, 2007.

**Attorneys and Law Firms**

Rafael Messa, Dannemora, NY, pro se.

Bridget Erin Holohan, New York State Attorney General,
Albany, NY, for Defendants.

### DECISION and ORDER

THOMAS J. McAVOY, Senior United States District
Judge.

**\*1** Plaintiff Rafael Messa, appearing *pro se,* brings
this action pursuant to 42 U.S.C. § 1983 against
nineteen New York State Department of Corrections
("DOCS") employees, alleging that they violated his
Eighth and Fourteenth Amendment rights. Dkt. No.
1, 55. Defendants moved for summary judgment under
Rule 56(b) of the Federal Rules of Civil Procedure. Dkt.
No. 70. The matter was referred to the Hon. David R.

Homer, United States Magistrate Judge, for a Report-
Recommendation pursuant to 28 U.S.C. § 636(b) and
Local Rule 72.3(c).

The Report-Recommendation dated February 26,
2007 recommended that Defendants' motion for
summary judgment dismissing Plaintiff's complaint be
granted, in part, with respect to Plaintiff's Eighth
Amendment claim of deliberate indifference to his
serious medical needs and Fourteenth Amendment claim
that Defendant Blaetz violated Plaintiff's due process
rights by finding Plaintiff guilty of disciplinary charges
without any supporting evidence. However, the Report-
Recommendation recommended that Defendants' motion
otherwise be denied, and that the matter proceed with
regard to Plaintiff's claim that Defendants violated
the Eighth Amendment's prohibition against cruel and
unusual punishment by using excessive force and by
failing to intervene in the use of such force. The
Magistrate Judge also recommended that Plaintiff be
granted thirty days to file an amended complaint to allege
that Defendants violated the Fourteenth Amendment due
process clause by failing to provide Plaintiff with an
adequate translator. Both parties had the opportunity
to submit objections to the Report-Recommendation.
Plaintiff did not file any objections despite being given a
time extension to file. Defendants filed objections to the
report, contending, first, that they should not be estopped
from asserting the affirmative defense that Plaintiff failed
to exhaust his administrative remedies, and second, that
Plaintiff should not be given the opportunity to amend his
complaint to allege a Fourteenth Amendment due process
violation caused by Defendants' failure to provide an
adequate translator at Plaintiff's April 9, 2001 disciplinary
hearing.

When objections to a magistrate judge's Report-
Recommendation are lodged, the Court makes a *"de
novo* determination of those portions of the report or
specified proposed findings or recommendations to which
objection is made." *See* 28 U.S.C. § 636(b)(1). After such a
review, the Court may "accept, reject, or modify, in whole
or in part, the findings or recommendations made by
the magistrate judge. The judge may also receive further
evidence or recommit the matter to the magistrate judge
with instructions." *Id.*

Having reviewed the record *de novo* and considered
the issues raised in Defendants' objections, this Court

2007 WL 2288106

has determined to accept and adopt Magistrate Judge Homer's recommendations for the reasons stated in the February 26, 2007 Report-Recommendation.

It is therefore

**\*2** ORDERED that Defendants' motion for summary judgment (Dkt. No. 70) is GRANTED in part and DENIED in part. Plaintiff's Fourteenth Amendment due process claim is DISMISSED as it relates to Defendant Blaetz' alleged failure to provide evidentiary support for her decisions at the April 9, 2001 disciplinary hearing. Furthermore, Plaintiff's Eighth Amendment claim that Defendants Bendheim, Paolano, Silverburg, Nesmith, LeClaire, Wright, Van Buren, and Stern inadequately treated and were deliberately indifferent to Plaintiff's medical needs is DISMISSED in its entirety. The motion is DENIED as to Plaintiff's Eighth Amendment claim of excessive force because triable issues of fact exist regarding whether the threats Plaintiff alleges were sufficient to estop Defendants from asserting the defense of non-exhaustion. Lastly, Plaintiff is GRANTED thirty (30) days to file an amended complaint, whereby he may allege violation of his Fourteenth Amendment right to an adequate translator.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 2288106

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

---

2006 WL 1313344
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Mark LARRY, Plaintiff,

v.

P. BYNO, Corrections Officer; J. Anctil,
Corrections Officer; R. Girdich, Superintendent;
G. Goord, Commissioner, Defendants.

No. 9:01-CV-1574.
|
May 11, 2006.

**Attorneys and Law Firms**

Mark Larry, New York, NY, Pro Se.

Kate H. Nepveu, Krista A. Rock, David L. Cochran, New York State Attorney General, Albany, NY, for Defendants.

***DECISION and ORDER***

THOMAS J. McAVOY, Senior United States District Judge.

## I. INTRODUCTION

**\*1** At all times relevant hereto, Plaintiff Mark Larry was an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), and was incarcerated in Franklin Correctional Facility ("Franklin"). Plaintiff, proceeding *pro se*, alleges violations of his civil rights by four DOCS employees. On October 4, 2001, Plaintiff filed a Complaint pursuant to 42 U.S.C. § 1983 alleging that Defendant Lieutenant P. Byno violated his constitutional rights. On January 20, 2002, Plaintiff filed an Amended Complaint which named Defendants Sergeant James Anctil, Superintendent Roy Girdich, and Commissioner Glenn Goord, in their individual and official capacities. Specifically, Plaintiff alleges that, because he filed complaints with "Superior staff," he was physically assaulted by Byno and was threatened to be killed if he continued to write complaints. *See* Am. Compl. at ¶ 12. Plaintiff further alleges that Goord failed to address his complaints about the "retaliatory, discriminatory [and] degrading treatment" of

Franklin inmates, that Girdich allowed Byno to conduct an investigation into Plaintiff's claim of misconduct which allowed for further physical injury, and that Anctil was present when Byno conducted his investigation of Plaintiff's claim, but did not attempt to curb Byno's alleged attack on Plaintiff. *See* Am. Compl. at ¶¶ 12-16. Plaintiff's motion for injunctive relief was denied as moot in a July 29, 2002 order (docket no.34) and Plaintiff's remaining motion is for monetary damages.

Defendants moved to dismiss the Complaint pursuant to Fed.R.Civ.P. 12(b)(1) or 12(b)(6) in light of the Supreme Court's decision in *Porter v. Nussle,* 122 S.Ct. 983 (2002), which provides that a plaintiff must first exhaust administrative remedies before commencing litigation. On March 18, 2003, the Court granted Defendants' motion and Plaintiff's Complaint was dismissed without prejudice.

On appeal, the Second Circuit vacated the judgment and remanded the case for further proceedings in light of its decision in *Hemphill v. State of New York,* 380 F.3d 680 (2d Cir.2004). Specifically, the Second Circuit directed this Court to determine whether administrative remedies were, in fact, "available" to the Plaintiff, or whether estoppel or "special circumstances" exist to excuse Plaintiff's failure to exhaust the administrative remedies in light of *Hemphill.*

## II. FACTS

On April 4, 2001, Plaintiff drafted and mailed a letter to Superintendent Girdich, Complaint # 109-01, alleging retaliation and intimidation for having written prior complaints. Am. Compl. ¶ 10. According to Plaintiff, on April 17, 2001, during the investigation of Complaint # 109-01, he was assaulted by Byno in retaliation for writing to "Superior staff." Am. Compl. ¶ 12. During the alleged assault, Byno physically forced the Plaintiff against a wall and expressly "threatened to ... kill[ ]" him if he continued to write to the Superintendent. *Id.* On April 4, April 21, and April 25, 2001, Plaintiff sent letters to Superintendent Roy Girdich. On April 13, 2001, a memorandum was drafted by Superintendent Girdich that acknowledged receipt of the Plaintiff's initial letter.

## III. DISCUSSION

**\*2** For purposes of this decision on Defendants' motion to dismiss, the facts as alleged by Plaintiff in his Amended Complaint are accepted as true. *Sheppard v. Beerman,* 18

F.3d 147, 150 (2d Cir .1994) (noting that "a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant").

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." The Supreme Court held that the PLRA's exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002). The PLRA was enacted to "reduce the quantity and improve the quality of prisoner suits" by giving prison officials the first opportunity to deal with inmate complaints by internal processes. *Id.* at 524-25. The act's "dominant concern [is] to promote administrative redress, filter out groundless claims, and foster better prepared litigation of claims aired in court," *id.* at 528, and "clarif[y] the contours of the controversy" once it is litigated. *Id.* at 525.

Following *Nussle,* the Second Circuit decided a series of cases on the extent of exhaustion required by inmate plaintiffs to meet the requirements of PLRA. *Ortiz v. McBride,* 380 F.3d 649 (2004); *Abney v. McGinnis,* 380 F.3d 663, (2004); *Giano v. Goord,* 380 F.3d 670, (2004); and *Johnson v. Testman,* 380 F.3d 691, (2004). In *Hemphill* the Second Circuit noted that:
Read together, ... [these] decisions ... suggest that a three-part inquiry is appropriate in cases where a prisoner plausibly seeks to counter defendants' contention that the prisoner has failed to exhaust available administrative remedies as required by the PLRA. Depending on the inmate's explanation for the alleged failure to exhaust, the court must ask whether administrative remedies were in fact "available" to the prisoner. The court should also inquire as to whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense. If the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped

and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should consider whether "special circumstances" have been plausibly alleged that justify "the prisoner's failure to comply with administrative procedural requirements."

**\*3** *Hemphill,* 380 F.3d at 686 (citations omitted). This three-part inquiry will be addressed in order.

### A. Whether administrative remedies were, in fact, "available" to the Plaintiff

The DOCS has a well-established three-step Inmate Grievance Program ("IGP") to resolve inmate complaints. First, the inmate files a level 1 grievance (either on an Inmate Grievance Complaint Form, or on plain paper if the form is not readily available) with the Inmate Grievance Resolution Committee ("IGRC"). The IGRC, which is composed of fellow inmates and prison officials, must convene a hearing within seven working days, and issue a written decision within two days of the hearing. *See Hemphill* at 682. The level 1 grievance must be filed within fourteen days of the alleged incident. 7 N.Y.C.R.R. § 701.7(a)(1). Next, the inmate has four days to appeal the IGRC decision to the superintendent of the facility, who must respond within ten days and must provide "simple directions" on how to appeal to the next level, the Central Office Review Committee ("CORC"). The inmate's final opportunity for resolution of his grievance is to appeal to the CORC within four working days of the Superintendent's decision, or in the situation where the inmate does not receive the written decision from the Superintendent within twelve working days, the grievant may appeal his grievance to CORC. Directive 4040, Part VII(F). The CORC then has 20 working days to render a decision. 7 N.Y.C.R.R. § 701.7(c)(4). There is also an expedited grievance procedure for prisoners who, as in the present case, allege that they have been harassed or assaulted by correctional officers. 7 N.Y.C.R.R. § 701.11. Under the regulation in place as of Plaintiff's alleged assault, it was unclear whether the expedited procedure altered the procedure for a prisoner to file a grievance. [1]

---

[1]    Effective on April 14, 2004, the regulation was amended to provide that the prisoner should follow the same procedures set forth in the three-step IGP. 7 N.Y.C.R.R. § 701.11(1) ("An inmate who wishes to file a grievance complaint that alleges employee

harassment shall follow the procedures set forth in section 701.7(a)(1) of [the three-step IGP].").

The Second Circuit "has recognized that while the PLRA's exhaustion requirement is mandatory, certain caveats apply." *Giano v. Goord,* 380 F.3d 670, 677 (2d Cir.2004). In *Hemphill,* the Second Circuit addressed whether administrative remedies were "available" under facts that closely resemble those in the present case. In *Hemphill,* the prisoner alleged that several correctional officers had assaulted him and threatened him that he had "better drop" a claim that the officers believed he had filed. Following the incident, the plaintiff wrote a letter to the superintendent stating that he intended to file "criminal charges" against the officers, but never filed a grievance with the IGRC. *See* 380 F.3d at 683-84, 686. The Second Circuit articulated that the proper test for determining whether ordinary grievance procedures were "available" was whether "a similarly situated individual of ordinary firmness [would] have deemed them available." Notably, the Court commented that

> threats or other intimidation by prison officials may well deter a prisoner of "ordinary firmness" from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system, or to external structures of authority such as state or federal courts.

**\*4** *Id.* at 688.

In the present case, Plaintiff alleges that he was physically assaulted by Defendant Byno in retaliation for his mailing an earlier complaint. *See* Am. Compl. ¶ 12. Although Plaintiff contends that his use of a "secondary means" to address the grievance was established by the superintendent, it is clear that these informal letters of complaint technically did not start the formal grievance process of the IGP. However the Second Circuit has reaffirmed that "in some circumstances, the behavior of the defendants may render administrative remedies unavailable." *Hemphill,* 380 F.3d at 686. If the allegation of physical assault and threats of violence are true, it is certainly plausible that Byno's conduct would deter a person of ordinary firmness from using the grievance process to grieve the instant claims, and, as in *Hemphill,*

the Court is unable to conclude that the normal grievance procedures were "available" to Plaintiff.

**B. Whether estoppel exists to excuse Plaintiff's failure to exhaust the administrative remedies**

The Second Circuit also held in *Hemphill* that "prison officials' threats or other inhibiting conduct may estop defendants from asserting the affirmative defense of non-exhaustion." 380 F.3d at 688 (restating the holding of *Ziemba v. Wezner,* 366 F.3d 161 (2d Cir.2004)). Plaintiff alleges that, during the investigation of Complaint # 109-01, Byno physically assaulted him and expressly threatened that he would kill him. Arguably, Byno's words and actions implied that he would again assault Plaintiff if he mailed another complaint. It, thus, may have been reasonable for Plaintiff to rely on Byno's threat and opt against filing a formal grievance and going straight to the Superintendent. If these allegations are true, it could be concluded that Plaintiff's actions were been sufficiently inhibited and Byno should be estopped from raising the defense of non-exhaustion.

**C. Whether Plaintiff's failure to exhaust remedies is justified by "special circumstances"**

The Supreme Court had held that the PLRA requires administrative exhaustion; however, there may be "certain 'special circumstances' in which, though administrative remedies may have been available and though the government may not have been estopped from asserting the affirmative defense of non-exhaustion, the prisoner's failure to comply with administrative procedural requirements may nevertheless have been justified." *Giano,* 380 F.3d at 676 (citing *Berry v. Kerik,* 366 F.3d 85, at 87-88 (2004)). In *Hemphill,* the Second Circuit held that the plaintiff's attempt to exhaust available administrative remedies by writing directly to a superintendent comported with DOCS procedural rules (or at least, reflected a reasonable interpretation of those regulations at the time), when the plaintiff received threats and his fear of retaliation justified sending a letter directly to a superintendent instead of filing a level one grievance. 380 F.3d at 690. The special circumstances under *Hemphill* are not readily distinguishable from this case. Like in *Hemphill,* in this case Plaintiff wrote directly to the superior officers, and purportedly also to Albany, skipping the level one grievance procedure. Although there is no evidence of reliance on, or misinterpretation of, any of DOCS regulations, *see Giano,* 380 F.3d at 679,

**Larry v. Byno, Not Reported in F.Supp.2d (2006)**
Case 9:09-cv-00517-LEK-TWD   Document 113   Filed 06/16/17   Page 63 of 101
2006 WL 1313344

Plaintiff was under threats that, line in *Hemphill,* may justify writing a letter directly to a superintendent rather than filing a level one grievance. *See Hemphill,* 380 F.3d at 690. Upon consideration of the interplay between Byno's threats and the Plaintiff's decision to bypass filing a level 1 grievance, it cannot be said as a matter of law that special circumstances did not exist in this case.

## IV. CONCLUSION

**\*5** For the foregoing reasons, the Defendants' motion to dismiss on exhaustion grounds is DENIED. The parties will be permitted to undertake limited discovery as to the alleged threats. Thereafter, Defendants may, if they choose, move for summary judgment on this issue.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 1313344

---

2006 WL 162996
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Lloyd Elton BODDIE, Jr., Plaintiff,
v.
J. BRADLEY, Correctional Officer; D. Barber,
Correctional Officer; M. Lamar, Correctional
Officer; Mr. Harvey, Hearing Officer; M.
Schaap, Correctional Officer; P. Callanan,
Correctional Counselor; W. Naylor, Correctional
Officer; and G. Scrcki, Lieutenant, Defendants.

No. 9:99-CV-1016.
|
Jan. 20, 2006.

**Attorneys and Law Firms**

Lloyd Elton Boddie, Elmira, NY, pro se.

Stephen M. Kerwin, Office of Attorney General,
Department of Law, Albany, NY, for Defendants.

DECISION & ORDER

MCAVOY, Senior J.

I. Introduction

 **\*1** Plaintiff Lloyd Elton Boddie ("Boddie"), proceeding
*pro se,* filed a complaint on June 28, 1999, pursuant to
42 U.S.C. §§ 1983 and 1985 alleging that Defendants,
eight New York State Department of Correctional
Services ("DOCS") employees, violated his constitutional
rights. Specifically, Plaintiff alleges that Defendants filed
false misbehavior reports, delayed access to legal mail,
provided unsanitary food and living conditions, caused
loss of his personal property, assaulted him, and failed
to provide timely disciplinary hearings all in violation
of the First, Eighth and Fourteenth Amendments. The
complaint sought compensatory and punitive damages.

Defendants moved to dismiss the complaint pursuant to
Fed.R.Civ.P. 12(b)(6). On March 25, 2002, this Court
adopted the Report-Recommendation and Order dated
March 8, 2001 by Magistrate Judge Homer and granted
Defendants' motion to dismiss the action on the ground

that Plaintiff failed to exhaust available administrative
remedies as required by 42 U.S.C. § 1997e(a). Plaintiff
appealed.

On appeal, the Second Circuit vacated the judgment and
remanded the case for further proceedings in light of the
Second Circuit's decisions in *Giano v. Goord,* 380 F.3d
670 (2d Cir.2004), *Hemphill v. State of New York,* 380
F.3d 680 (2d Cir.2004), and *Johnson v. Testman,* 380 F.3d
691 (2d Cir.2004). Specifically, the Second Circuit directed
this Court to determine (1) whether Boddie's letters of
complaint sufficed to put the defendants on notice and
give them an opportunity to address the complaints
internally in light of *Johnson* decision, 380 F.3d at 697;
(2) whether Boddie's appeals of the misbehavior reports
filed against him were "enough to 'alert [ ] the prison to
the nature of the wrong for which redress is sought," ' *id.;*
and (3) whether "special circumstances" exist to excuse
Boddie's failure to exhaust the administrative remedies
in light of the *Giano,* 380 F.3d at 675-76, and *Hemphill,*
380 F.3d at 689, decisions. The Second Circuit directed
this Court's attention to Boddie's claims that he had filed
letter complaints about various incidents alleged in his
Complaint.

II. Background
Boddie stated on the Inmate Civil Rights Complaint
Form that he had not filed any grievances. Based on
this admission, both the Magistrate Judge and this Court
concluded that Plaintiff did not exhaust the available
administrative remedies and dismissed the case. However,
in the body of his Complaint, Boddie claims that he filed
letter complaints about various incidents. In addition,
Boddie now claims that he appealed the misbehavior
reports filed against him and that these appeals should
be sufficient to exhaust his claims based on those
misbehavior reports.

III. Facts
On April 14, 1997, Plaintiff complained to Deputy
Superintendent of Security William Connolly about
Officer Bradley's misconduct of serving inmates their
meals on the floor. William Connolly stated this conduct
would not be repeated. Compl. 4C. [1]

[1]       In his Memorandum of law, Plaintiff additionally
          stated that, on April 16, 1997, he wrote a formal

Boddie v. Bradley, Not Reported in F.Supp.2d (2006)

2006 WL 162996

complaint against Bradley's misconduct to Deputy Superintendent of Security William Connolly, but it has never been fully investigated and nobody responded to him. Memorandum of Law at pp. 3-4.

**\*2** On August 29, 1997, Plaintiff filed a grievance against Officer Barber for the allegedly "false" misbehavior report filed by Barber. *Id.* at 4D. Plaintiff stated in his grievance that any future threats, reprisals or harassment would be in retaliation for filing this grievance. *Id.* Plaintiff did not specify to whom he filed this formal grievance, but he stated that he did not receive any response from state officials in the "Central Office." *Id.*

Additionally, in his Memorandum of Law, Plaintiff alleges that he wrote letters to various Superintendents for missing personal property on March 29, 1998; for the missing window in his cell on April 3, April 12 and May 3, 1998; and finally he wrote a complaint letter to Maggie Lizenberger, L.S. in Central Office about Officer Davis' holding up law material from Plaintiff.

IV. Discussion

For purposes of this decision on Defendants' motion to dismiss, the facts as alleged by Plaintiff in his Complaint are accepted as true. *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994) ("a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant.").

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." The Supreme Court held that the PLRA's exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

The regular DOCS grievance procedure consists of three tiers. *Hemphill* 380 F.3d at 682. The first step for the inmate is to file a level 1 grievance (either on an Inmate Grievance Complaint Form, or on plain paper if the form is not readily available) with the Inmate Grievance Resolution Committee ("IGRC"). [2] The IGRC, which is

composed of fellow inmates and prison officials, must convene a hearing within seven working days, and issue a written decision within two days of the hearing. Next, the inmate has four days to appeal the IGRC decision to the superintendent of the facility, who must respond within ten days and must provide "simple directions" on how to appeal to the next level, the Central Office Review Committee ("CORC"). The inmate's final opportunity for resolution of his grievance is to appeal to the CORC within four working days of the superintendent's decision. The CORC then has 20 working days to render a decision. 7 N.Y.C.R.R. § 701.7(c)(4).

2       The inmate has fourteen days from the date of the incident complained of to file a complaint, but "mitigating circumstances" may toll the deadline. 7 N.Y.C.R.R. § 701.7(a)(1).

The Second Circuit directed this Court to determine three issues. *Supra* opinion, at 2. The first two issues implicate both procedure and the substance of his claims, whereas, the third issue is exclusively on the procedural aspect. Because the procedural requirements must be met before this Court can rule on the merits, the third issue is discussed first.

A. Whether Plaintiff's failure to exhaust remedies is justified by "special circumstances" in light of *Giano,* 380 F.3d at 675-76, and *Hemphill,* 380 F.3d at 689.

**\*3** The Supreme Court held that the PLRA requires administrative exhaustion even where the grievance process does not permit money damages and the prisoner seeks only money damages. *Booth v. Churner,* 532 U.S. 731, 734, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001). Noting that Congress replaced the text of the statute in § 1997e(a), the Court held that Congress has mandated exhaustion regardless of the "relief sought and offered" through administrative procedures. *Id.* at 741, note 6. The Court further stated that one must " 'exhaust[ ]' processes, not forms of relief." *Id.* at 739. However, there may be "certain 'special circumstances' in which, though administrative remedies may have been available and though the government may not have been estopped from asserting the affirmative defense of non-exhaustion, the prisoner's failure to comply with administrative procedural requirements may nevertheless have been justified." *Giano,* 380 F.3d at 676 (citing *Berry,* 366 F.3d at 88; *Rodriguez* Order at 1). In *Giano,* the plaintiff's reasonable interpretation of ambiguous DOCS

regulations justified his failure to exhaust remedies. *Id.* The Second Circuit held that the plaintiff in *Giano* reasonably concluded that DOCS regulations did not provide any available administrative remedies. *Id.* In *Hemphill,* the Second Circuit held that the plaintiff's attempt to exhaust available administrative remedies by writing directly to a superintendent comported with DOCS procedural rules (or at least, reflected a reasonable interpretation of those regulations), when the plaintiff received threats and his fear of retaliation justified sending a letter directly to a superintendent instead of filing a level one grievance. 380 F.3d at 690.

In this case, Plaintiff offered two reasons for his failure to file grievances-(1) that no relief was available for his constitutional claims; and (2) that he could not recover any monetary damages. As the Supreme Court held in *Booth,* the mere fact that he could not recover any monetary damages through the state prison's grievance procedure is not a valid justification for failing to file grievances. 532 U.S. at 734. The other reason that Plaintiff provided also is without merit. All of Plaintiff's claims pertain to prison conditions. The PLRA is unambiguous about the exhaustion requirement that "[n]o action shall be brought with respect to prison conditions under section 1983 ... until such administrative remedies as available are exhausted." 42 U.S.C. § 1997e(a).

The special circumstances under *Giano* and *Hemphill* are distinguishable from this case. Unlike *Giano,* Plaintiff in this case did not rely on any provisions of DOCS regulations in his decision not to exhaust remedies. Therefore the special circumstances identified in *Giano* do not exist in this case. *Hemphill* may be more analogous to this case. Like *Hemphill,* Plaintiff in this case wrote directly to the Superintendent, skipping the level one grievance procedure. However, the similarity of this case to *Hemphill* stops there. Unlike in *Hemphill,* here, there is no evidence of reliance on any of the DOCS' regulations. This Court specifically afforded Plaintiff an opportunity to explain why he skipped level one of the grievance procedures and was apprised of the decisions in *Johnson, Giano,* and *Hemphill.* Notwithstanding this, Plaintiff does not rely on any misinterpretation of DOCS regulations. Furthermore, Plaintiff was not under threats that might justify writing a letter directly to a superintendent rather than filing a level one grievance. *Id.* at 690. Therefore, no special circumstances exist in this case.

B. Whether Boddie's letters of complaint sufficed to put the defendants on notice and give them an opportunity to address Boddie's complaints internally in light of *Johnson,* 380 F.3d 691.

**\*4** In *Johnson,* the Second Circuit remanded the case to the district court to determine, among other things, whether the plaintiff was justified in raising his complaint against a defendant through a disciplinary appeal, rather than by filing a separate grievance. *Id.* at 698. The Second Circuit asked whether the plaintiff's submissions in the disciplinary process were sufficient, in a substantive sense, to exhaust his remedies under § 1997e(a). *Id.* at 697. It should be noted that the Second Circuit decisions in *Johnson* and *Giano* did not overrule its prior decision in *Berry v. Kerik,* 366 F.3d 85 (2d Cir.2004). Rather, the Second Circuit reaffirmed *Berry* in *Giano.* 380 F.3d at 676. In *Berry,* the plaintiff filed telephone and mail complaints directly to the Inspector General and argued that the exhaustion requirement was met. 237 F.Supp.2d 450 (S.D.N.Y.2002), *aff'd,* 366 F.3d 85 (2d Cir.2004). However, the court ruled that the city prisoner's informal complaints to city's inspector general's office did not exhaust his administrative remedies, and, thus, the prisoner was required under the PLRA to adhere to available formal administrative procedures before filing a § 1983 suit against prison officials. *Id.* at 452 (" 'To allow [P]laintiff to bypass those procedures would obviate the purpose for which the procedures were enacted.' ")(quoting *Grey v. Sparhawk,* 2000 WL 815916, at 2 (S.D.N.Y. June 23, 2000)).

In the instant case, Plaintiff did not raise his complaint through a disciplinary appeal as in *Johnson.* [3] Rather, Boddie filed two formal complaints, one against Officer Barber and the other against Officer Bradley. With regard to his complaint against Barber, Boddie did not specify to whom he sent a letter. However, he stated that he did not receive any response from "state officials out of Central Office." Compl. at 4D. With regard to Bradley, Plaintiff wrote a complaint to Deputy Superintendent of Security William J. Connolly and a further letter to Central Office. Plaintiff did not receive any response to his complaint.

[3]     Plaintiff now claims that he appealed the misbehavior reports filed against him and that these appeals should be sufficient to exhaust his claims based on those misbehavior reports. In support of this claim, he provided his letter of Appeal to the Commissioner

Case 9:09-cv-00517-LEK-TWD   Document 113   Filed 06/16/17   Page 67 of 101
Boddie v. Bradley, Not Reported in F.Supp.2d (2006)
2006 WL 162996

dated Feb. 18, 1999 along with the subsequent Review of the Superintendent's Hearing by the Director of Special Housing/ Inmate Disciplinary Program. However, this evidence is not related to any of the claims alleged in the instant Complaint. Evidence of exhaustion of remedies in one claim does not prove that the administrative remedies are exhausted in other claims. Further, even if Plaintiff amends his Complaint and includes this new allegation, he still fails the exhaustion requirement because Plaintiff does not allege, and therefore fails to show, that he reasonably believed that the appellate process for disciplinary rulings and inmate grievance process is "one and the same" because of unclear regulations governing grievance procedures. *Johnson,* 380 F.3d at 696.

As opposed to *Johnson,* in which the plaintiff pursued his claims through a different venue, here, Plaintiff ignored and skipped the first step of the grievance procedure. Plaintiff should have filed an initial complaint with the IGRC, and, if not satisfied, appealed its decision to the Superintendent, and then finally to the Central Office. 7 N.Y.C.R.R. § 701.7. The question in this case is not, as in *Johnson,* whether Plaintiff's submissions in the disciplinary process are sufficient to exhaust the remedies under the PLRA in a substantive sense, but rather, whether Plaintiff's failure to follow the established state grievance procedure is justified. In his own accounts, Plaintiff admitted that he sent complaint letters to either the Superintendents or Central Office, thereby skipping the first level of grievance procedure. Memorandum of Law at pp. 36-39. Plaintiff's failure to follow the grievance procedure and to provide any justification for failing to follow the procedure is distinguished from complaining through the disciplinary appeal in *Johnson* and *Giano. Berry'* s holding governs the result of the case before the Court today.

C. Whether Plaintiff's appeals of the misbehavior report filed against him were "enough to 'alert [ ] the prison to the nature of the wrong for which redress is sought,' '

**\*5** In *Johnson,* the Second Circuit directed the district court to determine whether the plaintiff's descriptions

of the defendant's misconduct in the disciplinary appeal provided enough information to allow prison officials to take appropriate responsive measures. 380 F.3d at 697. As the words "descriptions" and "enough information" indicate, this inquiry is about the "particular content" of inmate grievances. *Id.* Also, the *Johnson* court's quotation of a Seventh Circuit case confirms the fact that this inquiry is about the content of the grievances. *Id.* ("if prison regulations do not prescribe any particular *content* for inmate grievances, 'a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought.' ") (quoting *Strong v. David,* 297 F.3d 646, 650 (7 th Cir.2002)) (emphasis added).

The Court does not consider the content of the grievance in this case, because, first, the decision to dismiss the case was not based on the contents of the complaint letters sent by Plaintiff or any appeals he made and, second, the issue Petitioner raised on appeal (that he appealed the misbehavior reports filed against him and that these appeals should be sufficient to exhaust the remedies) is not the same as the claims he alleged in the Complaint. *Supra* note 3, at 7. Plaintiff skipped the level one grievance procedure without justification. Accordingly, his claim of exhausting administrative remedies through disciplinary appeals is not sufficient to meet the exhaustion requirement. *Id.* Because Plaintiff's grievance was not properly before the prison officials from a procedural standpoint, the content of his grievance is irrelevant.

For the foregoing reasons, Defendants' motion to dismiss is GRANTED and Plaintiff's complaint is DISMISSED because Plaintiff has failed to exhaust available administrative remedies as required by 42 U.S.C. § 1997e(a).

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 162996

---

2005 WL 3164248
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Derrick McCULLOUGH, Plaintiff,
v.
T. BURROUGHS, Correctional Officer, Arthur Kill
Correctional Facility; Mendez, Correctional Officer,
Arthur Kill Correctional Facility, Defendants.

No. 04-CV-3216 FB LB.
|
Nov. 29, 2005.

**Attorneys and Law Firms**

Derrick McCullough, Marcy, NY, pro se.

Eliot Spitzer, Attorney General of the State of New
York, by Donald Paul Delaney, Esq., Assistant Attorney
General, New York, NY, for Defendants.

*MEMORANDUM & ORDER*

BLOCK, District Judge.

**\*1** *Pro se* prisoner plaintiff, Derrick McCullough
("McCullough"), brings this lawsuit under 42 U.S.C.
§ 1983 against defendants T. Burroughs ("Burroughs")
and L. Mendez ("Mendez")[1] in both their individual
capacities and as officers of Arthur Kill Correctional
Facility ("Arthur Kill"),[2] a division of New York
State Department of Correctional Services ("DOCS").
McCullough, a former inmate at Arthur Kill, alleges, *inter
alia,* that the defendants assaulted him and seeks monetary
damages and injunctive relief.

[1]    The caption of the complaint lists the defendant
       as "Mendez"; however, the body of the complaint
       identifies the defendant as "L. Mendez." Compl. at 1.

[2]    Although the caption of the complaint does not
       specify the capacities in which the defendants
       are being sued, the body of the complaint notes
       that plaintiff is suing the defendants in both
       their "official and individual capacit[ies,]" Compl.
       at 3-4; accordingly, the Court will treat the

complaint as against the defendants in both of these
capacities. *See Soto v. Schembri,* 960 F.Supp. 751,
755 (S.D.N.Y.1997) (treating complaint as suing
defendants in official capacities because body of
complaint referred to defendants in their official
capacities).

Defendants move to dismiss the complaint under
Federal Rule of Civil Procedure 12(b)(6) on the ground
that McCullough has not exhausted his administrative
remedies as required by the Prisoner Litigation Reform
Act ("PLRA"), 42 U.S.C. § 1997e(a). Because both
parties have presented material outside the pleadings
and McCullough has construed the defendants' motion
as one for summary judgment, *see* McCullough's Opp.
to Defs.' Motion at 1 (labeling his opposition as a
response to defendants' motion for summary judgment
*and* for dismissal), the Court will treats it as one for
summary judgment (defendants provided McCullough
with the requisite advisory notice pursuant to Local
Rule 12.1). *See Scott v. Gardner,* 287 F.Supp.2d 477,
485-86 (S.D.N.Y.2003) (sufficient notice to treat motion
to dismiss as one for summary judgment where defendants
served Local Rule 12.1 notice on plaintiff); *see also Taylor
v. New York State Dep't of Corrs.,* 2004 WL 2979910, at
\*4 (S.D.N.Y. Dec. 22, 2004) (treating motion to dismiss as
one for summary judgment where Local Rule 12.1 notice
served on *pro se* plaintiff).

Preliminarily, the Court *sua sponte* dismisses
McCullough's claims for damages against the defendants
in their official capacities because they are barred by the
Eleventh Amendment, [3] *see Davis v. New York,* 316 F.3d
93, 101 (2d Cir.2002) (citing *Kentucky v. Graham,* 473
U.S. 159, 169 (1985) (a claim for damages against state
officials in their official capacity is considered to be a
claim against the State and is therefore barred by the
Eleventh Amendment)); however, McCullough's claims
for prospective injunctive relief against the defendants in
their official capacities are not barred by the Eleventh
Amendment and therefore are not dismissed. *See Dube v.
State Univ. of New York,* 900 F.2d 587, 595 (2d Cir.1990)
("On the other hand, a state official acting in his official
capacity may be sued in a federal forum to enjoin conduct
that violates the federal Constitution, notwithstanding the
Eleventh Amendment bar."). For the following reasons,
summary judgment is denied in all other respects.

[3]    The Court may *sua sponte* dismiss a claim on the
       ground of Eleventh Amendment immunity because

it affects subject matter jurisdiction. *See Atlantic Healthcare Benefits Trust v. Googins,* 2 F.3d 1, 4 (2d Cir.1993) (*sua sponte* raising Eleventh Amendment immunity "because it affects ... subject matter jurisdiction").

## BACKGROUND

### A. McCullough's Affidavits

The following is taken from two affidavits submitted by McCullough: (1) an affidavit attached to his complaint and (2) an affidavit submitted in opposition to the defendants' motion.

On April 9, 2004, the defendants accosted him and ordered him to place his hands on the wall. Burroughs then "pat frisk[ed]" and "vi[ ]ciously punched" him in his left side, McCullough Aff. in Supp. of Compl. ¶ 5-6; during the encounter, Burroughs screamed, "Do you have a fucking beef with me?" and threatened that the defendants would "get [him] sooner or later." *Id.* ¶ 8. While Burroughs was punching him, Mendez "attempted to block other inmates from seeing what was occurring." *Id.* ¶ 7. McCullough believed that the incident was "in retaliation for a harassment grievance [that he] had filed against ... Burroughs." *Id.* ¶ 9.

*2 McCullough admits that he never filed a grievance in regard to this incident, but offers, as a justification, that it was "because of bias acts already placed against [him]." Aff. in Opp. to Defendants' Mot. ¶ 11. He did, however, submit a "formal complaint" to the superintendent of Arthur Kill and the Inspector General's ("IG") Office; furthermore, "[a] representative from the [IG]'s Office came to Arthur Kill to interview [him]." *Id.* ¶¶ 12-13. He also noted that the defendants have "constantly harassed" him and that, in the past, he had filed "[s]everal grievances against the defendants[.]" *Id.* ¶¶ 15-16.

### B. Defendants' Affidavit

The Director of the DOCS's Inmate Grievance Program ("IGP") submitted an affidavit averring that the Central Office Review Committee ("CORC"), a division of DOCS, had no record that McCullough had ever filed an appeal of any grievance. He did not state whether McCullough had ever filed a grievance of any kind. No other affidavits were submitted on the defendants' behalf.

## DISCUSSION

### I.

A district court must grant summary judgment "whenever it determines that there is no genuine issue of material fact to be tried." *Savino v. City of New York,* 331 F.3d 63, 71 (2d Cir.2003) (citing Fed.R.Civ.P. 56(c) and *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986)). "A genuine issue of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Id.* (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)). In considering a motion for summary judgment, the Court must "resolve all ambiguities and draw all factual inferences in favor of the nonmoving party." *Id.* (citing *Anderson,* 477 U.S. at 255). Moreover, "[w]here the non-moving party is proceeding *pro se,* the court must interpret that party's supporting papers liberally, that is, interpret them 'to raise the strongest arguments that they suggest.' " *Forsyth v. Federation Employment & Guidance Serv.,* 409 F.3d 565, 569 (2d Cir.2005) (quoting *Burgos v. Hopkins,* 14 F .3d 787 (2d Cir.1994)).

Under the PLRA, "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted[,]" 42 U.S.C. § 1997a(e); this exhaustion requirement applies "whether [a prisoner] allege[s] excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002). "[T]he burden of proving [McCullough]'s non-exhaustion rests upon defendants...." *Roland v. Murphy,* 289 F.Supp.2d 321, 323 (E.D.N.Y.2003); *see also Evans v. Jonathan,* 253 F.Supp.2d 505, 509 (W.D.N.Y.2003) ("The failure to comply with the PLRA's exhaustion requirement is viewed as an affirmative defense on which defendant bears the burden of proof." (citing *Jenkins v. Haubert,* 179 F.3d 19, 28-29 (2d Cir.1999)).

### A. NY DOCS Inmate Grievance Program ("IGP")

*3 The DOCS has a well-established three-step IGP to resolve inmate grievances. "First, the inmate files a level 1 grievance (either on an Inmate Grievance Complaint Form, or on plain paper if the form is not readily available) with the Inmate Grievance Resolution

Committee ("IGRC"), which is composed of fellow inmates and prison officials[,]" *Hemphill v. New York,* 380 F.3d 680, 682 (2d Cir.2004); the level 1 grievance must be filed within fourteen days of the alleged incident. *See* 7 N.Y.C.R.R. § 701.7(a)(1).

> The IGRC must convene a hearing, if necessary, within seven working days, and issue a written decision within two days of the hearing. Next, the inmate has four days to appeal the IGRC decision to the superintendent of the facility, who must respond within ten days and must provide "simple directions" on how to appeal to the next level, the [CORC]. The inmate's final opportunity for resolution of his grievance is to appeal to the CORC within four working days of the superintendent's decision. The CORC then has 20 working days to render a decision. 7 N.Y.C.R.R. § 701.7(c)(4).

*Hemphill,* 380 F.3d at 682. If any of the above steps is "not decided within the time limit[specified]," it "may be appealed to the next step." [4] 7 N.Y.C.R.R. § 701.8.

[4]   There is also an expedited grievance procedure for prisoners who, as in the present case, allege that they have been harassed or assaulted by correctional officers. *See* 7 N.Y.C.R.R. § 701.11. Under the regulation in place as of McCullough's alleged assault, it was unclear whether the expedited procedure altered the procedure for a prisoner to file a grievance; effective on April 14, 2004, five days after McCullough's alleged assault, the regulation was amended to provide that the prisoner should follow the same procedures set forth in the three-step IGP. *See* 7 N.Y.C.R.R. § 701.11(1) ("An inmate who wishes to file a grievance complaint that alleges employee harassment shall follow the procedures set forth in section 701.7(a)(1) of this Part [the three-step IGP set forth above]."). Under the amended regulation, the expedited grievance procedure differs from the ordinary grievance procedure only in the amount of time that the Superintendent has to render a decision in regard to the grievance. *See* 7 N.Y.C.R.R. § 701.11. In light of the Court's denial of summary judgment, the Court need not concern itself

with the nuances of the expedited grievance procedure before the amendment.

## B. Exceptions to the PLRA Exhaustion Requirement

The Second Circuit "has recognized that while the PLRA's exhaustion requirement is mandatory, certain caveats apply." *Giano v. Goord,* 380 F.3d 670, 677 (2d Cir.2004). First, in certain situations (such as when prison officials withhold a promised remedy), a court may deem the procedures not "available." *See id.* (citing, *inter alia, Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004)). Next, a prison official who inhibits a prisoner from using the grievance procedures may be estopped from invoking the exhaustion requirement. *See id.* (citing *Ziemba v. Wezner,* 366 F.3d 161 (2d Cir.2004)). Finally, " '[s]pecial circumstances' may exist that amount to a 'justification' for not complying with administrative procedural requirements." *Id.* (citing *Berry v. Kerik,* 366 F.3d 85, 88 (2d Cir.2004), and *Rodriguez v. Westchester County Jail Corr. Dep't,* 372 F.3d 485 (2d Cir.2004)).

Summary judgment must be denied because there are genuine issues of material facts as to: (1) whether grievance procedures were available to McCullough and (2) whether the defendants are estopped from raising the exhaustion defense.

## II.

### A. Availability of Administrative Remedies

In *Hemphill,* the Second Circuit addressed whether administrative remedies were "available" under facts that closely resemble those in the present case: there, the prisoner plaintiff alleged that several correctional officers had assaulted him and threatened him that he had "better drop" a claim that the officers believed he had filed; following the incident, the plaintiff wrote a letter to the superintendent stating that he intended to file "criminal charges" against the officers, but never filed a grievance with the IGRC. *See* 380 F.3d at 683-84, 686. The Second Circuit articulated that the proper test for determining whether ordinary grievance procedures were "available" was whether "a similarly situated individual of ordinary firmness [would] have deemed them available"; notably, it commented that "threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority

within the prison system, or to external structures of authority such as state or federal courts." *Id.* at 688. Applying the test to the limited factual record before it, the circuit court remanded to the lower court to determine whether or not the grievance procedures were available to the plaintiff. *See id.*

**\*4** Similarly, in the present case, McCullough alleges that he was physically assaulted by the defendants in retaliation for his filing an earlier grievance; if true, it is certainly plausible that the assault would deter a person of ordinary firmness from using that same grievance process to grieve the instant claims; therefore, as in *Hemphill,* the Court cannot conclude at this stage that the normal grievance procedures were "available" to McCullough.

### B. Estoppel

The Second Circuit also held in *Hemphill* that "prison officials' threats or other inhibiting conduct may estop defendants from asserting the affirmative defense of non-exhaustion." 380 F.3d at 688. "To establish equitable estoppel, the party claiming estoppel must show: (1) a misrepresentation by the opposing party; (2) reasonable reliance on that misrepresentation; and (3) detriment ." *Lewis v. Washington,* 300 F.3d 829, 834 (7th Cir.2002) (citation omitted). "When asserting equitable estoppel against the government, one must also prove affirmative misconduct." *Id.*

McCullough alleges that the April 9, 2004, assault occurred in retaliation for prior grievances that he had filed against Burroughs and that, during the assault,

Burroughs expressly threatened that he would "get [him]." Implicit in Burroughs' words and actions was that Burroughs would again assault McCullough if he filed another grievance against Burroughs; thus, it was reasonable for McCullough to rely on Burroughs' threat and opt against filing a subsequent grievance. If these allegations are true, Burroughs would be estopped from raising this defense of non-exhaustion. In regard to Mendez, although McCullough does not assert that Mendez directly threatened him or retaliated against him for filing grievances, *cf. Barad v. Comstock,* 2005 WL 1579794, at \*6 (W.D.N.Y. June 30, 2005) (no estoppel where individual defendants did not make threats against plaintiff), the Court cannot conclude in light of the limited record before it that Mendez is not similarly estopped. *See Liner v. Goord,* 310 F.Supp.2d 550, 554 (W.D.N.Y.2004) (denying motion for summary judgment because further factual development was required).

### CONCLUSION

Summary judgment is granted with respect to the claims for damages against the defendants in their official capacities and otherwise denied.

**SO ORDERED.**

### All Citations

Not Reported in F.Supp.2d, 2005 WL 3164248

---

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2004 WL 1946458
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Michael PENDERGRASS, Plaintiff,

v.

Corrections Officers T. SANNEY et al., Defendants.

No. 01 CV 243A.
|
Aug. 18, 2004.

**Attorneys and Law Firms**

Michael Pendergrass, Pine City, NY, pro se.

Ann C. Williams, Buffalo, NY, for Defendant.

Order and Report & Recommendation

SCOTT, Magistrate J.

*\*1* The following motions are before the court: the defendants' motion to dismiss based upon a failure to exhaust (Docket No. 11) and the plaintiff's motion for appointment of counsel (Docket No. 20). [1]

[1]   The Court notes that the plaintiff's motion for reconsideration (Docket No. 9) was denied on December 18, 2003. (Docket No. 17).

Background

In this inmate civil rights action brought pursuant to 42 U.S.C. § 1983, the plaintiff, Michael Pendergrass ("Pendergrass"), alleges that on July 7, 2001 he was assaulted by Corrections Officer T. Sanney with the assistance or acquiescence of other corrections officers. He also alleged that various corrections officers conspired to coverup the attack. (See Complaint, Docket No. 1).

The defendant's move to dismiss this action on the grounds that Pendergrass allegedly failed to exhaust his administrative remedies as required under the Prisoner Litigation Reform Act, codified at 42 U.S.C. § 1997(e).

Discussion

Exhaustion
The Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." It is well settled that the PLRA's exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). This requirement applies even to suits seeking relief, such as money damages, that may not be available in prison administrative proceedings, as long as other forms of relief are obtainable through administrative channels. *Booth v. Churner,* 532 U.S. 731, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001). The Second Circuit has held that administrative exhaustion is not a jurisdictional predicate, *Richardson v. Goord,* 347 F.3d 431 (2d Cir.2003), and that plaintiffs are entitled to notice and an opportunity to be heard before a court can dismiss their complaints for failure to exhaust administrative remedies. *Snider v. Melindez,* 199 F.3d 108 (2d Cir.1999).

The regular grievance procedure established by the New York State Department of Correctional Services ("DOCS"). consists of three tiers. First, the inmate files a level 1 grievance (either on an Inmate Grievance Complaint Form, or on plain paper if the form is not readily available) with the Inmate Grievance Resolution Committee ("IGRC"), which is composed of fellow inmates and prison officials. [2] The IGRC must convene a hearing, if necessary, within seven working days, and issue a written decision within two days of the hearing. Next, the inmate has four days to appeal the IGRC decision to the superintendent of the facility, who must respond within ten days and must provide "simple directions" on how to appeal to the next level, the Central Office Review Committee ("CORC"). The inmate's final opportunity for resolution of his grievance is to appeal to the CORC within four working days of the superintendent's decision. The CORC then has 20 working days to render a decision. 7 N.Y.C.R.R. § 701.7(c)(4). [3]

[2] The PLRA's exhaustion requirement is designed to "afford [ ] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter,* 534 U.S. at 524–25. As such, it is not dissimilar to the rules of notice pleading, which prescribe that a complaint "must contain allegations sufficient to alert the defendants to the nature of the claim and to allow them to defend against it." *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234 (2d Cir.2004). If prison regulations do not prescribe any particular content for inmate grievances, "a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought. As in a notice pleading system, the grievant need not lay out the facts, articulate legal theories, or demand particular relief. All the grievance need do is object intelligibly to some asserted shortcoming." *Johnson v. Testman,* 2004 WL 1942669 at *5 quoting *Strong v. David,* 297 F.3d 646, 650 (7th Cir.2002).

[3] In cases alleging harassment or other misconduct by corrections employees, an inmate may attempt to expedite the administrative process by reporting the conduct to the direct supervisor of the employee. 7 N.Y.C.R.R. § 701.11. However, it appears that an inmate cannot seek expedited relief until he has filed a formal grievance under § 701.7. See *Hemphill v. New York,* 2004 WL 1842658 (2d Cir.2004).

**\*2** Section 1997(e) of the PLRA mandates dismissal of any unexhausted inmate claims brought under § 1983. There is often a dispute as to whether the plaintiff has exhausted his administrative remedies. In *Hemphill v. New York,* 2004 WL 1842658 (2d Cir.2004), the Second Circuit reaffirmed that a three-part inquiry is appropriate in cases where a prisoner plaintiff plausibly seeks to counter defendants' contention that the prisoner has failed to exhaust available administrative remedies as required by the PLRA. Depending on the inmate's explanation for the alleged failure to exhaust, the court must ask whether administrative remedies were in fact "available" to the prisoner. The court should also inquire as to whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense. *Hemphill,* 2004 WL 1842658 at *5 citing *Ziemba v. Wezner,* 366 F.3d 161, 163 (2dCir.2004). If the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their

non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should then consider whether "special circumstances" have been plausibly alleged that justify "the prisoner's failure to comply with administrative procedural requirements." *Hemphill,* 2004 WL 1842658 at *5.

It should be noted that the failure to exhaust is an affirmative defense which may be waived by the defendants. See *Johnson v. Testman,* 2004 WL 1842669 (2d Cir.2004); [4] *Jenkins v. Haubert,* 179 F.3d 19, 28–29 (2d Cir.1999). In addition, the defendants' actions "may ... estop[ ] the State from asserting the exhaustion defense," *Ziemba,* 366 F.3d at 163. In *Abney v. McGinnis,* 2004 WL 1842647 (2d Cir.2004), the Court held that an inmate who receives a favorable disposition after filing a grievance need not file additional grievances prior to commencing a § 1983 action based upon a failure of the defendants to implement the favorable relief granted in the initial grievance. In *Hemphill,* the Second Circuit held that threats by corrections officers against an inmate to dissuade him from filing a grievance may in some instances be sufficient to estop the government from asserting the affirmative defense of non-exhaustion. *Hemphill,* 2004 WL 1842658 at *8; see also *Giano v. Goord,* 2004 WL 1842652 at *4 (2d Cir.2004). [5] Where questions of fact exist as to these issues, summary judgment is inappropriate. *Giano,* 2004 WL 1842652 at *4. Exhaustion may not be required where an inmate reasonably believes that the grievance process in not available. *Giano,* 2004 WL 1842652 at *6–7. Finally, in *Ortiz v. McBride,* 2004 WL 1842664 (2d Cir.2004), the Second Circuit held that total exhaustion was not necessary with respect to § 1983 complaints. Where a complaint includes both exhausted and unexhausted claims, the Court may dismiss the unexhausted claims and proceed with the exhausted claims. In such cases, the Second Circuit contemplated that in the ordinary case the Court would proceed to decide the exhausted claims "without waiting for the plaintiff to attempt to exhaust available remedies with respect to the dismissed claims." *Ortiz,* 2004 WL 1842664 at *12.

[4] In *Johnson,* the Court also held that in some situations, the raising of a prisoner complaint in a disciplinary hearing may amount to exhaustion of administrative remedies. Johnson, 2004 WL 1842664 at *6.

5    Where a prison fails to provide access to grievance forms, a prisoner's complaint cannot be dismissed for failure to exhaust. See *Feliciano v. Goord,* 1998 WL 436358 (S.D.N.Y. July 27, 1998) (denying dismissal on failure to exhaust grounds where corrections officers refused to provide inmate with grievance forms); *Burns v. Moore,* 2002 WL 91607, at *5 (S.D.N.Y. Jan.24, 2002) ("if an inmate is not allowed to file a grievance by prison authorities, a question exists as to whether he ... had any available administrative remedies"). The plain language of the statute requires only "available" administrative remedies to be exhausted. *See Miller v. Norris,* 247 F.3d 736, 740 (8th Cir.2001) ("a remedy that prison officials prevent a prisoner from utilizing is not an "available" remedy under § 1997e(a)") (internal quotations omitted). See also *Kendall v. Kittles,* 2004 WL 1752818, *4 (S.D.N.Y.2004).

Pendergrass' Claim

**\*3**  In the instant case, the defendant's contend that the plaintiff made no attempt to file a grievance relating to the July 7, 2001 attack which serves as the basis of the Pendergrass' complaint. (Docket No. 13 at page 6). In support of this argument, the defendant's submit the Affidavit of Thomas G. Eagen, Director of the Inmate Grievance Program ("IGP") for the New York State Department of Correctional Services ("DOCS"), attesting that a search of IGP records does not reveal any grievance filed by Pendergrass relating to the July 7, 2001 incident. (Docket No. 12).

In his reply to the instant motion, however, Pendergrass represents that he did file a grievance with respect to the July 7, 2001 attack. (Docket No. 16). Attached to his response is a copy of a handwritten document dated July 12, 2001 labeled as a "Grievance." This document starts out with the following complaint: "On July 7, 2001 I was assaulted by Officer T. Sanney, E. Emminger, Robinson, Buckly, Connolly and numerous John Does for no reason." (Docket No. 16, Exhibit 1). The plaintiff also attaches another purported grievance dated July 24, 2001 in which he complains that the corrections officers are tampering with his mail. (Docket No. 16, Exhibit 2). Pendergrass alleges in this grievance that the officers "are not letting [his] mail out that's going to [his] family or any agency who [he is] trying to reach out to for help concerning [his] situation with their fellow officers." He also attaches a third document which appears to be a letter dated July 24, 2001 to the "Correspondence Office"

in which he again complains that correction officers are tampering with his mail. (Docket No. 16, Exhibit 3).

In their reply, the defendant's assert that the correspondence attached to the plaintiff's response relates only to a problem he was allegedly experiencing with the mail room. (Docket No. 19 at page 2). To the contrary, as quoted above, at least one of the purported grievances directly addresses the July 7, 2001 incident that underlies this complaint.

A question of fact exists as to whether or not the plaintiff in fact filed a grievance regarding the alleged attack in this matter. Further, the additional correspondence attached to the plaintiff's response, to the effect that the correction officers tampered with his mail to prevent him from sending mail to address his concerns, raises factual questions as to the plaintiff's ability to take advantage of the grievance process notwithstanding any efforts on his part to do so. These questions of fact are sufficient to preclude summary judgment under *Hemphill* and *Giano,*

Based upon the record before the Court, questions of fact exist as to whether the plaintiff exhausted his administrative remedies as required under § 1997(e). Thus, it is recommended that the defendants' motion to dismiss be denied.

The plaintiff has also moved for the appointment of counsel. (Docket No. 20). This motion is denied at this time. The plaintiff has demonstrated the ability to adequately prosecute his claims in this case.

Conclusion

**\*4**  Based on the forgoing, the plaintiff's motion for the appointment of counsel (Docket No. 20) is denied. It is recommended that the defendants' motion to dismiss (Docket No. 11) also be denied.

Pursuant to 28 USC § 636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report & Recommendation to all parties.

ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within ten(10) days after receipt of a copy of this Report &

2004 WL 1946458

Recommendation in accordance with 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, as well as WDNY Local Rule 72(a)(3).

FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT ORDER BY THE DISTRICT COURT ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *F.D.I.C. v. Hillcrest Associates,* 66 F.3d 566 (2d. Cir.1995); *Wesolak v. Canadair Ltd.,* 838 F.2d 55 (2d Cir.1988); see also 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and WDNY Local Rule 72(a)(3).

Please also note that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/or evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance. See *Patterson–Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co.,* 840 F.2d 985 (1st Cir.1988).

Finally, the parties are reminded that, pursuant to WDNY Local Rule 72.3(a)(3), "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." *Failure to comply with the provisions of Rule 72.3(a)(3) may result in the District Court's refusal to consider the objection.*

So ordered.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 1946458

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Webster v. Fischer, N.D.N.Y., March 9, 2010

2005 WL 755745
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Anthony G. GILL, Plaintiff

v.

William RIDDICK, Senior Counselor, Mohawk
Corr. Fac.; T. Brown, Sergeant, Mohawk Corr.
Fac.; J. Rosado, Deputy Supt. of Health Care,
Mohawk Corr. Fac.; K. Adamik, Lieutenant,
Mohawk Corr. Fac.; Kenneth Perlman, Supt.,
Mohawk Corr. Fac.; D. Malloni, C.O., Mohawk
Corr. Fac.; C.O. Cacocutti, [1] C.O., Mohawk Corr.
Fac.; G. Watson, C.O., Mohawk Corr. Fac.; K.
Saxena, M.D., Mohawk Corr. Fac., Defendants.

[1]     Defendants in form this Court that this Defendant's
        name is misspelled on the Amended Complaint and
        that the correct spelling is "Cacciotti." Dkt. No. 20
        (Defs.' Mem. of Law at p. 1). The Court will refer to
        this Defendant by the correct spelling and will direct
        the Clerk of the Court to correct the docket report.

No. Civ. 9:03-CV-1456.
|
March 31, 2005.

**Attorneys and Law Firms**

Anthony G. Gill, Livingston Correctional Facility,
Sonyea, New York, Plaintiff, pro se.

Hon. Eliot Spitzer, Attorney General of the State of
New York, The Capitol, Litigation Bureau, Albany, New
York, for Defendants, of counsel.

Lisa Ullman, Assistant Attorney General, of counsel.

*REPORT-RECOMMENDATION and ORDER*

TREECE, Magistrate J.

**\*1** Plaintiff Anthony Gill brings this *pro se* action,
pursuant to 42 U.S.C. § 1983, alleging the Defendants

violated his civil rights. Dkt. No. 5, Am. Compl. In his
Amended Complaint, Gill alleges eight causes of action:
(1) Defendant Riddick, Senior Correction Counselor at
Mohawk Correctional Facility (Mohawk), filed a false
misbehavior report against Plaintiff in retaliation for
Gill exercising a First Amendment right; (2) Defendant
T. Brown, Sergeant (Sgt.) at Mohawk, filed a false
misbehavior report against Plaintiff in retaliation for Gill
exercising a First Amendment right; (3) Defendant K.
Adamik, Lieutenant (Lt.) at Mohawk, denied Gill his
due process rights at a Tier II Disciplinary Hearing;
(4) Defendant J. Rosado, Deputy Superintendent of
Health at Mohawk, acted in concert with Defendants
Riddick, Brown, and Adamik; (5) Defendant D. Malloni,
Correction Officer (C.O.) at Mohawk, intentionally
destroyed and/or tampered with Plaintiff's legal mail; (6)
Defendant Kenneth Perlman, Supervising Superintendent
of Mohawk, failed to render a decision on Gill's appeal
of his Tier II Hearing disposition; (7) Defendants Cacciotti
and G. Watson, C.O.s at Mohawk, subjected Gill to cruel
and unusual punishment when, while en route to another
facility, they denied Gill the opportunity to use the
bathroom causing Plaintiff to urinate on himself, which
was responded to with further taunting and humiliation;
and (8) Defendant Kailash Saxena, Clinical Physician II,
M.D., at Walsh Regional Medical Unit (Walsh or RMU),
acted in concert with Defendants Adamik and Riddick
and transferred Gill to another facility in retaliation for
his exercise of a First Amendment right and to cover up
the constitutional violations of the other Defendants.

Defendants filed a Motion to Dismiss, pursuant to
FED. R. CIV. P. 12(b)(6), on the ground that Plaintiff's
Amended Complaint fails to state a cause of action. Dkt.
Nos. 20 (Motion) & 28 (Reply). Plaintiff opposes the
Motion. Dkt. No. 23. [2] For the reasons explained below,
it is recommended that Defendants' Motion be granted in
part and denied in part.

[2]     This matter was referred to the undersigned for a
        report-recommendation pursuant 28 U.S.C. § 636(b)
        and N.D.N.Y.L.R. 72.3(c).

**I. MOTION TO DISMISS STANDARD**

On a motion to dismiss, the allegations of the complaint
must be accepted as true. *See Cruz v. Beto,* 405 U.S.
319, 322 (1972). "Generally, in determining a 12(b)(6)

motion, the court may only consider those matters alleged in the complaint, documents attached to the complaint, and matters to which the court may take judicial notice." *Spence v. Senkowski,* 1997 WL 394667, at *2 (N.D.N.Y. July 3, 1997). On a motion to dismiss, the trial court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). "[T]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974).

**\*2** The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *See Retail Clerks Intern. Ass'n, Local 1625, AFL-CIO v. Schermerhorn,* 373 U.S. 746, 753 n. 6 (1963). Thus, the plaintiff need not necessarily plead a particular fact if that fact is a reasonable inference from facts properly alleged. *See id.; see also Wheeldin v. Wheeler,* 373 U.S. 647, 648 (1963) (inferring facts from allegations of complaint). In construing the complaint favorably to the pleader, the court may not dismiss the complaint for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim which would entitle him or her to relief. *See Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984) (citing *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)); *see also Scheuer v. Rhodes,* 416 U.S. at 236; *Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994). In spite of the deference the court is bound to give to the plaintiff's allegations, however, it is not proper for the court to assume that "the [plaintiff] can prove facts which [he or she] has not alleged, or that the defendants have violated the ... laws in ways that have not been alleged." *Assoc. Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526 (1983).

The Plaintiff herein is proceeding with this action *pro se.* "[A] pro se complaint, 'however inartfully pleaded,' must be held to 'less stringent standards than formal pleadings drafted by lawyers' and can only be dismissed for failure to state a claim if it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Estelle v. Gamble,* 429 U.S. 97, 106 (1976) (citing, *inter alia, Haines v. Kerner,* 404 U.S. 519, 520-21) (other internal citations and quotation marks omitted). However, the Second Circuit has stated that there are circumstances where an overly litigious inmate, "who is quite familiar with the legal system and with pleading requirements," may not be afforded such special solicitude. *Davidson v. Flynn,* 32 F.3d 27, 31 (2d Cir.1994) (declining to afford an "extremely litigious inmate" the benefit of lenient treatment normally afforded *pro se* litigants and thus denying the opportunity to amend a claim where he failed to properly plead a cause of action); *see also Davidson v. Dean,* 204 F.R.D. 251, 257 (S.D.N.Y.2001) (citing Second Circuit opinion in *Davidson v. Flynn,* 32 F.3d at 31, and refusing to accord deference to same plaintiff); *Santiago v. C.O. Campisi Shield No. 4592,* 91 F.Supp.2d 665, 670 (S.D.N.Y.2000) (applying *Davidson* to *pro se* plaintiff who had ten suits pending in district); *Brown v. McClellan,* 1996 WL 328209, at *1 n. 3 (W.D.N.Y. Jun. 11, 1996) (stating that plaintiff's "litigious nature," notwithstanding his *pro se* status, "weighs somewhat against the leniency that is normally accorded"); *Brown v. Selsky,* 1995 WL 13263, at *8 n. 1 (W.D.N.Y. Jan. 10, 1995) (denying special solicitude to *pro se* plaintiff who had seven cases pending in district). As the Second Circuit has noted, Anthony Gill, the Plaintiff herein is no stranger to the courts. *See Gill v. Pidlypchak* 389 F.3d 379, 384 (2d Cir.2004) (noting that the plaintiff therein, Anthony G. Gill, "is no stranger either to the grievance system or to the federal courts"). In light of Gill's experience in federal court, we find that the special solicitude afforded *pro se* litigants shall not be accorded herein. [3]

[3]      Gill has filed twenty (20) lawsuits in this district alone:
(1) *Gill v. LeFevre,* 85-cv-1534 (HGM/RWS) (closed on Jan. 17, 1992-failure to prosecute);
(2) *Gill v. Padilla,* 88-cv-147 (NPM/RWS) (closed on Mar. 26, 1992-failure to prosecute);
(3) *Gill v. Burch,* 94-cv-369 (FJS/DNH) (closed on Apr. 1, 1999-Defts.' Mot. for Summ. J. granted);
(4) *Gill v. Kramer,* 98-cv-45 (FJS/GJD) (closed on Sept. 27, 1999-Stip. of Discont.);
(5) *Gill v. Anderson,* 98-cv-1472 (LEK/GLS) (closed on Mar. 3, 2003-Defts.' Mot. for Summ. J. granted);
(6) *Gill v. Gummerson,* 99-cv-761 (NAM/DEP) (closed on Aug. 20, 2003-Jury Verdict for Defts.);
(7) *Gill v. Dann,* 00-cv-566 (NAM/RFT) (closed on Nov. 20, 2001-failure to prosecute);
(8) *Gill v. Tuttle,* 00-cv-585 (DNH/DRH) (currently stayed);
(9) *Gill v. Doe,* 00-cv-983 (GLS/DEP) (closed on June 8, 2004-Defts.' Mot. for Summ. J. granted);

(10) *Gill v. Calescibetta,* 00-cv-1553 (LEK/DEP) (closed on Aug. 5, 2004-frivolous action);

(11) *Gill v. McGinnis,* 00-cv-1787 (LEK/RWS) (*habeas corpus* petition transferred to S.D.N.Y. on Dec. 19, 2000);

(12) *Gill v. Smith,* 00-cv-1905 (FJS/GJD) (currently pending, trial date to be set);

(13) *Gill v. Butero,* 01-cv-82 (LEK/DRH) (closed on Apr. 30, 2003-Defts.' Mot. to Dismiss granted at trial);

(14) *Gill v. Hoadley,* 01-cv-323 (FJS/DEP) (currently pending);

(15) *Gill v. Steinberg,* 02-cv-82 (DNH/DEP) (closed on Feb. 19, 2004-Stip. of Discont.);

(16) *Gill v. Pflueger,* 02-cv-130 (DNH/GJD) (closed on Jan. 30, 2003-Defts.' Mot. to Dismiss granted);

(17) *Gill v. Coyne,* 02-cv-1380 (TJM/GHL) (currently pending);

(18) *Gill v. Pidlypchak,* 02-cv-1460 (JMH/RFT) (currently pending);

(19) *Gill v. Erickson,* 02-cv-1573 (LEK/RFT) (transferred to S.D.N.Y. on Jan. 21, 2003);

(20) *Gill v. Riddick,* 03-cv-1456 (NAM/RFT) (currently pending).

In light of Gill's litigious track record, as stated above, and the Second Circuit's explicit recognition that Gill has stepped into that rare status for inmate litigants as being deemed not entitled to "special solicitude," we place both parties on notice that FED. R. CIV. P. 11 sanctions may be applicable, when warranted, for any future litigation pursued by Gill. However, Rule 11 sanctions will not be considered for this case.

## II. BACKGROUND

**\*3** The following facts are derived from the Amended Complaint, which on a motion to dismiss this Court must construe as an accurate depiction of what took place. Due to the complexity of the facts involved and the numerous Defendants and claims asserted, the Court shall recite the relevant factual averments, set forth in the Amended Complaint, as it pertains to Gill's separate claims. As a general statement relevant to all claims, the Court notes that on or about June 10, 2002, Gill was transferred from Elmira Correctional Facility to the Walsh Regional Medical Unit (Walsh or RMU).[4] Dkt. No. 5, Am. Compl. at ¶ 1. Gill believed that this transfer was due to his chronic asthmatic medical condition. *Id.* Upon admission to Walsh, Gill was housed in the general population medical unit, C-wing, room C2B3-03, and was informed

by Defendant Saxena that he was indeed transferred to Walsh due to his asthma condition and would remain there until his scheduled parole board appearance in July 2003. *Id.* at ¶ 2.

[4]  Walsh Medical Center is a regional medical unit located on the grounds of Mohawk Correctional Facility. N.Y. COMP.CODES R. & REGS. tit. 7, § 100.100.

Retaliation Claims Against Defendants Riddick, Brown, and Rosado-First, Second, and Fourth Causes of Action Walsh RMU has a "Problem Solving Committee" chaired by prison officials and inmate representatives from each living unit. Am. Compl. at ¶ 3, Ex. A, Vander Bosch Aff.[5] at ¶ 3. The inmate representatives are selected by patient/residents of the respective living units, *i.e.,* A-wing, C-wing. *Id.* The C-wing at Walsh is divided into two separate living units, C-1 and C-2. Vander Bosch Aff. at ¶ 4. In the past, C-wing was permitted two inmate/patient representatives, one from the C-1 and one from C-2 living areas, to represent the C-wing before the Problem Solving Committee. Am. Compl. at ¶ 3; Vander Bosch Aff. at ¶ 5. At the time Gill was transferred to Walsh RMU, the C-wing only had one representative, inmate Samuel Kelly, who resided in the C-1 section. Am. Compl. at ¶ 3; Vander Bosch Aff. at ¶ 6. Having no general or formal election procedures, the residents of the C-2 area approached Gill and collectively asked that he act as the C-2 Problem Solving Committee representative and work in conjunction with the C-1 representative. Am. Compl. at ¶ 3; Vander Bosh Aff. at ¶ 8. After a majority of the patient/residents in the C-2 living area of the C-wing selected Gill as the C-2 representative, Gill accepted such position. Am. Compl. at 3; Vander Bosh Aff. at ¶¶ 9-11.

[5]  Exhibit A, attached to Plaintiff's Amended Complaint, consists of affidavits of eight inmates all housed at Walsh, in the C-wing, during the relevant time. The Court has reviewed the contents of each affidavit and finds that they generally contain the same information sans names, living assignment, and time spent at Walsh. In light of the fact that the affidavits generally contain the same material information, the Court will, in the interest of expedience, make reference to the first Affidavit submitted by Joseph Vander Bosch. It should be noted that in citing to Mr. Vander Bosch's Affidavit, this Court makes no credibility nor

reliability assessments with regard to this Affidavit as being more credible than the other seven Affidavits.

On or about September 1, 2002, Gill discussed his selection as the C-2 representative with Defendant Rosado. Am. Compl. at ¶ 8. On or about September 4, 2002, per the direction of Defendant Rosado, Gill submitted an agenda for the upcoming September 2002 Problem Solving Committee meeting. Am. Compl. at ¶ 4; Ex. B (typed agenda). The agenda, which contained multiple issues that were reviewed and approved by the residents of C-wing, was forwarded to Defendants Rosado and Riddick. [6] Am. Compl. at ¶ 4. Plaintiff also attached to the agenda a memorandum he wrote to Defendant Riddick, dated August 29, 2002, notifying the recipients that he had been selected as the C-2 representative and would work in conjunction with the C-1 representative, Mr. Kelly. Id., Ex. B. On or about September 5, 2002, Defendant Riddick provided Plaintiff with a copy of the August 21, 2002 Problem Solving Committee meeting minutes. [7] Am. Compl. at ¶ 5, Ex. C (Memorandum of Minutes of Aug. 21, 2002 Meeting addressed to "All Concerned" from Defendant Riddick).

[6]    Gill also asserts he hand delivered the agenda to Mr. Pryor who is not a Defendant in this action. Am. Compl. at ¶ 4, n. 1.

[7]    It is unclear, and no inference can be drawn one way or another, whether the minutes were provided to Gill in his capacity as representative or as a general circulation given to all resident inmates.

*4   On or about the morning of September 7, 2002, Gill asked Defendant Brown about a recent memorandum posted by prison officials concerning the Walsh yard staying open until 11:00 p.m., as well as other issues concerning C-wing. Am. Compl. at ¶ 6. In response, Defendant Brown stated that Gill should mind his business and not be concerned about inmate activities. Id. at ¶ 7. Gill then informed Defendant Brown that he had been selected as the C-2 representative to the Problem Solving Committee and C-wing patients had asked him to inquire about their privileges since the posted memorandum was not being honored. Id. When Defendant Brown inquired how Plaintiff obtained such representational status, Gill disclosed his previous September 1st conversation with Defendant Rosado who accepted Plaintiff's appointment. Id. at ¶ 8. After Gill provided Brown with a copy of his August 29th

Memorandum, Brown informed Gill that he would check into the yard matter. Id.

On or about September 10, 2002, Gill and inmate Kelly, C-1 representative, met with Defendant Riddick in the C-wing yard to discuss issues presented in the September 2002 proposed agenda. Id . at ¶ 9. During this meeting, Gill asked Defendant Riddick if the agenda he submitted had been circulated and also inquired as to the date of the upcoming meeting. Id. Defendant Riddick responded that there wasn't going to be a meeting until prison officials saw fit and that at no time in the past did the living units have two inmate representatives as one was sufficient. Id. at ¶ 10. Riddick also declared that the agenda was too demanding and that Plaintiff would be subjected to disciplinary action for filing the agenda on the basis that he was submitting legal work on behalf of the inmates in C-wing. Id. The following day, Gill wrote Defendant Rosado about the encounter with Defendant Riddick and requested Defendant Rosado to confirm, based on their previous September 1st conversation, whether she now disapproved of Plaintiff's selection as the C-2 representative. Id. at ¶ 11, Ex. D (typed letter). Defendant Rosado did not respond to Gill's inquiries. [8] Id.

[8]    Gill states that upon information and belief, inmate Kelly also wrote a letter to Defendant Rosado regarding Defendant Riddick's disapproval of Gill's selection. Am. Compl. at ¶ 11, n. 3. Plaintiff did not submit Kelly's letter but did attach a memorandum from Defendant Rosado to Kelly in response to Kelly's correspondence dated September 6, 2002. Id., Ex. E. In this correspondence, Rosado states, "[t]he correct procedure for an inmate to represent his unit on the problem solving committee is to be elected by his peers [and][t]his procedure is overseen by the Guidance Counselor." Id. Gill asserts that Rosado's response to Kelly established for the first time a new policy on how an inmate can become an inmate representative to the Problem Solving Committee. Id.

On or about September 12, 2002, Gill was issued two separate disciplinary reports authored by Defendants Brown and Riddick. Id. at ¶ 12, Ex. G (misbehavior reports). In his report, dated September 11, 2002, Defendant Brown relayed the substance of his September 7th encounter with Plaintiff, which was in accord with Plaintiff's account, as described above. Id. Defendant Brown further stated that, after his encounter with

Gill, he wrote to Defendant Riddick to confirm Gill's representations to which Riddick responded in a written statement that Gill was not the Problem Solving Committee representative.[9]  *Id.* Brown accused Plaintiff of violating prison rule 107.20 (lying) and 110.10 (impersonation). Defendant Riddick's report, dated September 10 or 11, 2002,[10] recounts the encounter between himself and Gill on September 10th in the C-wing outside recreation area, however, such report is not in accord with Plaintiff's version. According to Riddick's report, while Riddick was sitting talking with other inmates in the yard, Gill approached him in an aggressive manner, stood over him, and demanded certain information about the Walsh Problem Solving Committee. Riddick replied that, as he told him throughout the week, Gill is not an inmate representative. *Id.* Riddick claimed that Gill then became loud, stating "you're a racist. You know I file lawsuits and that's why you oppose me as a representative. I am a rep until Administration says otherwise." *Id.* In his report, Riddick asserted that Gill's loud aggressive speech attracted the attention of the other inmates in the yard. *Id.* Defendant Riddick accused Plaintiff of violating rules 107.11 (harassment) and 104.13 (disturbance). *Id.*

[9]   Brown asserts in his report that he attached to the report a copy of Riddick's written statement, however, such statement was not included as an exhibit to Plaintiff's Amended Complaint. Plaintiff asserts that at his disciplinary hearing he requested Riddick's written statement, which was not produced. Am. Compl. at ¶¶ 14 & 17.

[10]  It is unclear whether the report is dated September 10th or 11th.

**\*5** Plaintiff believed that these reports were false and were filed as retaliation for Plaintiff exercising his right to make oral requests and for filing his grievance agenda for the Problem Solving Committee to address at an upcoming meeting. *Id.* at ¶ 13. Plaintiff filed institutional grievances against Defendants Brown and Riddick for the filing of false disciplinary reports in retaliation for Plaintiff exercising his right to redress grievances to the Problem Solving Committee. *Id.* at ¶ 13, n. 4, Ex. F (grievance).

Due Process/Retaliation Claims Against Defendants Adamik and Rosado-Third and Fourth Causes of Action

The disciplinary reports authored by Defendants Riddick and Brown were consolidated and a Tier II Hearing on both reports commenced on September 16, 2002, with Defendant Adamik presiding as hearing officer. Am. Compl. at ¶ 14. Gill pleaded not guilty to all charges. *Id.* Plaintiff requested witness testimony from Defendants Brown, Riddick, and Rosado, C.O. Swanson, and inmates Kelly and Cruz. *Id.* Plaintiff also requested document production, specifically, the letter sent by Defendant Brown to Defendant Riddick, as referenced in Brown's misbehavior report, as well as any Walsh RMU written policies disclosing the procedures for inmate elections as Problem Solving Committee representative. *Id.* After Gill testified on his own behalf,[11] the hearing was adjourned "for witnesses and document production." *Id.* at ¶ 15. On or about September 18, 2002, testimony was procured from inmates Kelly and Cruz, C.O. Swanson, and Defendant Brown. Inmates Kelly and Cruz testified that they were present in the C-wing yard on September 10, 2002, and witnessed the encounter between Defendant Riddick and Gill. *Id.* at ¶ 16. Both inmates asserted that Gill did not at any time harass or create a disturbance. *Id.* Inmate Kelly further testified that throughout the duration of his confinement at Walsh, each housing unit had two inmate representatives and that there hadn't been any "elections" for approximately five years. *Id.* C.O. Swanson testified on Gill's behalf and stated that, on September 10, 2002, he was employed as the "A-man" on C-wing and at no time was he informed by Defendant Riddick, or anyone else, that Plaintiff harassed Riddick or created a disturbance in the yard. Defendant Brown testified about the letter he wrote to Defendant Riddick but could not produce a copy of such letter.

[11]  In his Amended Complaint, Gill asserts the sum and substance of his testimony was as follows:

[P]er [plaintiff's] September 1, 2002, conversation with defendant Rosado about plaintiff being selected as the C-2 inmate Problem Solving Committee representative by his peers, that there was no disapproval of this selection and that defendant Riddick had in fact provided plaintiff with the August 2002 Problem Solving Committee minutes ... and that on information and belief, there hasn't been an election held within the past five years to elect representatives. Further, that plaintiff never violated the alleged prison rules violation authored by the named defendants.

Am. Compl. at ¶ 15.

On the same date, that is September 18th, Gill submitted a formal complaint to Defendant Perlman to have Defendant Adamik removed from his role as hearing officer due to his prejudice and failure to conduct a fair and unbiased hearing. *Id.* at ¶ 19, Ex. H (typed complaint). In sum Gill complained that during the hearing when he and Adamik disagreed on an issue, Gill stated he would appeal that issue to which Adamik responded "you can appeal this issue, but you're going to los[e]." *Id.* Gill asked Defendant Perlman to assign a different officer to conduct the hearing. *Id.* Defendant Perlman did not respond to Gill's September 18th complaint. *Id.* On September 27, 2002, Defendant Brown approached Gill at his living quarters and stated, "next week you'll be locked up, just because you requested for Dep. Rosado as a witness, you think she'll testify for you. You're guilty, accept it, you're in a no win situation. You keep filing fucking grievances around here you'll be locked up until July, smart ass jailhouse lawyer." *Id.* at ¶ 20. Later that day, Gill filed a grievance against Defendants Brown and Adamik for collusion regarding Gill's disciplinary hearing and asked that Adamik be removed as hearing officer. *Id.* at ¶ 21, Ex. I (typed grievance).

**\*6** On or about October 1, 2002, Plaintiff's hearing was set to continue but was briefly adjourned so Gill could retrieve his documents. *Id.* at ¶ 22. Upon his return to the hearing with his documents, Gill witnessed Defendants Adamik, Rosado, and Riddick exiting a room adjacent to the hearing office. *Id.* at ¶ 23. It appeared to Gill as though the three had been in a conference behind closed doors prior to the re-commencement of his hearing. *Id.* When the hearing re-convened, Gill attempted to place on the record what he had witnessed with respect to these Defendants conversing in a separate room, however, Defendant Adamik prevented Plaintiff from placing such information on the record and arbitrarily dismissed Defendant Rosado as Plaintiff's witness and proceeded instead with the testimony of Defendant Riddick.[12] *Id.*

[12]    Gill asserts that Defendant Riddick supplied contradictory testimony that did not support his written report. Am. Compl. at ¶ 23.

At the conclusion of Gill's hearing, on October 1, 2002, Defendant Adamik found Plaintiff guilty of all charges and sentenced Plaintiff to thirty (30) days keeplock confinement with corresponding loss of privileges, recreation, telephone, packages, and commissary. *Id.* at ¶

24, Ex. G. Plaintiff's sentence was set to run from October 1st through October 31st. *Id.* In his hearing disposition statement, Defendant Adamik stated the evidence he relied upon was the misbehavior reports and testimony rendered by Gill, Brown, inmates Kelly and Cruz, C.O. Swanson, and Riddick. *Id.,* Ex. G. Adamik further stated that Rosado was dismissed in the middle of the hearing due to Gill's refusal to ask questions when instructed. *Id.*

### Due Process and First Amendment Claims Against Defendants Malloni and Perlman-Fifth and Sixth Causes of Action

On October 2, 2002, Plaintiff had his Tier II Hearing Appeal notarized by the facility's law library officer. Am. Compl. at ¶ 25. The following morning, Plaintiff issued Defendant Malloni his appeal in a sealed envelope addressed to Superintendent Perlman, with the belief that Defendant Malloni would deposit Plaintiff's mail accordingly. *Id.* at ¶ 26, Ex. J (copy of typed and notarized appeal). As of October 24, 2002, more than fifteen days had elapsed since the filing of Gill's appeal and Defendant Perlman had still failed to render a decision on such appeal. *Id.* at ¶ 34. On or about April 15, 2003, while incarcerated at Five Points Correctional Facility, Gill received a memorandum decision from Captain Bellnier stating that Defendant Adamik's October 1st Tier II Hearing Decision had been reversed and all hearing records were expunged. *Id.* at ¶ 40, Ex. N.

### Eighth Amendment Claims Against Defendants Watson and Cacciotti-Seventh Cause of Action

On or about October 17, 2002, Plaintiff was transferred from Walsh RMU back to Elmira Correctional Facility. Am. Compl. at ¶ 27. At approximately 9:30 a.m., on October 17th, Gill was escorted to the transporting vehicle by Defendants Watson and Cacciotti. *Id* . at ¶ 28. At approximately 11:00 a.m., while en route to Elmira, Gill informed Watson and Cacciotti that he needed to urinate. *Id.* at ¶ 29. Both Defendants laughed and dismissed Gill's request. *Id.* Plaintiff then urinated on himself. *Id.* When he informed Defendants of his condition, Defendant Cacciotti replied, "Howard Stern would love you on his show." *Id.* Defendants then pulled into a mini-mart gas station at which time Plaintiff again requested use of the facility to relieve himself; such request was again denied. *Id.* at ¶ 31. Plaintiff was unable to control himself and urinated on himself for a second

time. *Id.* When Gill reported his condition to Defendants, Defendant Cacciotti replied, "I don't care if you shit on yourself." *Id.* Plaintiff arrived at Elmira at approximately 12:10 p.m.

Retaliation Claim Against Defendant Saxena-Eighth Cause of Action

**\*7** On or about November 12, 2002, while confined at Elmira, Plaintiff's correction counselor informed Plaintiff that he had been transferred from Walsh for "medical reasons." *Id.* at ¶ 37. On or about December 11, 2002, Gill filed a grievance against Defendant Saxena for retaliatory transfer. *Id.* at ¶ 38, Ex. M (grievance). In his grievance, Gill stated that Saxena's transfer was retaliation for his exercise of his constitutional rights and Saxena conspired with other Walsh RMU officials to deny Gill his rights. *Id.,* Ex. M. Gill also requested Saxena explain the medical reasons that led to his transfer. *Id.*

## III. DISCUSSION

### A. Retaliation Claims

In Plaintiff's First, Second, Third, Fourth, and Eighth Causes of Action, Gill asserts that Defendants Riddick, Brown, Adamik, [13] Rosado, and Saxena retaliated against him for engaging in constitutionally protected activity and in doing so, violated his First Amendment rights as well as his Fourteenth Amendment Substantive Due Process rights.

[13]     In moving for dismissal, the Defendants have not construed a retaliation claim to have been asserted against Defendant Adamik. However, Plaintiff clearly states in his Amended Complaint that "the protected conduct was the substantial and motivating factor in the decision by defendant Adamik to punish and discipline plaintiff[ .]" Am. Compl. at ¶ 47.

The retaliatory actions vary with each Defendant. With regard to Defendants Riddick and Brown, the adverse action is the filing of false misbehavior reports; Defendant Adamik is alleged to have conspired with Defendants Riddick, Brown, and Rosado in rendering a guilty determination on both reports; Defendant Rosado acted in concert with Defendants Riddick, Brown, and Adamik; and Defendant Saxena transferred Gill to another facility.

First, with regard to Gill's assertion that Defendants Riddick and Brown filed false misbehavior reports against him, we note that prisoners have no constitutional right to be free from being falsely accused, and thus, the filing of a false report does not give rise to a constitutional violation *per se. Freeman v. Rideout,* 808 F.2d 949, 950 (2d Cir.1986) (holding that prison inmates do not have a "constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest[ ]"). Rather, the Constitution guarantees that such inmates will not be "deprived of a protected liberty interest without due process of law." *Id.* Thus, as long as the prison officials provided the inmate with procedural due process requirements, *i.e.,* a hearing and an opportunity to be heard, "the filing of unfounded charges d[oes] not give rise to A *per se* constitutional violation actionable under section 1983." *Franco v. Kelly,* 854 F.2d 584, 587 (2d Cir.1988) (quoting *Freeman,* at 953); *see also Wolff v. McDonnell,* 418 U.S. at 564-66. In the case at bar, however, Gill is asserting that Defendants Riddick and Brown filed false reports against him as *retaliation* for the exercise of a constitutional right and thus violated his substantive due process right, under the Fourteenth Amendment, as well as his First Amendment right. The Second Circuit has made it clear that an inmate has a substantive due process right not to be subjected to false misbehavior charges or be harassed in retaliation for the exercise of a constitutional right such as petitioning the government for redress of grievances. *Jones v. Coughlin,* 45 F.3d 677, 679-80 (2d Cir.1995); *Franco v. Kelly,* 854 F.2d at 587-90 (citing cases) ("Although our decision in *Freeman* accords prison officials wide latitude in disciplining inmates as long as minimum constitutional procedures are employed, ... that latitude does not encompass conduct that infringes on an inmate's substantive constitutional rights."). Thus, we may properly proceed with an assessment of Gill's retaliation claims against these Defendants.

**\*8** To state a claim for retaliation, an inmate must demonstrate (1) he or she was engaged in constitutionally protected activity, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected speech and the adverse action in that the alleged conduct was substantially motivated by the protected activity. *Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002) (citing *Dawes v. Walker,* 239

F.3d 489, 492 (2d Cir.2001)); *see also Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002) (alleging false disciplinary report); *Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997) (alleging retaliatory transfers).

The Second Circuit has noted that retaliation claims are prone to abuse, therefore, courts should examine such claims "with skepticism and particular care." *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003); *Dawes v. Walker,* 239 F.3d at 491 ("[V]irtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act."); *see also Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996); *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 467-68 (S.D.N.Y.1998).

In *Flaherty v. Coughlin,* the Second Circuit described three different methods of pleading retaliation, each requiring separate analysis by the court. 713 F.2d 10, 13 (2d Cir.1983). First, a retaliation claim supported by "specific and detailed allegations" must be pursued with full discovery. *Id.* (cited in *Carpio v. Walker,* 1997 WL 642543, at *6 (N.D.N.Y. Oct. 15, 1997)). Whereas, a claim asserting retaliation in "wholly conclusory terms may safely be dismissed on the pleadings alone." *Id.* ("In such a case, the prisoner has no factual basis for the claim other than an adverse administrative decision and the costs of discovery should not be imposed on defendants."). The third situation involves a complaint alleging facts that give rise to a "colorable suspicion of retaliation." *Id.* This third type of case will support at least documentary discovery. *Id.; see also Carpio v. Walker,* 1997 WL 642543, at *6.

The first prong of a retaliation analysis requires this Court to assess whether Gill was engaged in constitutionally protected activity. In construing Gill's Complaint, it appears that the protected activity at issue is two-fold. On the one hand, Gill asserts he had a constitutional right to serve as the C-2 wing inmate representative to the Walsh Problem Solving Committee and to participate on that Committee without repercussion. On the other hand, Gill asserts that the filing of his "Grievance Agenda" and making oral complaints about the facility's procedures and enforcement therewith was the protected activity and the motivating factor for the retaliation he received. While the Defendants focus on the former theory, this Court finds that it is Gill's latter theory which saves his claim from dismissal at this juncture. Such theory

is not raised for the first time in his opposition to the Defendants' Motion as Defendants suggest. [14] In fact, Gill makes multiple references in his Complaint to his filing a "Grievance Agenda" as well as making oral complaints which, in his estimation, served as the basis for the retaliatory backlash he received, namely, false reports, guilty determinations, and a facility transfer. Our assessment that the agenda and statements are the primary constitutional activities at issue is further bolstered by Gill's assertion that Defendants Riddick, Brown, Rosado, and Adamik violated New York's Correction Law § 138, which states in pertinent part: "Inmates shall not be disciplined for making written or oral statements, demands, or requests involving a change of institutional conditions, policies, rules, regulations, or laws affecting an institution." N.Y. CORRECT. LAWW § 138(4). We now assess whether Gill has properly met the first prong of the retaliation analysis.

[14]    In their Reply, Defendants assert that Plaintiff, in his Opposition, "shifts his focus towards arguing that the retaliation against him was instead because he filed grievances, which defendants admit would be constitutionally protected conduct under the law." Dkt. No. 28, Defs.' Reply at p. 2. Defendants then point out that Plaintiff only mentions the filing of grievances in a footnote in his Amended Complaint. *Id.* It is this Court's estimation that Defendants have misconstrued, to some extent, Plaintiff's use of the word "grievance," in categorically stating that he shifted his focus. It is clear from both the Amended Complaint and Plaintiff's Opposition to Defendants' Motion that the "grievance" Plaintiff refers as the basis for the retaliatory acts is primarily the "grievance agenda" he submitted for the upcoming Problem Solving Committee meeting. That is not to say that the Plaintiff has not alleged, that the Grievance he filed against Defendant Riddick for threatening him with disciplinary conduct, attached to the Amended Complaint as Exhibit F, may also have played a role in the retaliatory actions. We only point out that Gill has not attempted to salvage his claims by asserting new theories in his Opposition papers.

**\*9** First, we address Gill's participation on the Problem Solving Committee, which Defendants assert is not protected conduct. While the Second Circuit has not definitively weighed in on the matter, other district courts throughout this Circuit have held that an inmate's participation as a member of a formal problem solving

2005 WL 755745

committee, such as the Inmate Grievance Resolution Committee (IGRC) or the Inmate Liason Committee (ILC), is protected activity. In *Alnutt v. Cleary,* 913 F.Supp. 160 (W.D.N.Y.1996), the court held that an inmate has a protected First Amendment right to "engage in his duties as IGRC representative without fear of reprisal or retaliation." 913 F.Supp. at 169. In reaching this determination, the court relied on a multitude of precedents establishing an inmate's protected right to seek redress for grievances. First, the court began with the premise recognized by the Second Circuit in *Franco v. Kelly,* 854 F.2d 584 (2d Cir.1988) that "prisoners must be permitted the 'free and uninhibited access' to both administrative and judicial forums for the purpose of seeking redress of grievances." *Id.* (quoting *Franco,* 854 F.2d at 589). The court then cited the following precedents amongst the district courts in this Circuit, as well as cases from sister Circuits, holding that petitioning for redress of grievances is protected activity:

> *Jones v. Coughlin,* 45 F.3d 677 (2d Cir.1995) (inmate stated cause of action where he alleged retaliation as result of administrative complaint he filed against corrections officer); *Morrison v. Lefevre,* 592 F.Supp. 1052 (S.D.N.Y.1984) (inmate stated cause of action where he alleged retaliation, due, in part, to assistance he provided to other prisoners in filing lawsuits); *McCorkle v. Walker,* 871 F.Supp. 555 (N.D.N.Y.1995) (inmate stated a claim where he alleged that a prison nurse filed false charges against him in retaliation for his informing prison officials that she was nurse on duty when another inmate nearly drowned in infirmary); *Payne v. Axelrod,* 871 F.Supp. 1551 (N.D.N.Y.1995) (inmate stated cause of action where he alleged that a razor blade was planted in his cell in retaliation for reporting that a corrections officer set a fire in an inmate's cell); *Cale v. Johnson,* 861 F.2d 943 (6th Cir.1988) (inmate stated cause of action by alleging retaliation for complaining to associate warden concerning the poor quality of the food); *McDonald*

> *v. Hall,* 610 F.2d 16 (1st Cir.1979) (inmate stated cause of action where he alleged that he was transferred in retaliation for filing suits against prison officials, and for giving legal assistance to other inmates).

*Alnutt v. Cleary,* 913 F.Supp. at 169.

The court then noted that the *principles* established in the above cases "support the concept that [the inmate plaintiff] has a protected First Amendment right to engage in his duties as IGRC representative without fear of reprisal or retaliation." *Id.* (emphasis added). Then, after explaining the statutory evolution of the IGRC, the court noted that the inmates who filed grievances with the IGRC were exercising their First Amendment right to petition the government for redress of grievances and that "[i]t would be curious indeed for this Court to recognize the rights of inmates to petition for redress of grievances without fear of retaliation but deny [the inmate plaintiff] the same right in connection with his role in reviewing inmate grievances and ruling on them." *Id.* at 169-70. As such, the court held that the inmate possessed a "constitutional right to be protected against retaliation by state officers who are not pleased with the activities engaged in and decisions made by [the inmate plaintiff] as IGRC representative." *Id.* Thus, it appears to this Court that an inmate's constitutionally protected right to serve as a grievance committee representative is derived from the inmates' protected rights to petition for redress. This derivative right has been upheld in other courts in this Circuit. *See Greene v. Coughlin,* 1995 WL 60020, at *15 (S.D.N.Y. Feb. 10, 1995) (analyzing, in the context of a procedural due process claim, whether an inmate had a liberty interest in maintaining position as IGRC representative and if certain procedures were mandated prior to removal from such position); *McCorkle v. Juchenwicz,* 1999 WL 163205, at *1 (S.D.N.Y. Mar. 23, 1999) (upholding an inmate's right to serve on the ILC and citing *Alnutt, inter alia,* in support of the ruling that "an inmate grievance committee representative has a constitutional right to seek redress of the grievances of other inmates without fear of retaliation"); *Maurer v. Patterson,* 197 F.R.D. 244, 247 n. 3 (S.D.N.Y.2000) (noting, in the context of deciding a Rule 50 motion for judgment as a matter of law, that an inmate has a protected right to engage in duties as IGRC representative); *Garrett v. Reynolds,* 2003 WL 22299359,

at *4 (N .D.N.Y Oct. 7, 2003) (citing *Alnutt* for the proposition that an inmate has a "constitutional right to be protected from retaliation based upon his activities as an IGRC representative").

**\*10** Thus, in construing *Alnutt,* we find that prisoners have a constitutional right to serve as a grievance committee representative. While other courts have limited the *Alnutt* holding to participation on the IGRC and ILC, we do not believe the reasoning applied therein supports such limitation in the case at bar. [15] If an inmate's right to serve on a "formal" committee, like the IGRC, is derived from an inmate's right to seek redress of grievances, and not from the "formal creation" or state mandate of the committee, then it cannot be said that such right is solely limited to activities on a formal resolution committee. [16] It would be more consistent to rule that an inmate serving on an "informal" grievance committee would also be entitled to constitutional protection since he would be performing the same tasks as a representative on a formal committee, such as the IGRC. [17] The difference between formal and informal grievance committees is a distinction without form or reason. This leads us to an analysis of the other protected activity Gill asserts was the basis for retaliatory conduct imposed on him, that is, his filing of the grievance agenda and making oral complaints. We find that such conduct is clearly protected. *See McCorkle v. Walker,* 871 F.Supp. 555, 559 (N.D.N.Y.1995) (protected conduct at issue in plaintiff's retaliation claim was that he informed prison officials that the defendant nurse had been on duty at the infirmary when another inmate nearly drowned); *Gaston v. Coughlin,* 81 F.Supp.2d 381, 386 (N.D.N.Y.1999) (protected conduct at issue was plaintiff's complaints to mess hall staff that his work schedule was a violation of state law). Moreover, New York State has enacted legislation that specifically protects Gill's conduct: "Inmates shall not be disciplined for making written or oral statements, demands, or requests involving a change of insitutional conditions, policies, rules, regulations, or laws affecting an institution." N.Y. CORRECT. LAWW § 138(4); *see also Gaston v. Coughlin,* 81 F.Supp.2d at 386 (noting that the prisoner's "attempts to obtain redress of a perceived violation of State law" were protected under both the Constitution and New York law); *Salahuddin v. Harris,* 657 F.Supp. 369, 376 (S.D.N.Y.1987) (noting that § 138(4) "suggests that New York views the broad exercise of inmates' First Amendment rights as consistent with its own penological interests and the order and security of the inmate population). Thus, since clearly Gill's attempts to

seek redress of grievances is protected activity, it is worth repeating, "[i]t would be curious indeed for this Court to recognize the rights of inmates to petition for redress of grievances without fear of retaliation but deny [the inmate plaintiff] the same right in connection with his role in reviewing inmate grievances and ruling on them." *Alnutt,* 913 F.Supp. at 169-70.

15    Defendants similarly construe that an inmate's right to serve on a grievance committee is limited to the formal committee, namely, the IGRC. Dkt. No. 20 (arguing that "activities conducted as part of an informal problem resolution committee do not have the same protection" as IGRC activities, if protected, since "there is no case law supporting such an argument").

16    In researching the genesis of an inmate's right to serve on a grievance committee, the Court found an unpublished Tenth Circuit opinion where the court was asked to decide whether an inmate has a protected right to provide legal work on behalf of another inmate. *See Northington v. Zavaras,* 229 F.3d 1164 (Table), 2000 WL 1133128 (10th Cir. Aug. 10, 2000). The circuit court stated that precedence in that circuit mandated the holding that such a right was not acknowledged. *Id.* at *2. In so ruling, the court noted in a footnote that "other federal courts have held that, *if a state creates a position* such as inmate representative, it must allow the representative to engage in his duties without fear of retaliation." *Id.* (emphasis added) (citing, *inter alia, Alnutt* ). We mention this unpublished decision only to point out that we do not interpret *Alnutt* the same. While the court in *Alnutt* referenced the state creation of the IGRC, the constitutional right to serve on that committee was not derivative of the state created nature of the committee, but rather, on the nature of the inmates' rights to seek redress for grievances.

17    In any event, even if we were to find that an inmate is only protected for participation on a formal committee, it is not clear to this Court whether or not the Problem Solving Committee at Walsh RMU was a formal tribunal.

Defendants ask this Court to find that, in light of the Supreme Court decision in *Shaw v. Murphy,* 532 U.S. 223 (2001), the rulings of the various district courts in our Circuit that hold that an inmate's activities on a grievance committee are protected are "no longer with force." Dkt. No. 20 at p. 7. The Court declines this invitation and finds *Shaw* completely distinguishable.

First, *Shaw* concerned the constitutionality of a prison policy restricting inmate-to-inmate correspondence. In *Shaw,* Kevin Murphy, an inmate incarcerated at the Montana State Prison, served as an " 'inmate law clerk,' providing legal assistance to fellow prisoners." 532 U.S. at 225. Murphy learned that another inmate had been charged with assaulting a correctional officer and decided to assist the inmate with his defense. *Id.* Prison rules prohibited Murphy from providing assistance, but Murphy nonetheless investigated the alleged assault. *Id.* [18] Murphy then sent a letter to the accused inmate discussing his investigation. However, in accordance with prison policy, such correspondence was intercepted by prison officials. *Id.* at 225-26. Based upon the content of the letter, specifically, the accusations against the assaulted correction officer, Murphy was cited for violations of various disciplinary rules, and, after a hearing, was found guilty of violating two of those rules. *Id.* at 226.

<hr>

[18]   Prison policy forbade Murphy, a "high-security" inmate from meeting with maximum security inmates. *Murphy,* 532 U.S. at 225 n .1.

**\*11**  Before examining the Supreme Court's holding, we pause to point out some other distinctions, that is, in *Shaw* the inmate acted as a *legal representative* for inmates and sought to represent another inmate in court on his criminal charge of assault; whereas a representative on a grievance committee does not act as a legal representative, but rather, as a facilitator or adjudicator of grievances. Furthermore, the Court in *Shaw* was asked to decide "whether prisoners have *any* First Amendment rights when they send legal correspondence to one another." *Id.* (emphasis in original). Thus, the Court analyzed whether the prison policy at issue restricting inmate-to-inmate communications passed the constitutional test established in *Turner v. Safely,* 482 U.S. 78 (1987), which directs courts to ask wether the "restrictions are reasonably related to legitimate and neutral governmental objectives ." *Id.* (citing *Turner,* 482 U.S. at 89). Here, we are not asked to construe the constitutionality of any prison policy restricting Gill's communications.

In applying the *Turner* Test to the prison policy at issue, the Supreme Court in *Shaw* declined to afford First Amendment protection to inmates providing legal assistance to other inmates "beyond the protection normally accorded prisoners' speech." *Id.* at 231. We find such holding to be inapplicable to inmates participating on grievance committees in light of the fact that such participation and activities do not constitute legal work, but rather, involve a duty to investigate and adjudicate matters being grieved. Thus, it can hardly be said that a grievance committee member's role is analogous to an inmate performing legal work on behalf of other inmates. Taking this one step further, we also believe that the filing of an institutional grievance by an inmate on behalf of himself as well as others who share the same grievance is not comparable to providing legal assistance to other inmates. We also note that, as explained above, the right to serve as a grievance committee representative derives from an inmate's right to seek redress of grievances, a right undoubtedly protected by the Constitution.

The inmate in *Shaw* argued that his right to provide legal advice "follows from a right to receive legal advice." 532 U.S. at 231 n. 3. In response, the Supreme Court noted that "even if one right followed the other, Murphy is incorrect in his assumption that there is a free-standing right to receive legal advice." *Id.* (citing previous Supreme Court precedence limiting an inmate's right to receive legal advice from other inmates "only when it is a necessary means for ensuring a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." *Id.* (internal quotation marks and citations omitted). Neither the Supreme Court nor any court in our Circuit has similarly limited an inmate's right to seek redress of grievances.

**\*12**  Finding that Gill has satisfied the first prong, our analysis of his retaliation claims continues. Under the second prong, a prisoner must allege that the Defendants took adverse action against him. The third prong requires an assessment of whether there was a causal connection between the protected speech and the adverse action in that the alleged conduct was substantially motivated by the protected activity. To satisfy the second prong, a prisoner must present evidence inferring that Defendants acted with an improper motive. Such evidence may include: (1) temporal proximity between the protected activity and the alleged retaliatory act; (2) plaintiff's prior good disciplinary record; (3) plaintiff's vindication at his disciplinary hearing; and (4) defendants' statements regarding their motive for the discipline. *See Colon v. Coughlin,* 58 F.3d 865, 872-73 (2d Cir.1995). A plaintiff may meet this burden by presenting circumstantial evidence of a retaliatory motive, thus obviating the need for direct evidence. *Bennett v. Goord,* 343 F.3d 133, 139 (2d

Case 9:09-cv-00517-LEK-TWD   Document 113   Filed 06/16/17   Page 87 of 101

Cir.2003) (holding that plaintiff met his burden in proving retaliatory motive by presenting circumstantial evidence relating to, *inter alia,* the temporal proximity of allegedly false misbehavior reports and the subsequent reversal of the disciplinary charges on appeal as unfounded). "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d at 493). Otherwise, the retaliatory act is "*de minimis* and therefore outside the ambit of constitutional protection." *Dawes v. Walker,* 239 F.3d at 493. Furthermore, in satisfying the causal connection requirement, also known as temporal proximity, the allegations must be "sufficient to support the inference that the speech played a substantial part in the adverse action." *Id.* at 492 (cited in *Davis,* 320 F.3d at 353).

As stated above, the adverse conduct varies with each Defendant. First, with regard to Defendant Rosado, it is unclear to this Court the precise role Gill alleges Rosado played in retaliating against him. Stated another way, it is unclear what adverse action was taken by Rosado. Gill's bald assertion that Rosado conspired with other Defendants to deny Gill his constitutional rights is wholly conclusory. It is well settled that the personal involvement of a defendant is a prerequisite for the assessment of damages in a § 1983 action. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). Defendant Rosado's involvement is rather limited. According to Gill's Amended Complaint, he discussed his selection as C-2 representative with Rosado on or about September 1, 2002. Rosado then directed Gill to submit a grievance agenda for the upcoming meeting. Then, after his altercation with Defendant Riddick in the yard, Gill wrote Rosado a letter to confirm their previous conversation regarding his selection as a representative on the committee. Gill never received a response from Rosado. Then, Rosado was set to testify at Gill's hearing but was dismissed by the hearing officer. Based on the above facts, it has not been shown what *action* was taken by

Rosado. From these bare facts, we cannot draw the inference that Rosado actively impeded Gill's ability to participate on the committee. It is clear from the facts alleged that, at best, Rosado's failure to speak on Gill's behalf or answer his correspondence, if received, amounts to nothing more than indifference or inactiveness, which is clearly not a constitutional violation. Furthermore, the fact that Plaintiff may have written a letter does not automatically render Rosado responsible for any constitutional violation. *See Thomas v. Coombe,* 1998 WL 391143, at *6 (S.D.N.Y. July 13, 1998) (ignoring letter is insufficient for personal involvement); *Young v. Kihl,* 720 F.Supp. 22, 23 (W.D.N.Y. Sep. 22, 1989) (the wrong must have been capable of mitigation at the time the supervisory official was apprised thereof); *Woods v. Goord,* 1998 WL 740782 (S.D.N.Y. Oct. 23, 1998) (receiving letters or complaints does not automatically make a supervisor liable for the denial of medical care). Since Gill has not established any adverse conduct, he has failed to state a retaliation claim against Defendant Rosado. We therefore recommend dismissal of Gill's retaliation claim against Defendant Rosado.

**\*13** Turning to the other Defendants, Gill asserts that Defendants Riddick and Brown filed false misbehavior reports, Defendant Adamik found Plaintiff guilty of the false reports, and Defendant Saxena transferred Gill to another facility. In moving for dismissal, Defendants focus solely on Gill's transfer from a medical facility to a non-medical facility as the only retaliatory conduct at issue and that such conduct is not adverse where the Plaintiff has not alleged that "his medical needs can only be treated adequately at Walsh and not the facility to which he was transferred." Dkt. No. 20. In his Amended Complaint, Gill explains that upon his arrival at Walsh in June 2002, he was informed by Defendant Saxena that he had been transferred to Walsh due to his asthmatic condition and that he would remain at Walsh until his parole board appearance set for July 2003. The chronology of events unfolded as follows:

| | |
|---|---|
| September 1, 2002 | Gill and Rosado converse about his selection as representative; |
| September 4, 2002 | Gill circulates the grievance agenda; |
| September 7, 2002 | Confrontation between Defendant Brown and Gill; |

| September 10, 2002 | Confrontation between Defendant Riddick and Gill; |
|---|---|
| September 12, 2002 | Gill receives two misbehavior reports, one from Brown, the other |
| | from Riddick; |
| September 16, 2002 | Hearing on reports with Defendant Adamik presiding; |
| October 1, 2002 | Defendant Adamik finds Gill guilty and dispenses keeplock |
| | punishment for thirty days and corresponding loss of privileges; |
| October 17, 2002 | Gill transferred to another facility on Dr. Saxena's orders |
| April 15, 2003 | Disciplinary disposition overturned; records expunged. |

Based upon this chronology, and focusing on the temporal proximity of Gill's exercise of his constitutional rights and adverse action, coupled with the fact that his disciplinary disposition was overturned on appeal, we find that Gill's retaliation claims against Defendants Riddick, Brown, Adamik, and Saxena, raise at least a colorable suspicion of retaliation such that he is entitled to pursue some discovery. While it is true that Gill has not asserted that the medical care he received at another facility was inadequate, he has at least stated a claim that the transfer itself was improperly motivated. As such, he has stated a cause of action for retaliation.[19] Based on the above analysis, we recommend that Defendants' Motion for dismissal of Gill's retaliation First Amendment and substantive due process claims against Defendants Riddick, Brown, Adamik, and Saxena be denied and discovery proceed on these claims.

[19] We note that in situations where the defendant's actions are the result of both retaliatory and legitimate motives, the burden shifts to the defendants to show that they would have taken the same action absent the retaliatory motive. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citing *Mount Healthy Sch. Dist. v. Doyle,* 429 U.S. 274, 287 (1977)); *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994) (cited in *Carpio v. Walker,* 1997 WL 642543, at *6 (N.D.N.Y. Oct. 15, 1997)); *see also Gayle v. Gonyea,* 313 F.3d at 682 (defendant may successfully meet this burden of justification with

regard to a particular punishment by demonstrating that "plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report"). Thus, Defendants may pursue and defend their motives for their actions in a motion for summary judgment.

B. Procedural Due Process Claims

Gill asserts that Defendant Adamik violated Gill's constitutional rights when Adamik failed to conduct a fair and impartial hearing, denied Gill the opportunity to present his own witnesses, failed to issue a written statement as to the reason for such denial, and conspired with Defendants Riddick, Brown, and Rosado to violate Gill's First and Fourteenth Amendment rights. Gill also asserts that, in committing the conduct above, Defendant Adamik violated New York Correction Law § 138. As to Defendants Malloni and Perlman, Gill maintains that these Defendants violated his constitutional rights when Defendant Malloni destroyed Gill's notarized appeal of his disciplinary hearing and Defendent Perlman failed to render a timely decision on such appeal. It appears to this Court that the claims against these three Defendants center around the disciplinary hearing and are primarily rooted in Fourteenth Amendment Procedural Due Process.

**\*14** With regard to procedural due process allegations, we note that in order to state a due process claim

under § 1983, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)). Inmates' liberty interests are typically derived from two sources: (1) the Due Process Clause of the Fourteenth Amendment; and (2) state statute or regulations. *Id.* If the prisoner successfully establishes the presence of a protected liberty interest, he must then demonstrate that he was deprived of that interest without due process. *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998). If, however, no liberty interest is implicated, then *a fortiori,* our analysis ceases and the claim should be dismissed.

The deprivation at issue in this case is the thirty (30) day disciplinary sentence in keeplock with corresponding loss of privileges. Therefore, in order for the Court to assess the viability of the process Gill received at his hearing, Gill must initially show that he possessed a liberty interest in remaining free from keeplock and receiving recreation, packages, commissary, and phone privileges. As explained below, the Court finds that Gill cannot establish the existence of such a liberty interest and therefore cannot maintain procedural due process claims against Defendants Adamik, Malloni, and Perlman.

With regard to liberty interests arising directly under the Due Process Clause, the Supreme Court has "narrowly circumscribed its scope to protect no more than the 'most basic liberty interests in prisoners.' " *Arce v. Walker,* 139 F.3d at 333 (quoting *Hewitt v. Helms,* 459 U.S. 460, 467 (1983)). The Due Process Clause does not protect against "every change in the conditions of confinement having a substantial adverse impact" on inmates if those changes are "within the normal limits or range of custody which the conviction has authorized the state to impose." *Sandin v. Conner,* 515 U.S. 472, 478 (1995). Instead, the Due Process Clause protects against restraints or conditions of confinement that "exceed[ ] the sentence in ... an unexpected manner." *Id.* at 484 (quoted in *Arce v. Walker,* 139 F.3d at 333).

State statutes and regulations may also confer liberty interests on prisoners. *Arce v. Walker,* 139 F.3d at 334 (citing *Kentucky Dep't of Corr.,* 490 U.S. at 460). Such interests, however, are generally limited to those deprivations which subject a prisoner to "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. at 484; *see*

*also Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001) (citing *Sandin* ); *Welch v. Bartlett,* 196 F.3d at 392. Thus, a prisoner asserting that he was denied due process in connection with segregated confinement or a loss of privileges must make a threshold showing that his confinement or restraint (1) created an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," *Sandin,* 515 U.S. at 484, and (2) that the "state has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint," *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

**\*15** Clearly, the thirty-day sentence to keeplock and corresponding loss of privileges would not fall under the auspice of "the most basic liberty interests" and, therefore, Gill would not have a valid liberty interest arising under the Due Process Clause. As for a state created liberty interest, Gill fails to allege any facts demonstrating that the conditions surrounding his thirty-day punishment were "atypical" or "significant" as to create a liberty interest. As such, where no liberty interests are at stake, no procedures are required. *Kentucky Dep't of Corr.,* 490 U.S. at 460. Since Gill cannot establish he had a liberty interest in remaining free from the punishment imposed at the disciplinary hearing, the Court need not assess the adequacy of the process he received. Accordingly, Plaintiff has failed to state a procedural due process claim. *See Husbands v. McClellan,* 990 F.Supp. 214, 217 (W.D.N.Y.1998) (citing *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996) for the proposition that loss of privileges, *i.e.,* commisary, recreation, package, and telephone, did not amount to an atypical and significant deprivation and clearly fell within the expected parameters of the sentence imposed by a court of law); *see also Greenholtz v. Inmates of Nebraska Penal and Correctional Complex,* 442 U.S. 1, 9 (1979) ("There is a crucial distinction between being deprived of a liberty one has ..., and being denied a conditional liberty that one desires.") (quoted in *Rouccio v. Coughlin,* 923 F.Supp. 360, 371 (E.D.N.Y.1996)). We further note that, with regard to Defendant Rosado, Gill has failed to allege Rosado's personal involvement in any alleged due process violations. It is therefore, recommended that Defendant's Motion to Dismiss be granted and any procedural due process claims asserted against Defendants Adamik, Malloni, Perlman and Rosado be dismissed. Since we recommend dismissal of the claims

asserted against Defendants Perlman and Rosado, these Defendants should be dismissed from this lawsuit.


## C. Interference with Legal Mail

In his Fifth Cause of Action against Defendant Malloni, Gill asserts that Defendant Malloni also violated his First and Fourteenth Amendment rights when he tampered with Gill's "legal mail." In this regard, Gill analogizes his prison disciplinary appeal to legal mail and Malloni's interference therewith denied Gill access to the courts. Were we to draw the same analogy, we would nevertheless find such claim to be wholly conclusory and should be dismissed. *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987) ("[C]omplaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead a litany of general conclusions that shock but have no meaning."); *see also Cekic v. Coombe,* 2000 WL 1373136, at *1 (N.D.N.Y. Mar. 27, 2000) (quoting *Barr* ). Notably, Gill's legal mail claim fails to properly allege a cognizable cause of action for interference with legal mail since he only cites to this one instance, he has not pled malicious intent, and he cannot show that he was prejudiced by the interference in light of the fact that the appeal was ultimately decided in his favor.[20] *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003) (citing cases for the proposition that an isolated incident of tampering is insufficient to state a constitutional violation and in cases where the incidents are few and a violation is not patent, the plaintiff must specifically allege invidious intent or actual harm); *Cancel v. Goord,* 2001 WL 303713, at *4-6 (S.D.N.Y. Mar. 29, 2001) (citing *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986) for the proposition that a prisoner who asserts a First Amendment violation resulting from interference with mail must show that the prison officials "regularly and unjustifiably interfered with the incoming legal mail," and citing *Lewis v. Casey,* 518 U.S. 343, 353 (1996) for the proposition that "in order to survive a motion to dismiss a plaintiff must allege not only that the defendant's alleged conduct was deliberate and malicious, but also that the defendant's actions resulted in actual injury to the plaintiff such as the dismissal of an otherwise meritorious legal claim."). Accordingly, such claims, to the extent stated, should also be dismissed against Defendant Malloni. Since we recommend dismissal of the only claims asserted against Defendant Malloni, we accordingly recommend dismissal of Defendant Malloni from this lawsuit.

20    We also note that his claim against Defendant Malloni involves a significant leap in logic: *If* there was a delay in the decision, *then* Malloni interfered with his mail.


## D. Eighth Amendment Claims

**\*16** Gill asserts that Defendants Cacciotti and Watson violated his Eighth Amendment right to be free from cruel and unusual treatment when they denied him the opportunity to use the bathroom while en route to Elmira Correctional Facility and further tantalized him when he informed them that he had urinated on himself. According to the Complaint, Plaintiff boarded the transferring vehicle at approximately 9:30 a.m., he asked to use a bathroom at 11:00 a.m., and arrived at Elmira at approximately 12:10 p.m. Plaintiff's Eighth Amendment claim centers around the hour and ten minutes he was denied access to a lavatory.

The Eighth Amendment prohibits the infliction of cruel and unusual punishment and is applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Robinson v. California,* 370 U.S. 660, 666-67 (1962) (cited in *Tramell v. Keane, et al.,* 338 F.3d 155, 161 (2d Cir.2003)). The Eighth Amendment is violated only by those deprivations which deny "the minimal civilized measure of life's necessities." *Rhodes v. Chapman,* 452 U.S. 337, 347 (1981). Conditions of confinement rise to the level of an Eighth Amendment violation only when extreme deprivations are imposed. *Hudson v. McMillian,* 503 U.S. 1 (1992). A prisoner alleging that a certain prison condition constitutes cruel and unusual punishment must prove both an objective and subjective element, specifically, the inmate must show that the deprivation at issue is " 'objectively sufficiently serious' such that the plaintiff was denied 'the minimal civilized measure of life's necessities,' " and that the defendant possessed a " 'sufficiently culpable state of mind' associated with 'the unnecessary and wanton infliction of pain.' " *Trammell v. Keane,* 338 F.3d 155, 161 (2d Cir.2003) (quoting *Farmer v. Brennan,* 511 U.S. 825, 834 (1994)); *see also Wilson v. Seiter,* 501 U.S. 194 (1991). The objective component of an Eighth Amendment violation must be evaluated based on the severity of the deprivation imposed. *Graham v. Fries,* 1996 WL 1057212, at *8 (E.D.N.Y. Oct. 16, 1996). When considering whether a particular condition is so serious as to invoke the Eighth Amendment, a

court should assess the "duration of the condition and the potential for serious physical harm." *Whitted v. Lazerson,* 1998 WL 259929, at *2 (S.D.N.Y. May 21, 1998); *see also Graham v. Fries,* 1996 WL 1057212, at *8 ("While many conditions may be restrictive and harsh, they do not violate the Eighth Amendment unless they deprive inmates of the minimal civilized measures of life's necessities."). To prove the second, subjective component, a prisoner must establish that the person who inflicted the unconstitutional condition was "deliberately indifferent" to the severe deprivation. *Wilson v. Seiter,* 501 U .S. at 304-05.

Applying these standards to the case at bar, we find that, in accordance with case law in this circuit, "[t]he temporary deprivation of the right to use the toilet, in the absence of serious physical harm or a serious risk of contamination, does not rise to the level of an Eighth Amendment violation." *Whitted v. Lazerson,* 1998 WL 259929, at *2 (no violation where prisoner urinated and defecated on himself after being deprived the opportunity to use a toilet for approximately ninety minutes); *see also Odom v. Keane,* 1997 WL 576088, at *4-5 (S.D.N.Y. Sept. 17, 1997) (absence of a working toilet in prison cell for approximately ten hours, absent any allegation that the prisoner risked contamination by contact with human waste, did not rise to the level of cruel and unusual punishment); *Bourdon v. Roney,* 2003 WL 21058177, at *30-31 (N.D.N.Y. Mar. 6, 2003) (pre-trial detainee deprived of bathroom privileges for a maximum of three hours "failed to adequately allege that he was denied minimal necessities of civilized life for a substantial period of time").[21] Gill has not alleged any injury to his health as a result of being forced to hold his urine and any discomfort he experienced lasted only seventy minutes, at most. No matter how humiliating urinating on oneself can be, since Gill has failed to prove the objective component, we need not reach the subjective component because "without a constitutional violation, Defendants clearly could not have acted with "deliberate indifference." *Odom v. Keane,* 1997 WL 576088 (S.D.N.Y. Sept. 15, 1997). As such, Gill has failed to allege a cognizable cause of action under the Eighth Amendment. We therefore recommend granting Defendants' Motion to Dismiss as to this ground and, since this Eighth Amendment violation was the only cause of action asserted against Defendants Cacciotti and Watson, we recommend dismissing these Defendants from this lawsuit.

21  Plaintiff's reference to *Hope v. Pelzer,* 536 U.S. 730 (2002), in support of his Eighth Amendment claim is misplaced. The plaintiff in *Hope* had been handcuffed, naked, to a hitching post for seven hours and was exposed to an extraordinary summer sun. Here, the discomfort Gill experienced lasted, at most, seventy minutes.

### D. Qualified Immunity

**\*17** As an affirmative defense, Defendants Riddick, Brown, Rosado, Saxena, Cacciotti, and Watson assert they are entitled to qualified immunity. Because we have already recommended dismissal of the Eighth Amendment claims asserted against Cacciotti and Watson, and the retaliation/due process claims against Defendant Rosado, we need not address the applicability of any immunity doctrine. *Saucier v. Katz,* 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."). However, with regard to Defendants Riddick, Brown, and Saxena, since a constitutional violation has been established, at least at this limited stage of the litigation, we may proceed with an assessment of immunity.

The doctrine of qualified immunity shields public officials from suit for conduct undertaken in the course of their duties if it "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Firzgerald,* 457 U.S. 800, 818 (1982); *Eng v. Coughlin,* 858 F.2d 889, 895 (2d Cir.1988). The doctrine protects public officials from 'personally facing the risk of incurring ruinous liability in the form of money damages, which would deter qualified people from public service." *Eng,* 858 F.2d at 895.

Qualified immunity analysis involves a three step inquiry. *See Harhay v. Town of Ellington Bd. of Ed.,* 323 F.3d 206, 211 (2d Cir.2003). As a threshold matter, it must first be determined whether, based upon the facts alleged, a plaintiff has established a constitutional violation. *Id.* If yes, the court must then question whether the right in issue was clearly established at the time of the alleged violation. *Id.* (citing *Saucier v. Katz,* 533 U.S. 194, 201-02 (2001)). Finally, if a plaintiff had a "clearly established, constitutionally protected right that was violated, he or she must demonstrate that it was not objectively

reasonable for the defendant to believe that his action did not violate such law." *Gill v. Hoadley,* 261 F.Supp.2d 113, 125 (N .D.N.Y.2003) (citing, *inter alia, Harhay,* 323 F.3d at 211); *see also Anderson v. Creighton,* 483 U.S. 635, 639 (1987); *Lewis v. Cowan,* 165 F.3d 154, 166 (2d Cir.1999).

Qualified immunity is an affirmative defense that must be pleaded by the official claiming it. *Satchell v. Dilworth,* 745 F.2d 781, 784 (2d Cir.1984) (citing *Harlow v. Fitzgerald,* 457 U.S. at 815). The only pleadings filed in the present case, thus far, are the Original and Amended Complaints. Defendants have not raised this affirmative defense in a responsive pleading as set forth in FED. R. CIV. P. 8(c), but rather have done so in their Memorandum of Law in support of their Motion to Dismiss. Generally, however, "the defense of qualified immunity cannot support the grant of a ... 12(b)(6) motion for failure to state a claim upon which relief can be granted." *Green v. Maraio,* 722 F.2d 1013, 1018 (2d Cir.1983); *see also McKenna v. Wright,* 2004 WL 2334909, at *2 (2d Cir. Oct. 18, 2004) (quoting *Green* ). An exception to this general rule exists where the complaint itself sets up, on its face, the qualified immunity defense; in such an occasion, dismissal for failure to state a claim would be appropriate. *Roniger v. McCall,* 22 F.Supp.2d 156, 162 (S.D.N.Y.1998) (citing *Green v. Maraio,* 722 F.2d at 1019); *see also McKenna v. Wright,* 2004 WL 2334909.

**\*18** The Second Circuit has further held that qualified immunity "turns on factual questions that cannot be resolved at [the motion to dismiss] stage of proceedings." *Taylor v. Vermont Dep't of Ed.,* 313 F.3d 768, 793 (2d Cir.2002). For these reasons, any adjudication as to the applicability of the qualified immunity affirmative defense would be premature since "[r]esolution of qualified immunity depends on the determination of certain factual questions that cannot be answered at this stage of the litigation." *Denton v. McKee,* 332 F.Supp.2d 659, 666 (S.D.N.Y.2004).

Essentially, Defendants contend that it was not clearly established that an inmate has a First Amendment right to participate on an informal grievance committee and that the Supreme Court ruling in *Shaw* suggests otherwise. As explained above, we do not agree with the Defendants assessments and find that the conduct engaged in was clearly protected. However, the Court declines to fully adjudicate this affirmative defense until some discovery has been undertaken in this case. Further development

of the retaliation claims would put this Court in a better position to assess this defense and would provide Defendant Adamik the opportunity to assert this defense on his behalf. [22]

[22]    As noted above, the Defendants did not construe the Amended Complaint to have stated a retaliation claim against Defendant Adamik.

WHEREFORE, based on the foregoing, it is hereby

RECOMMENDED, that Defendants' Motion to Dismiss (Dkt. No. 20) should be denied in part as to Plaintiff's retaliation claims set forth against Defendants Riddick, Brown, Adamik, and Saxena, and these Defendants should be directed to file a response to Plaintiff's Amendment Complaint; and it is further

RECOMMENDED, that Defendants' Motion to Dismiss be granted in part as to Plaintiff's retaliation claims against Defendant Rosado; and it is further

RECOMMENDED, that Defendants' Motion to Dismiss be granted in part as to all due process claims asserted against Defendants Adamik, Perlman, Rosado, and Malloni; and it is further

RECOMMENDED, that Defendants' Motion to Dismiss be granted in part as to all Eighth Amendment claims asserted against Defendants Cacciotti and Watson; and it is further

RECOMMENDED, that if all the above recommendations are accepted, then Defendants Rosado, Perlman, Malloni, Cacciotti, and Watson be dismissed from this action as all claims against them have been dismissed; and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court.

*FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE*

2005 WL 755745

*REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b), 6(a), & 6(e).

**\*19** IT IS SO ORDERED

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 755745

---

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:09-cv-00517-LEK-TWD    Document 113    Filed 06/16/17    Page 94 of 101
Shaheen v. Filion, Not Reported in F.Supp.2d (2006)
2006 WL 2792739

2006 WL 2792739
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Marvin Smith SHAHEEN, Plaintiff,
v.
Gary FILION, Superintendent; Joan Smith, Deputy
Superintendent; Lt. Perez; J. Funk; Jochomas,
Correctional Officer; and John Doe, Defendants.

No. 9:04-CV-625 (FJS/DRH).
|
Sept. 5, 2006.
|
Sept. 17, 2006.

**Attorneys and Law Firms**

Marvin Smith Shaheen, Portchester, NY, Plaintiff, Pro se.

Hon. Eliot Spitzer, Attorney General for the State of
New York, Stephen M. Kerwin, Esq., Assistant Attorney
General, of counsel, Albany, NY, for Defendants.

### *DECISION AND ORDER*

FREDERICK J. SCULLIN, JR., S.J.

**\*1** The above-captioned matter having been presented to
me by the Report-Recommendation of Magistrate Judge
David R. Homer filed September 5, 2006, and the Court
having reviewed the Report-Recommendation and the
entire file in this matter, and no objections to said Report-
Recommendation having been filed, it is hereby

**ORDERED,** that the Report-Recommendation of
Magistrate Judge David R. Homer filed September 5,
2006 is **ACCEPTED** in its entirety, for the reasons stated
therein; and it is further

**ORDERED,** that Defendants' motion for summary
judgment is **GRANTED,** as to defendants Filion, Smith,
Horton, Perez and Funk and as to both of Shaheen's
causes of action, and it is further

**ORDERED,** that the complaint is **DISMISSED** without
prejudice as to defendants John Doe and Jochomas, and
it is further

**ORDERED,** that this action is **TERMINATED** in its
entirety as to all defendants and all claims.

**IT IS SO ORDERED.**

DAVID R. HOMER, Magistrate Judge.

### REPORT-RECOMMENDATION AND ORDER [1]

[1]     This matter was referred to the undersigned for report
and recommendation pursuant to 28 U.S.C. § 636(b)
and N.D.N.Y.L.R. 72.3(c).

Plaintiff pro se Marvin Smith Shaheen ("Shaheen"),
formerly an inmate in the custody of the New York
State Department of Correctional Services (DOCS),
brings this action pursuant to 42 U.S.C. § 1983
alleging that defendants, seven DOCS employees, violated
his constitutional rights under the First, Fifth, and
Fourteenth Amendments. Compl. (Docket No. 1).
Presently pending are the motions of five defendants [2]
for summary judgment pursuant to Fed.R.Civ.P. 56 or to
dismiss for failure to prosecute pursuant to Fed.R.Civ.P.
41(b). Docket No. 34. Shaheen opposes both motions.
Docket No. 40. For the reasons which follow, it is
recommended that defendants' motion be granted. It
is also recommended that the complaint be dismissed
without prejudice as to the two unserved defendants.

[2]     Filion, Smith, Horton, Perez, and Funk.

### I. Background

The facts are presented in the light most favorable to
Shaheen as the non-moving party. *See Ertman v. United
States,* 165 F.3d 204, 206 (2d Cir.1999).

At all relevant times, Shaheen was incarcerated
at Coxsackie Correctional Facility ("Coxsackie"). In
November 2003, Shaheen was elected Chairman of the
Inmate Liaison Committee ("ILC"). Filion Decl. (Docket
No. 34) at ¶ 5. On November 25, 2003, Shaheen was
punched in the face by another inmate in the ILC office.
Funk Decl. (Docket No. 34) at Ex. A. Corrections

Shaheen v. Filion, Not Reported in F.Supp.2d (2006)
Case 9:09-cv-00517-LEK-TWD    Document 113    Filed 06/16/17    Page 95 of 101
2006 WL 2792739

officers responded and Shaheen was issued an inmate misbehavior report for fighting and violent conduct. *Id.* On December 1, 2003, a hearing on the charges was held. Smith Decl. (Docket No. 34) at Ex. A. During the hearing, Shaheen did not request any witnesses or documents and was the only witness to testify. *Id.* at ¶ 5, Ex. A; Pl. Reply Statement of Material Facts (Docket No. 40) at ¶¶ 8-10. Defendant Smith, the hearing officer found Shaheen guilty and sentenced him to sixty days of keeplock, [3] sixty days loss of recreation, and thirty days loss of telephone, commissary, and packages. Smith Decl. at ¶ 5. Shaheen was also removed from his position as ILC chairman. Filion Decl. at ¶ 12. On administrative appeal, the determination was overturned but only after Shaheen had completed service of the punishment. Pl. Reply Statement of Material Facts at ¶ 14. This action followed.

[3]    "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." *Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995); N.Y. Comp.Codes R. & Regs. tit. 7, § 301.6 (1995).

## II. Discussion

**\*2** Shaheen asserts two causes of action against all defendants. The first alleges that defendants retaliated against him after he wrote newspaper articles criticizing prison officials. The second alleges that defendants violated his due process rights in the disciplinary proceedings. Defendants seek judgment and dismissal for both claims.

### A. Summary Judgment Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law.

*Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.* 22 F.3d 1219, 1223-24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988). When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. *Id.* [4] However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247-48.

[4]    Notwithstanding his pro se status, Shaheen has significant experience in litigation having filed at least twenty-one other federal actions in the last eighteen years. *See U.S. Party/Case Index* (visited Aug. 30, 2006) <http://pacer.uspci.uscourts.gov/cgibin/dquery.pl>.

### B. Retaliation

Shaheen contends that defendants placed him in keeplock and removed him from his position as chairman of the ILC in retaliation for writing newspaper articles and filing complaints criticizing prison officials. Defendants contend that this claim is without merit.

In order to prevail on a retaliation claim, a plaintiff must first assert that the plaintiff's conduct was constitutionally protected and that this conduct was a "substantial factor" that caused the adverse action against plaintiff. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977). The burden then shifts to the defendant to show that by a preponderance of the evidence, the adverse action would have resulted even in the absence of the protected conduct. *Id.; see also Dawes v. Walker,* 239 F.3d 489, 492 (2d. Cir.2001), *overruled on other*

*grounds,* *Swierkiewicz v. Sorema,* 534 U.S. 506 (2002). Retaliation claims are actionable because the conduct may tend to chill an individual's exercise of constitutional rights. *Dawes,* 239 F.3d at 491. However, courts must view retaliation claims with care and skepticism to avoid judicial intrusion into prison administration matters. *Id.*

**\*3** Here, Shaheen's writing of articles critical of prison officials and his complaints to prison officials in his capacity as the chairman of the ILC were clearly assertions of his constitutional rights protected by the First Amendment. *See Simmat v. Manson,* 535 F.Supp. 1115, 1117-18 (D.Conn.1982) ( "[prisoner's] first amendment right to freedom of expression encompasses the right to express himself without punitive retaliation."). Shaheen claims that the adverse action which resulted from this conduct was defendants' filing of a false misbehavior report that resulted in Shaheen spending sixty days in keeplock. In order for any action to constitute adverse action, a plaintiff must establish that the adverse action would deter a similarly situated individual from exercising his or her constitutional rights. *Dawes,* 239 F.3d at 491. It is reasonably possible that other inmates would fail to exercise their constitutional right to criticize prison officials for fear that they would be subjected to false misbehavior reports and sentenced to keeplock. Thus, the disciplinary action and Shaheen's placement in keeplock at least present questions of fact whether they constitute adverse actions.

However, Shaheen fails to show a causal connection between his criticism of prison officials and the alleged filing of a false misbehavior report because he only offers conclusory evidence to support his claim that defendants were aware of his criticism of the prison. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983); *see also Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003). Shaheen provides no evidence to demonstrate that any defendant had any knowledge of his complaints against prison officials prior to the filing of the misbehavior report. In response to Shaheen's allegations, each moving defendant had provided a declaration stating that he or she was unaware of any of Shaheen's writings that criticized prison officials and conditions. *See* Filion Decl. at ¶ 9; Funk Decl. at ¶ 5; Horton Decl. (Docket No. 34) at ¶ 7; Perez Decl. (Docket No. 34) at 4; Smith Decl. at ¶ 3. Thus, because Shaheen offers only conclusory evidence to support his claim, he has failed to demonstrate a causal connection

between the constitutionally protected conduct and the alleged adverse action.

Therefore, it is recommended that defendants' motion on this ground be granted.

### C. Due Process

As a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property. *See Perry v. McDonald,* 280 F.3d 159, 173 (2d Cir.2001). To determine whether an inmate possessed a protected liberty interest, a prisoner must satisfy the standard set forth in *Sandin v. Conner,* 515 U.S. 472, 483-84 (1995). This standard requires a prisoner to establish that the confinement was atypical and significant in relation to ordinary prison life. *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). Here, Shaheen concedes that his time in keeplock was not atypical, stating "plaintiff has never presented or suggested that his confinement was atypical and significant hardship." Pl. Reply Mem. of Law (Docket No. 40) at 21. Thus, by his own admission, Shaheen has failed to establish the existence of a protected liberty interest. [5]

---

[5]     Shaheen also concedes that his position as Chairman of the ILC does not constitute a protected liberty interest. Pl. Reply Mem. of Law at 20 ("Next addressing the defendants claim that plaintiff had no liberty interest in my position as ILC chairman which they are totally correct ...").

**\*4** Accordingly, it is recommended that defendants' motion on this ground be granted.

### D. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability insofar as their conduct does not violate clearly established constitutional law of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229-30 (N.D.N.Y .2002), *aff'd,* 80 Fed.Appx. 146 (2d Cir.

Nov. 10, 2003). A court must first determine that if plaintiff's allegations are accepted as true, there would be a constitutional violation. Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, the second prong of the inquiry need not be reached because, as discussed *supra,* accepting all of Shaheen's allegations as true, he has not shown that defendants violated his constitutional rights.

Therefore, defendants' motion for summary judgment on this alternative ground should be granted.

### III. Failure to Prosecute

Defendants contend in the alternative that Shaheen's failure to inform the court of his new address after his release from Coxsackie requires dismissal of his claim for failure to prosecute.

Rule 41(b) of the Federal Rules of Civil Procedure provides that a court may dismiss an action based upon the failure of a plaintiff to prosecute an action, comply with an order of the court, or notify the court of a change of address. *See Link v. Wabash R.R. Co.,* 370 U.S. 626, 629 (1962); *MTV Networks v. Lane,* 998 F.Supp. 390, 393 (S.D.N.Y.1998); *see also* N.D.N.Y.L.R. 41.2(b). Local Rule 10.1(b)(2) provides that all pro se litigants must notify the Court of any change of address. *See Moshier v. Trabout,* No. 96-CV-1666, 1998 WL 167298, at *1 (N.D.N.Y. Apr. 2, 1998). Here, subsequent to defendants' motion for summary judgment, Shaheen filed a response in opposition to defendants' motion and a notice of a change of address. *See* Docket Nos. 40, 41. Thus, Shaheen clearly has not abandoned his claim and dismissal would be an unduly harsh remedy. *See LeSane v. Hall's Sec. Analyst, Inc.,* 239 F.3d 206, 209 (2d Cir.2001) (Rule 41(b) dismissal is a harsh remedy to be used only in extreme circumstances).

Therefore, defendants' motion on this ground should be denied.

### IV. Failure to Serve Defendants Doe and Jochomas

Shaheen's complaint asserts claims against John Doe, a defendant who has neither been identified nor served with the complaint. Rule 4(m) of the Federal Rules of Civil Procedure requires that service of process be effectuated within 120 days of the date of the filing of the complaint. *See also* N.D.N.Y.L.R. 4.1(b). Because defendant John Doe has not been identified by Shaheen or timely served with process, it is recommended that the complaint be dismissed without prejudice against this defendant.

**\*5** As to defendant Jochomas, a summons for service of process upon Jochomas was issued on June 3, 2004. Docket Entry dated 6/3/04. The summons was returned unexecuted as to Jochomas on July 7, 2004. Docket No. 7. More than 120 days have passed since the summons for Jochomas was issued. Accordingly, it is also recommended that the complaint be dismissed as to Jochomas without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b).

### V. Conclusion

For the reasons stated above, it is hereby

**RECOMMENDED** that:

   1. Defendants' motion for summary judgment (Docket No. 34) be **GRANTED** as to defendants Filion, Smith, Horton, Perez, and Funk and as to both of Shaheen's causes of action;

   2. The complaint be **DISMISSED** without prejudice as to defendants John Doe and Jochomas; and

   3. This action therefore be **TERMINATED** in its entirety as to all defendants and all claims.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**Shaheen v. Filion, Not Reported in F.Supp.2d (2006)**
2006 WL 2792739

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 2792739

---

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 2743835
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Orlando ADAMES, Plaintiff,

v.

NEW YORK CITY DEPARTMENT
OF CORRECTIONS, Defendant.

No. 07 Civ. 4021(GBD).
|
July 14, 2008.

*MEMORANDUM DECISION AND ORDER*

GEORGE B. DANIELS, District Judge.

**\*1** *Pro se* plaintiff, Orlando Adames, commenced this action, pursuant to 42 U.S.C. § 1983 and the Fifth, Eighth, and Fourteenth Amendments, against the New York City Department of Corrections ("DOC"), alleging inadequate conditions of confinement while incarcerated at the George R. Vierno Center ("GRVC") on Riker's Island. To maintain a cause of action under 42 U.S.C. § 1983, plaintiff must allege: (i) a violation of a federal statute or constitutional right and (ii) must show that the alleged deprivation was committed by a person "acting under the color of state law." *West v. Atkins,* 487 U.S. 42, 48 (1988). Plaintiff alleges overcrowding, abuse of solitary confinement, lack of recreational opportunities, inadequate supplies for personal hygiene, inadequate access to the law library, overly restricted visitation periods, and exposure to unnecessary health risks.

Defendant moved to dismiss pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that: (1) the only defendant DOC is not a suable entity; (2) plaintiff failed to exhaust administrative remedies as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e; (3) plaintiff lacks standing to bring certain claims; (4) plaintiff failed to state a § 1983 claim as his claims do not rise to the level of a constitutional deprivation; and, (5) plaintiff failed to file requisite notice of supplemental claims for money damages under state law.

During plaintiff's detention at the GRVC, he served as a member of the Inmate Liason Committee. Plaintiff alleges numerous problems with confinement conditions while he was incarcerated at the GRVC as a pretrial detainee. Plaintiff contends that in his capacity as an inmate representative, plaintiff frequently met with the facility's warden and other lesser officials, and during such meetings made several complaints on behalf of himself and the inmate population regarding the conditions there. Plaintiff alleges that he filed formal grievances concerning all of these issues. Plaintiff alleges that after receiving no response to his grievances, he filed repeated grievances about the same issues. After filing several rounds of grievances, plaintiff alleges that he was told to "stop filing complaints or else." Compl. 4. Plaintiff further alleges that he brought all of the same issues to the attention of the warden of GRVC during an inmate counsel meeting. Plaintiff is no longer being held at the GRVC and is now in state custody at the Oneida Correctional Facility in Rome, New York. Without elaborating, plaintiff argues that he made reasonable attempts to pursue his grievances to the next level, but that they were met with silence by defendants.

Plaintiff never fully exhausted his administrative remedies. The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997, bars litigation in federal courts by inmates complaining about prison conditions pursuant to 42 U.S.C. § 1983 "until such administrative remedies as are available are exhausted." *Id.* § 1997e(a). This exhaustion requirement is mandatory, requiring a plaintiff to pursue all available administrative review to the highest level of authorized officials before filing a federal action, and applies "to all inmate suits about prison life, whether they involve general circumstances or particular episodes." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *see also Giano v. Goord,* 380 F.3d 670, 677 (2d Cir.2004).

**\*2** Exhaustion is required even when the relief sought, like money damages, is unavailable through administrative channels. *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 2382-83 (2006). Where such administrative procedures exist, a plaintiff's failure to exhaust may not be excused except where defendants have forfeited the defense of exhaustion, defendants themselves have inhibited exhaustion, or other "special circumstances" justify the plaintiff's failure to comply with the procedures. *Macias v. Zenk,* 495 F.3d 37, 41 (2d Cir.2007). In

*Hemphill v. New York,* 380 F.3d 680 (2d Cir.2004), the Second Circuit articulated a three-part inquiry courts must conduct in reviewing a defense of a prisoner's failure to exhaust administrative remedies. The court must examine whether: (1) such remedies were in fact available to the inmate; (2) the defendants may have forfeited the defense by failing to preserve it; and, (3) the defendants' own actions inhibited the prisoner from exhausting available remedies and thus estop defendants from asserting plaintiff's failure to exhaust. *See id.* at 686.

Here, the established administrative remedies of the DOC were available to plaintiff at GRVC. The DOC addresses inmate grievances through its Inmate Grievance Resolution Program ("IGRP"), which has a five-step procedure. (Decl. of Deborah A. Dorfman 6-7 (citing 7 N.Y.C.R.R. § 701).) This process applies to grievances that concern facility conditions. *See, e.g., Wesley v. Hardy,* 2006 WL 3898199 (S.D.N.Y.2006). First, an inmate must file a grievance with the Inmate Grievance Review Committee ("IGRC"). The IGRC must attempt to resolve the grievance informally within five days. Second, if the grievance is not thereby resolved, the inmate may request a formal hearing, and the IGRC must issue a recommendation within three working days. Third, the inmate may appeal the IGRC's recommendation to his warden, who is required to render a decision within five working days. Fourth, the inmate may appeal the warden's decision to the Central Office Review Committee ("CORC"), which is to render a decision within fifteen working days. Finally, the CORC's decision may be appealed to the Board of Correction, which renders a final decision. *See, e.g., Bligen v. Griffen,* 2007 WL 430427 (S.D.N.Y.2007).

Plaintiff availed himself of only the first step in the established grievance procedure, by filing an initial grievance. Plaintiff did not obtain a response, nor did he request a formal hearing. Instead, plaintiff alleges that he followed up his initial grievances by filing repeated grievances regarding the same conditions. Plaintiff further alleges that he presented all of his grievances to the warden. The Second Circuit recently held that filing claims to " '[a]lert the prison officials as to the nature of the wrong for which redress is sought' ... does not constitute 'proper exhaustion.' " *Macias,* 495 F.3d at 37 (quoting *Braham v. Clancy,* 425 F.3d 177, 184 (S.D.N.Y.2005) (overruled in part by this case) and citing *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 2388 (2006)) (holding that plaintiff

"cannot satisfy the PLRA's exhaustion requirement solely by filing two administrative tort claims, or by making informal complaints to the MDC's staff"). The Second Circuit reasoned that "notice alone is insufficient because '[t]he benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance' and '[t]he prison grievance system will not have such an opportunity unless the grievant complies with the system's critical procedural rules.' " *Id.* (citing *Woodford,* 126 S.Ct. at 2388). Plaintiff has not given the IGRP its full opportunity to resolve the grievances.

**\*3** Although plaintiff may have grieved several issues multiple times, he did not pursue any of the subsequent four steps in the grievance resolution process. Plaintiff failed to exhaust the DOC's five-step grievance procedure. The IGRP directive states that "if the [initial] grievance is not informally resolved, the inmate may request a formal hearing." (Decl. of Deborah A, Dorfman 6 (citing 7 N.Y.C.R.R. § 701).) Plaintiff never requested such a hearing. Plaintiff failed to establish that he made reasonable effort to exhaust administrative procedures. *See Arce v. Keane,* 2004 WL 439428 (S.D.N.Y.2004). There is no evidence that the defendant waived its exhaustion defense, or prevented or frustrated plaintiff's attempt to fully utilize the grievance procedure. No special circumstances exist that would justify his failure to follow the DOC grievance procedures. Plaintiff simply did not comply with the PLRA's exhaustion requirement. [1]

---

[1]   To the extent that plaintiff seeks to assert claims against the DOC as sole defendant, the DOC would be a non-suable entity. The proper defendant would be the City itself. *See* N.Y.C. Charter § 396 ("All actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the [C]ity of New York and not in that of any agency, except where otherwise provided by law."); *Hyde v. Arresting Officer Caputo,* No. 98 Civ. 6722, 2001 WL 521699, at \*2 (E.D.N.Y. May 11, 2001); *Morris v. New York City Police Department,* No. 98 Civ. 6607, 1999 WL 1201732, at \*3 (S.D.N.Y. Dec. 14, 1999).

Defendant's motion to dismiss is GRANTED. This case is DISMISSED.

SO ORDERED:

2008 WL 2743835

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 2743835

---

**End of Document**                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.